# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| IN RE BP SHAREHOLDER DERIVATIVE LITIGATION | )    **MDL NO. 2185**<br>)<br>)    **Case No. 4:10-cv-03447**<br>)<br>)<br>) |
| In Re: BP P.L.C. SECURITIES LITIGATION | )    **Civil Action No. 4:10-md-2185**<br>)<br>)<br>)    **HON. KEITH P. ELLISON**<br>) |

## VERIFIED CONSOLIDATED AMENDED
## SHAREHOLDER DERIVATIVE COMPLAINT

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................ 2

II. JURISDICTION AND VENUE ................................................................................ 10

III. PARTIES ................................................................................................................... 10

    A. Plaintiffs ........................................................................................................ 10

    B. Nominal Defendant ........................................................................................ 11

    C. Individual Defendants .................................................................................... 12

        1. Executive Director Defendants .......................................................... 12

        2. Non-Executive Director Defendants .................................................. 14

        3. Chairmen and Presidents of BP America ........................................... 18

IV. BP SUFFERS A DECADE OF CATASTROPHIC SAFETY FAILURES
     UNDER DEFENDANTS' LEADERSHIP .............................................................. 18

    A. Overview of BP's Operations ........................................................................ 18

    B. The Extensive Regulation of BP's Business .................................................. 20

    C. Defendants Seek to Increase Earnings by Cutting Budgets at the Expense of
       Safety ............................................................................................................. 21

        1. Defendants Focus on Exploring Large Oil Fields in Inaccessible Places and
           Merge with Amoco to Access U.S. Markets and Resoureces .................... 21

        2. BP CEO John Browne: "More for Less" ........................................... 23

        3. Defendants Implemented a Top-Down Compensation Policy That Reward
           Cutting Costs at the Expense of Process Safety .................................... 24

    D. 2003 – 2007: Multiple Disasters and Near-Misses Warn and Inform Defendants
       that They Need to Change BP's Safety Culture ............................................. 27

        1. 2003 – *Forties Alpha* Near-Miss ...................................................... 27

        2. 2005 – Texas City Disaster ................................................................ 28

        3. 2005 – Thunder Horse Near-Miss ...................................................... 31

i

4. 2006 – Prudhoe Bay Spill ............................................................. 33

5. 2006 – Unsafe Refinery Operations in Ohio................................... 37

E. U.S. Governmental Agencies and Experts Repeatedly Warn Defendants to Change BP's Safety Culture ......................................................... 38

1. The Baker Report........................................................................... 38

2. The U.S. Chemical Safety and Hazard Investigation Board Report........... 42

3. The Booz Allen Report ................................................................. 46

F. 2007-2010 – Defendants Ignore Warnings and Do Not Change BP's Safety Culture......................................................................................... 48

1. CEO Tony Hayward Perpetuates the Strategy of Promoting Financial Performance over Process Safety.................................................. 48

2. BP Continues to Pay Record Safety Fines ................................... 50

G. The *Deepwater Horizon* Disaster ......................................................... 52

V. THE BP BOARD'S DUTIES ........................................................................ 57

VI. DEFENDANTS CONSCIOUSLY BREACH THEIR DUTIES BY REFUSING TO CORRECT BP'S LIFE-THREATENING SAFETY CULTURE ....................... 60

A. Defendants Consciously Ignore Numerous "Red Flags" Warning them of BP's Potentially Ruinous Safety Issues ...................................................... 60

B. Investigatory Reports Confirm that Defendants' Decisions and Deliberate Inaction are the Root Cause of the *Deepwater Horizon* Disaster ....................... 69

C. Another Disaster Could Spell the End for BP ...................................... 71

VII. THE ACTION IS PROPERLY BEFORE THIS COURT ........................... 74

VIII. DERIVATIVE ALLEGATIONS.................................................................... 78

A. Plaintiffs Bring This Action in Good Faith on Behalf of BP................ 78

B. Plaintiffs Were Not Required To Make a Pre-Suit Demand................. 79

C. Demand is Excused Because the Director Defendants' Conduct Was Not a Valid Exercise of Business Judgment ...................................... 80

D. Demand Is Excused Because a Majority of the Board Is Conflicted and Could Not Fairly Consider a Demand ................................................. 81

1.  The Executive Directors Implemented the Board's Strategy to Cut Costs at the Expense of Process Safety, Reaping Substantial Financial Benefits .......................................................................... 82

2.  The Non-Executive Directors Consciously Ignore Multiple Accidents and Urgent Warnings to Change BP's Process Safety................................. 83

IX.   CLAIMS FOR RELIEF ........................................................................... 86

X.   PRAYER FOR RELIEF ........................................................................... 93

This shareholder derivative action is brought in the name, and on behalf, of BP plc ("BP" or the "Company") by shareholders of BP, including Louisiana Municipal Police Employees' Retirement System ("LAMPERS"), City of New Orleans Employees' Retirement System ("NOERS"), and John P. Miles ("Miles") (collectively, "Plaintiffs"), by and through their undersigned counsel.[1]

The allegations in this verified consolidated amended shareholder derivative complaint (the "Complaint") are made upon Plaintiffs' personal knowledge with regard to their own acts and upon information and belief as to all other matters based upon due investigation of counsel. Plaintiffs' information and belief is based upon, among other things, the investigation by Court-appointed co-lead counsel, Bernstein Litowitz Berger & Grossmann LLP and Kahn Swick & Foti, LLC and other counsel retained by Plaintiffs, which includes, among other things: (a) review of public statements and filings with the U.S. Securities and Exchange Commission ("SEC") by officers and representatives of the Company; (b) investigation reports by, amongst others, the U.S. Chemical Safety and Hazard Investigation Board, the investigation panel chaired by James A. Baker III, and the U.S. Occupational Safety and Health Administration ("OSHA"); (c) testimony of BP representatives during hearings held by the U.S. Congress; (d) testimony of BP representatives before the U.S. Minerals Management Service and the U.S. Coast Guard; and (e) discovery in *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179 (E.D. La.). Plaintiffs believe additional evidentiary support will exist for their allegations after a reasonable opportunity for discovery.

---

[1] Throughout the complaint, emphasis in quotations has been added, unless otherwise indicated. "¶__" refers to corresponding paragraph(s) in this complaint. A full list of the shareholder plaintiffs is set forth in ¶¶ 26-29 below.

*From the top of the company, starting with the Board and going down … BP has not provided effective process safety leadership and has not adequately established process safety as a core value.*
(The Baker Panel Report, January 2007)

*BP Group Board did not provide effective oversight of the company's safety culture and major accident prevention programs.*
(U.S. Chemical Safety and Hazard Investigation Board describing "root causes" of Texas City Disaster, March 2007)

*Two refineries owned by oil giant BP account for 97 percent of all flagrant violations found in the refining industry by government safety inspectors over the past three years.*
(Center for Public Integrity, *Renegade Refiner: OSHA Says BP Has "Systemic Safety Problem,"* May 2010)

*There comes a point where the events conspire to basically show federal regulators that a particular company, for whatever reason, has no intent of complying with U.S. law and regulations.*
(U.S. EPA debarment attorney Jeanne Pascal reflecting on BP's criminal convictions in Texas City, Endicott Bay, and Prudhoe Bay, October 2010)[2]

## I.    INTRODUCTION

1.    The oil industry faces well-known and material operational risks. Safety violations that might be considered minor infractions in less dangerous industries can cause devastating accidents on an oil rig or in a refinery. The decision to cut maintenance budgets may have deadly consequences if, as a result, a company elects to no longer test fluid-level indicators and safety alarms that were designed to alert workers to an impending disaster at a rig or refinery. A failure to verify cement composition in a well-head may sound innocent, but it can cause a disaster when the selected cement is inadequate to contain an oil well. When the well is located thousands of feet below sea level, the oil company's Board is looking at a catastrophe of epic proportions.

---

[2]    Abrahm Lustgarten, *Furious growth, cost cuts led to BP accidents past and present* (ProPublica, October 26, 2010).

2.     The drastic consequences of disregarding safety processes is not news to executives and directors in the oil industry, who know, through painful experience, that oil companies cannot cut corners without exposing human life, property and the environment, and the company itself to existential risks. The job of a corporate board of directors of any major oil company, first and foremost, is therefore to act in good faith to ensure that the company's business is conducted safely and lawfully. This derivative action arises from the deliberate decision of BP's board of directors (the "Board") to ignore its mandate.

3.     BP was founded in 1909 as the Anglo-Persian Oil Company. In 1998, BP entered into a $110 billion "merger of equals" with Amoco, and the combined company purchased the Atlantic Richfield Company ("Arco") to become the third largest oil company in the world. BP is active in every area of the oil and gas industry, including exploration and production, refining, distribution and trading. BP is the single largest producer of oil and gas in the United States.

4.     Over the better part of the past decade, Defendants consciously pursued a strategy that elevated cost cutting at the expense of essential maintenance, essential safety measures, and essential personnel competence and qualifications. This deliberate strategy – approved and implemented from the very top of BP – created a sustained and systemic safety problem at BP.

5.     The consequences of this strategy have been catastrophic, resulting in multiple disasters with deadly consequences throughout BP's operations, multiple felony convictions, and multiple multi-million dollar fines and other penalties imposed by regulators. BP has found itself on criminal probation not once, not twice, but three distinct times over the past decade. Indeed, the "BP" logo is now synonymous with poor corporate governance and wanton behavior with multiple constituencies. BP has even considered changing the name of its 11,500 service stations to avoid the stigma attached to its name.

6.     The *Deepwater Horizon* calamity off the coast of Louisiana in April 2010 is only the latest in a long line of disasters with deadly consequences caused by BP.  For years, BP's Board, consisting of executive and non-executive directors, was warned specifically and repeatedly that their strategy of promoting budget cuts over robust maintenance and safety processes caused BP to break the law and endanger the lives of its employees.

7.     Between 1999 and 2010, Defendants learned about numerous dangerous incidents, accidents and near-misses involving BP's oil exploration, refinery and pipeline operations, including but not limited to the following:

- In 1999, BP caused a subsidiary to plead guilty for failing to notify authorities of a release of hazardous substances into the environment at Endicott Bay, Alaska, and a failure to provide adequate oversight, audits and funding to ensure proper environmental management.  BP agreed to pay the maximum criminal fine of $500,000, and $22 million to resolve related civil claims for violating U.S. environmental laws.  BP avoided being barred from receiving any government contracts – "federal debarment" – by agreeing to 5 years of probation and promising "a revised corporate attitude."[3]

- Between May 29 and June 10, 2000, the refinery in Grangemouth, Scotland suffered a power distribution failure, a steam pipe rupture, and a massive fire.  Investigators found that BP's safety processes failed the minimum legal requirements and that BP was not focused on preventing major hazards.  BP was fined £1 million.

- In May 2003, a major oil spill in the Gulf of Mexico was narrowly avoided after the riser of *Discoverer Enterprise* rig split in two.  BP engineers later concluded that BP was not adequately prepared to respond to the potential problem. BP later reported that "***no one was hurt and the well was secure, but the initial scene was daunting***."[4]

- In November 2003, a gas line ruptured on the Forties Alpha platform in the North Sea, resulting in thousands of pounds of pressurized gas escaping at a high velocity. An investigation revealed that the gas leak occurred because of pipeline corrosion in what a prosecutor called "***an accident waiting to happen***."[5]  BP admitted violating health and safety regulations.

---

[3]     Abrahm Lustgarten, *Furious growth, cost cuts led to BP accidents past and present* (ProPublica, October 26, 2010).

[4]     *Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling* ("BP Oil Spill Commission Report") (Jan. 11, 2011) at 49.

[5]     Maggie Barry, *Gas Leak: BP fined* (Daily Mirror, Nov. 17, 2004).

- In March 2005, a massive explosion and fire killed 15 workers and injured more than 170 others at the Texas City refinery. Investigators determined that BP's budget cuts and production pressures on managers to increase production impaired process safety performance. BP pleaded guilty to knowingly violating the Risk Management Plan regulations promulgated under the Clean Air Act (the first company ever to do so) and paid a $50 million criminal fine (twice the fine paid by Exxon in connection with the Exxon Valdez disaster). BP also paid $21.4 million to settle work safety violations with OSHA and paid more than $1 billion in damages.

- In July 2005, the *Thunder Horse* rig in the Gulf of Mexico listed and nearly sank. According to analysts, competitors, and former employees, "***the problems at Thunder Horse were not an anomaly, but a warning that BP was taking too many risks and cutting corners in pursuit of growth and profits.***"[6]

- In March 2006, 267,000 gallons of oil spilled from a hole in BP's pipeline at BP's Prudhoe Bay, Alaska facility. Investigators determined that the hole was the result of corrosion caused by neglected maintenance and that BP had ignored four separate alarms indicating the pipeline was leaking oil.

- In April 2006, OSHA imposed a $2.4 million fine for unsafe operations at the Oregon, Ohio refinery. Investigators had found 32 "willful" violations that were similar to the findings after the fatal explosion in Texas City. OSHA assistant secretary Edwin Foulke, Jr. noted that "***It is extremely disappointing that BP Products failed to learn from the lessons of Texas City to assure their workers' safety and health.***"[7]

- In October 2007, BP caused a subsidiary to plead guilty and agreed to pay $12 million in criminal fines and three years' probation in connection with Prudhoe Bay spills.

- In September 2008, an eight-inch high pressure gas line at the Y-Pad location "separated." Alaska investigators later determined that the incident could have been catastrophic. According to the Alaska's Petroleum Systems Integrity Office, ***the rupture resulted from*** "***procedures that either were not in place or had not been fully implemented at BP in their management system***."[8]

- In March 2010, OSHA imposed a $3 million fine for "willful" safety violations at the Toledo, Ohio refinery. U.S. Secretary of Labor, Hilda Solis, noted that "***OSHA has found that BP often ignored or severely delayed fixing known hazards in its***

---

[6]   Sarah Lyall et al., *In BP's Record, a History of Boldness and Costly Blunders* (N.Y. Times July 12, 2010).

[7]   U.S. Department of Labor News Release, *OSHA Fines BP $2.4 Million for Safety and Health Violations Inspection Initiated under Enhanced Enforcement Program,* USDL 06-737-NAT (April 25, 2006).

[8]   Guy Chazan, et al., *As CEO Hayward Remade BP, Safety, Cost Drives Clashed* (Wall Street Journal, June 29, 2010).

*refinery … There is no excuse for taking chances with people's lives. BP must fix the hazards now*." [9]

8.     Defendants were told, and only through conscious disregard could have failed to appreciate, that BP's pattern of serious incidents, accidents and near-misses at BP's operations could be traced directly back to BP's culture and strategy of promoting budget cuts over adequate maintenance and safety processes.

9.     Following these incidents, members of the Board frequently pointed to low level "human error" to insulate themselves from accountability.  This is no excuse.  Everyone in the oil industry knows that human error is inevitable and must be expressly taken into account by good process safety.  Skimping on process safety while engaging in inherently dangerous activities on a worldwide scale makes the occurrence of an uncontrolled disaster inevitable.

10.    Senior management and the Board (Defendants herein) were repeatedly informed that their decisions to cut budgets and to subordinate process safety caused BP's dismal safety record and continued to put the Company at risk.  In January 2007, a "Blue Ribbon" commission headed by former U.S. Secretary of State James A. Baker, III issued a scathing report on the Texas City refinery disaster, finding "*systemic*" failures in BP's safety procedures:  "*from the top of the company, starting with the Board and going down . . . .  BP has not provided effective process safety leadership and has not adequately established process safety as a core value*." [10]

---

[9]     U.S. Department of Labor News Release, *US Labor Department's OSHA proposes more than $3 million in fines to BP-Husky refinery near Toledo, Ohio*, 10-234-CHI (March 8, 2010).

[10]    Report of the BP U.S. Refineries Independent Safety Review Panel (January 2007) ("Baker Report") at xii.

11. In March 2007, the U.S. Chemical Safety and Hazard Investigation Board ("CSB") presented the final results of its investigation of the Texas City refinery disaster. The CSB identified a number of "root causes" of the incident, including:

> ***BP Group Board did not provide effective oversight of the company's safety culture and major accident prevention programs.***

> ***Senior executives:***

> - ***inadequately addressed controlling major hazard risk. Personal safety was measured, rewarded, and the primary focus, but the same emphasis was not put on improving process safety performance;***

> - ***did not provide effective safety culture leadership and oversight to prevent catastrophic accidents;***

> - ***ineffectively ensured that the safety implications of major organizational, personnel, and policy changes were evaluated;***

> - ***did not provide adequate resources to prevent major accidents; budget cuts impaired process safety performance at the Texas City refinery.***[11]

12. Defendants consciously ignored these warnings, and disregarded their duty to intervene. In May 2010, the Center for Public Integrity reported that a review of refinery inspection data over the past three years revealed that "[t]wo refineries owned by oil giant BP account for 97 percent of all flagrant violations found in the refining industry by government safety inspectors over the past three years."[12] During the same time period, OSHA statistics showed that BP committed 760 "egregious, willful" safety violations, while Exxon Mobil Corp. ("Exxon"), the largest oil company in the world, had only one such citation.

---

[11] U.S. Chemical Safety and Hazard Investigation Board, *Investigation Report Refinery Explosion and Fire (15 killed, 180 Injured)* (March 2007) at 210.

[12] Jim Morris, et al., *Renegade Refiner: OSHA Says BP Has "Systemic Safety Problem,"* (Center for Public Integrity, May 16, 2010).

13.     Most of BP's violations were very serious and demonstrated that BP failed to take the risk of a catastrophic accident seriously.  As the Center for Public Integrity noted in May 2010:

> *Most of BP's citations were classified as "egregious willful" by the Occupational Safety and Health Administration and reflect alleged violations of a rule designed to prevent catastrophic events at refineries*.[13]

14.     Discussing these findings, U.S. Deputy Assistant Secretary of Labor, Jordan Barab, said that "*[t]he only thing you can conclude is that BP has a serious, systemic safety problem in their company*."[14]

15.     BP's Board knew that it was duty-bound to take aggressive action to cure BP's "safety problem" and that its failure to do so would subject BP and its shareholders, BP's employees, and the general public to grave risks.  Their actions show their disregard for their obligations.

16.     In 2004, Defendants approved a 25% budget cut for all U.S. refineries – including maintenance and safety budgets.  These cuts followed a similar 25% across-the-board budget cut in 1999, and caused essential maintenance and safety budgets to be dangerously underfunded.

17.     In 2009, the Board approved an exploration plan to drill for oil in the Macondo project, about 40 miles of the coast off Louisiana.  The plan required BP to push the technological boundaries by engaging in "ultra-deep drilling" – one of the most dangerous forms of oil exploration on earth.

18.     Despite myriad warnings that BP failed to provide adequate resources to prevent major accidents, Defendants did not ensure that the *Deepwater Horizon* rig could safely do the job.  Defendants also did not ensure that BP adequately would prepare for a catastrophic disaster.

---

[13]     *Id.*
[14]     *Id.*

Indeed, under Defendants' direction, BP did not bother to prepare a site specific mitigation plan. Instead, BP's regional mitigation plan was cut and pasted from a mitigation plan that was developed for drilling in Alaska, listing a long-deceased expert as the person to be contacted in the event of an emergency.

19.     By April 20, 2010, the Macondo drilling project was already 43 days behind schedule and $55 million over budget. BP personnel cut a number of safety corners. BP started capping the well despite signs that the well appeared unstable and at risk of a blowout. Because of the prior budget cuts, BP failed to maintain the blowout preventer that was supposed to cut the riser and cap the well in case of an underwater blowout. In combination, these and other decisions were contrary to U.S. safety laws and industry norms, inconsistent with process safety, and directly contributed to the *Deepwater Horizon* disaster.

20.     The ensuing explosion killed eleven workers, injured at least seventeen others, and ignited a massive explosion and fire aboard the *Deepwater Horizon*. The fire burned uncontrollably for two days and caused the 400-foot-long rig to sink to the ocean floor. As it sank, the riser snapped, resulting in the worst oil spill ever—surpassing the Exxon *Valdez* disaster by at least 1,800 percent, in terms of the number of barrels of oil spilled into the sea. In addition to the tragic loss of life, the disaster is anticipated to cost the Company at least $40 billion in damages, plus permanent reputational harm and intense government scrutiny.

21.     This action seeks to hold Defendants accountable for the damage caused by their conscious disregard of their fiduciary duties, including their inexplicable decision to promote cost-cutting over process safety and their refusal to change BP's safety culture. This case also seeks to ensure that in the future BP will conduct its business in a safe and law-abiding manner.

22.     Any reasonable director sitting on the BP board before the *Deepwater Horizon* disaster would have recognized that when it came to the next catastrophe, the question was not "if," but rather "when" and "how bad."   Because this calamity involved BP's extensive U.S. operations, cost the lives of U.S. citizens, devastated the lives of the families of the deceased, and damaged the U.S. environment, and because about 40% of BP's shareholders are in the U.S., any reasonable BP director should expect to be held to account in a U.S. court for their conduct and breaches of duties that predicated this disaster.

## II.     JURISDICTION AND VENUE

23.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.  Plaintiffs are citizens of Louisiana, Florida, Michigan, Missouri, New Mexico, Ohio, and Pennsylvania.  None of the Defendants is a citizen of any of these States.

24.     The amount in controversy exceeds $75,000.   This action is not brought collusively to confer jurisdiction on this Court which it would otherwise not have.

25.     Venue is proper in this District pursuant to 28 U.S.C. §§1391(a)(2) and (3) and 1401 because (a) some or all of the events, actions, and failures to act giving rise to the claims asserted herein occurred in this District; and (b) those of the Defendants who are aliens may be sued in any District.  Pursuant to the same statutory sections, venue is also proper in the Eastern District of Louisiana, where this action was initiated before the MDL proceedings.

## III.     PARTIES

### A.     Plaintiffs

26.     Louisiana Municipal Police Employees' Retirement System ("LAMPERS") is a retirement system created for the purpose of providing retirement allowances and other benefits for full-time municipal police officers and employees in the State of Louisiana, secretaries to chiefs of police, and employees of the system.  LAMPERS is a current shareholder of BP and

has been a holder of BP common stock at all relevant times alleged in this Complaint and will continue to be a shareholder of BP through the conclusion of this litigation. LAMPERS is a citizen and an instrumentality of the State of Louisiana.

27. City of New Orleans Employees' Retirement System ("NOERS") is a retirement system established for the purpose of providing retirement allowances and death benefits for all officers and employees of the City of New Orleans and the parochial and judicial officers and employees of Orleans Parish. NOERS is a current holder of American Depositary Receipts ("ADR") of BP and has been a shareholder of BP at all relevant times alleged in this Complaint and will continue to be a shareholder of BP through the conclusion of this litigation. ADRs trade on the New York Stock Exchange at prices quoted in U.S. dollars. NOERS is a citizen of Louisiana and is headquartered within the federal Eastern District of Louisiana.

28. Plaintiff John P. Miles ("Miles") has been a shareholder of BP during all relevant times and is a current ADR shareholder of BP. Miles is a citizen of New Mexico.

29. Additional Plaintiffs Southeastern Pennsylvania Transportation Authority ("SEPTA"), Clay Dietrich, Robert Freedman, Frances Goldman, Cody A. Nedved, Rene Rogers, and Victor Skimedal have been, and are, current shareholders of BP, having held shares and/or ADRs of BP at all material times alleged in this Complaint. They will continue to be shareholders of BP through the conclusion of this litigation. Plaintiffs SEPTA, Dietrich, Freedman, Nedved, Rogers, and Skimedal initially filed actions in other jurisdictions, but stayed them to participate here.

**B.     Nominal Defendant**

30. BP is the third largest energy company and the fourth largest company in the world. In 1998, BP entered into a $110 billion "merger of equals" with Amoco. The resulting entity, BP Amoco, purchased ARCO in 2000, and renamed itself "BP plc" in 2001. BP is a

publicly traded company, incorporated under the laws of England and Wales. BP common shares are listed on the London Stock Exchange and BP American Depository Shares are listed on the New York Stock Exchange. Investors in the U.S. own about 40% of BP's outstanding common stock (as do investors in the U.K., with the remainder spread out in other countries). BP files consolidated financial statements which include BP's operating subsidiaries. BP's largest operations, through its wholly-owned and controlled operating subsidiary BP America, Inc. ("BP America"), are in the U.S. During the past ten years, BP's Board had at least fourteen meetings in the U.S. BP is the largest oil and gas producer in the U.S. and the nation's second largest gasoline retailer (through 11,500 service stations throughout the U.S.). BP has approximately 23,000 employees in the U.S., with the majority located in Texas.

### C. Individual Defendants

#### 1. Executive Director Defendants

31. Iain C. Conn ("Conn") has served as group vice president of refining and marketing since 2007 and as an executive director of the Board since July 2004. Conn received compensation from BP in the amounts of $2,500,000 in 2008 and $2,900,000 in 2009. Conn is a British national with extensive contacts with the U.S. over the past decade, including his service as: (a) Chairman of BP Pension Trustees Ltd., in which role he oversees BP's workers' pension in the U.S.; and (b) group vice president of BP's refining and marketing operations, which includes doing at least hundreds of millions of dollars of business within the United States and this District. Conn's contacts with the U.S. are so regular and systemic that he obtained and maintains a U.S. social security number.

32. Defendant Robert W. Dudley ("Dudley") has served as BP's chief operating officer ("Managing Director") and as an executive director of the Board since April 2009. On July 26, 2010, Dudley was promoted to CEO, effective October 1, 2010. Dudley has been with

the Company since he joined Amoco in 1979. Dudley received compensation of $2,179,000 in 2009. Dudley is American and a citizen of Texas, and he also has extensive contacts with Louisiana. According to Company filings with the SEC, Dudley has responsibility for broad oversight of the Company's activities in the Americas. Dudley also led the Company's response to the *Deepwater Horizon* disaster. Prior to his appointment as BP CEO, Company filings with the SEC labeled Dudley a "U.S. Director," and he participates in the U.S. BP Retirement Accumulation Plan.

33. Defendant Byron E. Grote ("Grote") is BP's Chief Financial Officer ("CFO") since 2002, and has been a member of the Board as an executive director since August 2000. Before becoming BP's CFO, Grote was an executive vice-president of BP exploration and production ("BP E&P") and responsible for directing the ARCO acquisition. Grote joined BP when it acquired Standard Oil of Ohio in 1987. Grote received compensation in the amounts of $3,090,000 in 2008 and $3,458,000 in 2009. Grote is American and a citizen of Connecticut. Grote has had extensive contacts with Texas and Louisiana over the past decade, including his tenure as executive vice-president of BP E&P. Grote is labeled a "U.S. Director" in the Company's SEC filings and he participates in the U.S. BP Retirement Accumulation Plan.

34. Defendant Anthony B. Hayward ("Hayward") was the Chief Executive Officer ("CEO") of BP from May 2007 until October 1, 2010, and was a member of the Board as an executive director from 2003 until 2010. In his capacity as "executive liaison," Hayward regularly informed BP Board's Safety, Ethics and Environment Assurance Committee concerning about accidents and incidents in BP's operations. Hayward received a salary, performance bonus, non-cash benefits and other emoluments in the amounts of $4,000,000 in 2008 and $5,100,000 in 2009. Hayward received a severance package of approximately

$20,000,000 when he was removed from the role of CEO. Hayward is a British national with extensive contacts with the U.S. over the past decade, including negotiating a February 2, 2008 settlement of a shareholder derivative suit filed against BP in the State of Alaska, and his continued service as a member of the MIT Energy Advisory Board. Hayward also had extensive contacts with Texas and Louisiana, including when he served as CEO of BP E&P from 2002 to 2007.

35.     Defendant Andy G. Inglis ("Inglis") was a member of the Board as an executive director and Chief Executive Officer of BP E&P from 2007 until October 31, 2010. As chief executive of BP E&P, Inglis attended meetings of the BP Board's Safety, Ethics and Environment Assurance Committee to report on topics specific to the BP E&P business. Inglis received compensation in the amount of $3,300,000 in 2008 and $3,500,000 in 2009. Inglis is a British national with extensive contacts with the U.S. over the past decade, including his work as the CEO of BP E&P from 2007 until October 31, 2010 and, before then, his responsibilities of overseeing BP's operations in the Gulf of Mexico.

36.     The Defendants set forth in ¶¶ 31-35 are the "Executive Director Defendants."

           2.     <u>Non-Executive Director Defendants</u>

37.     Defendant Antony Burgmans ("Burgmans") is a non-executive director of the Board since February 2004. Burgmans is a member of the Chairman's Committee (since 2004) and the Safety, Ethics and Environment Assurance Committee (since 2005). Burgmans received compensation of $140,000 in 2008 and $150,000 in 2009. Burgmans is a Dutch national with extensive contacts with the U.S. during the past decade, including service on the advisory boards of Akzo Nobel NV and AEGON NV, companies doing business in the U.S. either in their own names or through subsidiaries.

38.     Defendant Cynthia B. Carroll ("Carroll") is a non-executive director of the Board since June 2007.  Carroll is a member of the Chairman's Committee (since 2007) and the Safety, Ethics and Environment Assurance Committee (since 2009).  Carroll received compensation of $150,000 in 2008 and $145,000 in 2009.  Carroll is American and since 2007 Chief Executive Officer of Anglo American plc, one of the world's largest mining companies.  Carroll is a former director of the Sara Lee Corporation.  Caroll resides in the U.K. but maintains frequent contacts with the U.S., including in connection with her service as CEO of Anglo American.

39.     Defendant Sir William M. Castell ("Castell") is a non-executive director of the Board since July 2006.  Castell is a member of the Chairman's Committee (since 2006), the Nomination Committee, and is Chair of the Safety, Ethics and Environment Assurance Committee (since 2007).  He was a member of the Audit Committee during 2007-2008.  Castell received compensation of $170,000 in 2008 and $180,000 in 2009.  Castell is a British national with extensive contacts with the U.S. during the past decade, including his current service as Chairman of APBiotech Inc., based in New Jersey, his current services as a director of General Electric Co. in Connecticut (since 2004) and his prior service as President and CEO of GE Healthcare (2004-2006) in New York.  General Electric Co. does business within Louisiana and Texas.

40.     Defendant George David ("David") is a non-executive director of the Board since February 2008.  David is a member of the Chairman's Committee (since 2008) and the Audit Committee (since 2009).  David received compensation of $160,000 in 2008 and $190,000 in 2009.  David is American and a citizen of Connecticut.   David has had extensive contacts with Texas and Louisiana over the past decade, including when he served as chairman and CEO of United Technologies Corp.

41.     Defendant Erroll B. Davis, Jr. ("Davis") served as a non-executive director of the Board from 1998 until April 15, 2010.  Davis was a member of the Audit Committee (2005 through 2010) the Remuneration Committee (2005 through 2009), and the Safety, Ethics and Environment Assurance Committee (during 2010).  Davis received compensation of $170,000 in 2008 and $170,000 in 2009.  Davis is American and a citizen of Georgia.  Davis has had extensive contacts with Texas and Louisiana over the past decade.

42.     Defendant Douglas J. Flint ("Flint") is a non-executive director of the Board since January 2005.  Flint is a member of the Chairman's and Audit Committees (since 2005).   Flint received compensation of $145,000 in 2008 and $135,000 in 2009.  Though Flint is a British national, he has maintained extensive contacts with the U.S. during the past decade, including serving as a director of HSBC North America Holdings Inc. from 1995 to May 2009.

43.     Defendant DeAnne S. Julius ("Julius") is a non-executive director of the Board since November 2001.  Julius is a member of the Chairman's Committee (since 2001), a member of the Nomination Committee, and is Chair of the Remuneration Committee (since 2005).  Julius received compensation of $175,000 in 2008 and $170,000 in 2009.  Julius is American and a citizen of Washington, D.C.  Julius has had extensive contacts with the U.S. over the past decade.  Julius also has extensive knowledge of the oil industry, having served as the chief economist of Royal Dutch Shell from 1989 until 1993.

44.     Defendant Sir Ian M.G. Prosser ("Prosser") was non-executive deputy chairman and a non-executive director of the Board between 1999 and April 15, 2010.  Prosser was Chair of the Audit Committee (2005-2010) and a member of the Remuneration Committee (2005-2010).  Prosser received compensation of $275,000 in 2008 and $265,000 in 2009.  Prosser is a

British national with extensive contacts with the U.S. during the past decade, including serving as a director of the Sara Lee Corporation.

45.   Defendant Peter Sutherland ("Sutherland") was a non-executive director of BP from 1993 through January 1, 2010, and Chairman of the Board between 1997 and January 1, 2010.   Sutherland was Chairman of the Chairman's and Nomination Committee and attended meetings of the Remuneration Committees.   Sutherland received compensation of $970,000 in 2009, $970,000 in 2008, $835,000 in 2007, $800,000 in 2006 and $800,000 in 2005.   Though Southerland is an Irish national, Sutherland had regular and systematic contact with the States of Texas and Louisiana by virtue of his duties at BP and serving as non-executive chairman of Goldman Sachs International, a subsidiary of Goldman Sachs, Inc., a global investment banking and securities firm headquartered in New York City which engages in investment banking, securities, investment management, and other financial services primarily with institutional clients around the country and the globe.

46.   Defendant Carl-Henric Svanberg ("Svanberg") is a non-executive director of the Board since September 2009 and became the Chairman in January 2010.   Svanberg heads the Chairman's Committee and is a member of the Nomination Committee.   Svanberg received compensation of $48,000 in 2009.   Svanberg is a Swedish national with extensive contacts with the U.S., including visits to BP's *Thunder Horse* platform in the Gulf of Mexico and BP's fuels chain in the western U.S. upon becoming Chairman of the Board, and his service on the external advisory board of the Earth Institute at Columbia University in New York.

47.   The Defendants set forth in ¶¶ 37-46 are the "Non-Executive Director Defendants."   Together, the Executive Defendants and the Non-Executive Defendants are referred to herein as the "Director Defendants."

17

3.      Chairmen and Presidents of BP America

48.      Defendant H. Lamar McKay ("McKay") is chairman and president of BP America since January 2009.  In prepared testimony before the House Energy and Commerce Committee McKay described his responsibilities as follows: "As Chairman and President of BP America, I am part of an executive team that reports directly to our Global CEO . . . .  I am BP's lead representative in the U.S. and am responsible for broad oversight and connectivity across all of our U.S.-based businesses."  McKay has been with the Company since joining Amoco in 1980.  McKay is American and a citizen of Texas.  In connection with this work for BP, McKay has had extensive contacts with Texas and Louisiana over the past decade.

49.      Defendant Robert A. Malone was Defendant McKay's predecessor as chairman and president of BP America, and BP's lead representative in the U.S. from mid-2006 through the end of 2008.  During his time as BP America's chairman and president, Malone had extensive contacts with Texas and Louisiana.  Since 2009, Malone has been President and CEO of the First National Bank of Sonora, Texas.  Malone is American and a citizen of Texas.

50.      The Defendants set forth ¶¶ 48-49, together with the Executive Director Defendants, are referred to herein as the "Executive Defendants."

## IV.    BP SUFFERS A DECADE OF CATASTROPHIC SAFETY FAILURES UNDER DEFENDANTS' LEADERSHIP

### A.    Overview of BP's Operations

51.      BP is one of the world's largest oil and gas companies.  BP engages in every area of the oil and gas industry, including exploration and production, refining, distribution, petrochemicals and energy trading.  During fiscal year 2009, BP's business generated $246 billion in revenues and over $16 billion in profit.

18

52.     BP's core business is the exploration and extraction of oil and gas, refining the oil and gas into useable petroleum products like gasoline, diesel fuel, jet fuel, and liquefied petroleum gas (LPG), and then selling those products to businesses, consumers, and governments.  To engage in these activities, BP owns and leases oil rigs, pipelines, refineries, petrochemical plants, and gas stations.

53.     Like the activities of other oil and gas companies, BP's activities face certain serious dangers.  The upstream oil industry (exploration and production) involves the use of heavy industrial equipment to drill into the earth to access oil and natural gas that is trapped in underground reservoirs.  When the drill pierces the reservoir, oil and gas will be pushed out through the hole with incredible force and, unless controlled, cause the well to "gush" or "blow out."  From the beginning of the drilling industry, it has been patently clear that, in the absence of adequate safety procedures, blowouts would predictably kill and injure workers, damage equipment, and spill oil and gas into the environment.

54.     The downstream oil industry (refining and selling) also involves substantial risks.  Oil refineries use sophisticated equipment and dangerous chemicals to process the oil into other petroleum based products.  The chemicals are highly flammable, causing the risk of massive explosions and fires.

55.     As a result, the oil industry as whole is highly regulated.  Federal and state safety laws and regulations were enacted and adopted to protect workers and the general public from exposure to explosions and fires, and from the release of oil, gas and dangerous chemicals into the environment.  Some of these regulations specifically address the individual safety of workers.  Others are more global and regulate the safety of the processes that oil companies must use to engage in these economically useful but dangerous activities.

19

**B. The Extensive Regulation of BP's Business**

56. BP's business is the focus of extensive regulation and regulatory oversight by the U.S. Environmental Protection Agency ("EPA"), U.S. Minerals Management Service ("MMS"), recently renamed the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE"), the U.S. Department of Transportation ("DoT"), the U.S. Occupational Safety and Health Administration ("OSHA"), and their State equivalents throughout the United States.

57. BP's activities are subject to extensive environmental regulation under national, state and local laws, including the Clean Air Act (42 U.S.C § 7401 *et seq*.), the Clean Water Act (33 U.S.C § 1251 *et seq*.), the Oil Pollution Act (33 U.S.C § 2701 *et seq*.), and the Occupational Safety and Health Act (29 U.S.C § 651 *et seq*.), and rules promulgated thereunder.

58. The Clean Air Act, for example, regulates air emissions, permits, fuel specifications and other aspects of BP's production, distribution and marketing activities. Specifically, the General Duty Clause of the Clean Air Act, 42 U.S.C. § 7412(r), and the Risk Management Program Regulations, 40 C.F.R. Part 68, contain comprehensive requirements for preventing releases of hazardous air pollutants. These regulations require owners and operators of facilities to perform adequate and timely equipment inspections and repairs, train employees involved in the operation and maintenance of equipment, evaluate the consequences of changes to operating practices and equipment, and ensure that operating procedures contain clear and comprehensive instructions.

59. Subpart D of the Risk Management Program Regulations requires owners and operators of facilities to perform a comprehensive hazards analysis, and to "develop and implement written operating procedures that provide clear instructions for safely conducting activities involved in each covered process consistent with the process safety information." 40 C.F.R. Part 68, §68.69. In addition, owners and operators of facilities must inspect and test

process equipment as often as "shall be consistent with applicable manufacturers' recommendations and good engineering practices, and more frequently if determined to be necessary by prior operating experience." *Id.* at §68.73(d)(3). In case of discovered equipment deficiencies, the owner or operator must "correct deficiencies in equipment that are outside acceptable limits … before further use or in a safe and timely manner when necessary means are taken to assure safe operation." *Id.* at §68.73(e).

60.    The Clean Water Act requires BP to install control equipment and implement operational controls and other preventative measures. Moreover, after the Exxon Valdez oil spill in Alaska in 1989, the Clean Water Act was strengthened to include harsh civil and criminal penalties for oil spills. It provides regulatory and non-regulatory methods to reduce pollution discharges into U.S. waterways. 40 C.F.R. § 131.10(a). The Act was strengthened in 1990 through the Oil Pollution Act of 1990, 33 U.S.C. § 2701, *et seq.*, which gives the U.S Environmental Protection Agency ("EPA") authority to prevent and respond to catastrophic oil spills, and set civil and criminal penalties for spills.

61.    The Oil Pollution Act of 1990 requires owners and operators of oil storage facilities and vessels to submit detailed plans to the federal government explaining as to how they will respond to large discharges. The Oil Pollution Act also requires the development of Area Contingency Plans to prepare oil spill responses.

**C.    Defendants Seek to Increase Earnings by Cutting Budgets at the Expense of Safety**

1.    Defendants Focus on Exploring Large Oil Fields in Inaccessible Places and Merge with Amoco to Access U.S. Markets and Resoureces

62.    In 1989, John Browne, who was then head of BP exploration and development, assigned BP's ten best geologists to develop a new strategy to find oil. Tony Hayward was one of the ten geologists. After a few days, the group advised Browne to develop a strategy that

would focus BP's efforts on exploring and producing "elephants" – industry jargon for very large oil fields.[15] To find and develop these massive but elusive oil fields, BP would have to drill in places where few, if any, other oil companies had drilled before – places that were difficult to reach because of political, geological or technical difficulties. Deepwater wells in the Gulf of Mexico presented steep technological challenges, but were particularly promising places to find these massive fields.

63.     Browne accepted the recommendations and began to implement the strategy. As he later explained:

> Our agreed new exploration strategy would focus on a small number of the most attractive basins where we could potentially control a billion barrels of oil and gas. **We reasoned that costs would be lower per barrel for big fields,** and it would be easier to attract and retain good staff for the large long-lived projects. Success would be based on giant prolific fields and related infrastructure, not on a collection of small fields.[16]

64.     Browne was promoted to CEO of BP in 1995. He understood that the Company would need to grow substantially in order to successfully implement the "elephant" strategy. The Board authorized Browne to look for potential merger candidates in 1996.

65.     In 1998, BP merged with Amoco, then the largest industrial merger in history. Amoco was the quintessential American oil company, having been founded by John D. Rockefeller in 1889 as Standard Oil (Indiana). Browne explained that Amoco was a particularly attractive merger partner because of its "great U.S. refining and marketing operations and U.S. natural gas production," and because of Amoco's sizeable assets in the Gulf of Mexico.[17]

66.     Following the merger, BP embarked on an aggressive campaign of exploring and developing the Gulf assets, and of further expanding its total number of leases in the region. BP

---

[15]     Peter Elkind and David Whitford, *BP: "An Accident Waiting to Happen"* (Fortune, January 24, 2011).

[16]     John Browne, *Beyond Business, An Inspirational Memoir From a Visionary Leader* (The Orion Publishing Group, Ltd., 2010) at 60.

[17]     *Id.* at 70.

explored and developed these assets by using deepwater drilling techniques that were considered beyond human capabilities until just recently.

67.     The Board knew that deepwater drilling was a high-risk but high-reward endeavor.  Drilling a deepwater well can cost as much as $200 million.  In addition, the technological risks of drilling 5,000 feet below sea level under crushing pressure and in extreme temperatures are daunting.

68.     BP's strategy initially appeared to pay off.  By 2004, BP was the largest leaseholder in the Gulf of Mexico and, ultimately, produced more oil from the Gulf than any other company.  As BP's 2009 annual report explained, BP is "the largest producer and acreage holder in the region," and the "Gulf of Mexico is our largest area of growth in the U.S."

### 2.     BP CEO John Browne: "More for Less"

69.     Browne's 1995 promotion to CEO was based on his record of "producing more earnings with less capital."[18]  Simply stated, Browne was a cost-cutter who deployed a strategy known as "***more for less***."[19]

70.     Immediately following the 1998 BP-Amoco merger, Browne announced that the pre-tax profits of the combined company would increase by at least $2 billion in 2 years.[20] Following this announcement, BP shares surged 15%, enriching many Defendants in the process.

71.     To achieve the promised earnings, BP had to grow production by between 5.5% and 7% over three years, mostly in the Gulf of Mexico and in Angola, Africa.  BP was unable to achieve these production increases and could meet its promises only by ruthless cost-cutting.

---

[18]     Janet Guyon and Len A. Costa, *When John Browne Talks, Big Oil Listens* (Fortune, July 5, 1999).

[19]     Loren C. Steffy, *Drowning in Oil: BP & the Reckless Pursuit of Profit* (McGraw-Hill 2010) at 61.

[20]     *Business: The Company File BP and Amoco in Oil Megamerger* (BBC News, August 11, 1998).

With Board approval, Browne implemented a Company-wide cost-cutting strategy, reducing budgets by 25% and cutting 6,000 jobs, including those of many structural and safety engineers. Targets became the Holy Grail. "***Items cut included turn-arounds, safety committee meetings . . . plant maintenance and training courses. Safety and maintenance expenditures were a significant portion of the cuts***."[21] Skilled oil workers "resigned in disgust."[22]

72. After BP acquired another American oil company with a long history – the Atlantic Richfield Company ("ARCO") – the U.S. experienced a downturn in the economy. In 2001, the demand for oil declined, causing a two-year slide in the price for oil. This decline further intensified the Board's determination to improve operating margins by cutting costs.

73. In 2004, the Board implemented another round of substantial cuts to BP's operational budgets for U.S. refineries, again with no exemption for maintenance and safety programs. For example, Defendants told the Texas City refinery manager, Don Parus, to reduce the plant's annual operational budget of $300 million by $48 million. During this time, Texas City was BP's most profitable refinery, generating $900 million in annual earnings.

        3.    <u>Defendants Implemented a Top-Down Compensation Policy That Reward Cutting Costs at the Expense of Process Safety</u>

74. While he was the head of BP exploration and production, Browne also sowed the seeds for changing BP's corporate philosophy into one emphasizing profits at all costs. BP organizational values were defined as follows: "First, BP operates in a decentralized manner, with individual business unit leaders (such as refinery plant managers) given broad latitude for running the business and direct responsibility for delivering performance. Second, the corporate organization provides support and assistance to the business units (such as individual refineries)

---

[21]     Carl Mortished, *Deficiencies at all levels of BP caused refinery disaster, says U.S. Regulator* (The Sunday Times, March 21, 2007).

[22]     Tom Bower, *Return of Lord Oil Slick: Why has Cameron handed his Labour luvvie such a key job?* (Daily Mail, July 3, 2010).

through a variety of functions, networks, and peer groups. Third, BP relies on individual performance contracts to motivate people."[23]

75.     Accountability for BP's performance was said to run "down the line" from the Board through the CEO to the business unit leaders. Moreover, the organizational values stated that **BP business unit leaders "are not merely operations managers but also business or commercial managers because they have direct profit and loss responsibility" for their business unit**.[24]

76.     BP's senior management, including the Board, enforced accountability of BP's unit managers through their annual performance contracts. These contracts would set out aggressive productivity and profit targets, and were signed by each business unit leader. Browne then held each business unit leader personally accountable for meeting the assigned targets.[25] For example, the 1998 announcement that the Company would cut budgets by 25% was translated into the performance contracts as "milestones" for all of BP's business unit leaders, including the plant manager of the Texas City, Texas refinery.[26]

77.     In the case of the Texas City refinery, those cuts came on top of years of budget cuts under Amoco's management. In 2002, BP commissioned a report by the consulting firm A.T. Kearney to understand the historical facts that had led to the deterioration of the Texas City refinery's performance. The resulting report, dated October 28, 2002, connected the budget cuts to the corresponding refinery spending cuts and the resulting deterioration in the refinery's integrity and reliability. The A.T. Kearney report's findings included:

---

[23]     Baker Report at 27.
[24]     *Id.*
[25]     Peter Elkind, et al., *BP: "An Accident Waiting to Happen"* (Fortune, January 24, 2011).
[26]     Baker Report at 82.

- In the last ten years, maintenance budget allocation has been controlled essentially by a "top down" allocation of funds;

- Budget cuts were imposed based on the previous year's spend, and did not take into account the specific needs of the refinery;

- Prior to 2002, the refinery did not carry out a thorough, "bottom up" analysis of maintenance needs or challenge the budget allocation process;

- Evidence from annual performance reports suggested that cost cutting was not carried out as a structured, managed, and measured process; and

- There was no application of best practice in order to reach the budget reductions without reducing the level of maintenance work.[27]

78.    Despite the A.T. Kearney report's clear conclusion that the budget pressure was causing the integrity and reliability of the Texas City refinery to deteriorate, BP's senior management did not change the Company's strategy and continued to issue and enforce budget constraints.  In late 2004, BP's senior management issued, for example, a regional 25% budget cut for BP's five refineries in the U.S., including Texas City.[28]

79.    BP's Board also implemented "incentive" and "bonus" programs for lower-level workers that promoted cutting corners on safety in order to get the job done more quickly.  Thus, BP would provide bonus money to individual rig workers if their project was completed at or before a targeted number of days.  BP would also use this information for employee performance evaluations, grading employees every year based on how much money they saved the Company.[29]

80.    BP implemented this program from as early as 2001 through at least 2007 on a variety of rigs, and made bonus payments to workers that ranged from $2,000 per worker up to $6,000 per worker, based on a sliding scale of when a project was finished.  The bonus program

---

[27]    *Id.* at 83.
[28]    *Id.*
[29]    *BP put profits over safety: An Editorial*, (New Orleans *Times-Picayune*, Oct. 10, 2010).

that BP implemented for the *Kaskida* well in the Gulf of Mexico in 2006 provides a good example. The targeted length of time for this project was 123 days. If the project was finished in 99 to 122 days, workers were paid a base bonus of $80 plus $80 per day for every day before the 122nd day. If it was finished in 74 days to 98 days, workers were paid a base bonus of $2,000 plus $160 per day for every day before the 98th day. Finally, if the project was completed in 73 days or less, each worker received a bonus of $6,000.

### D.   2003 – 2007: Multiple Disasters and Near-Misses Warn and Inform Defendants that They Need to Change BP's Safety Culture.

#### 1.   2003 – *Forties Alpha* Near-Miss

81.     The effect of the Board's strategy of driving financial performance at the expense of operational and safety performance was felt throughout the Company.

82.     On November 27, 2003, a gas line ruptured on BP's Forties Alpha oil platform off of the coast of Scotland. Thousands of pounds of pressurized gas escaped at high velocity from the gas line, jeopardizing the lives of everyone on the platform. This risk was not theoretical – a few years earlier, the rupture of a gas line on the Piper Alpha oil platform, operated by BP's competitor Occidental Petroleum, had set that platform on fire, killing 167 people on board and causing shockwaves through the industry.

83.     An investigation revealed that the gas line rupture on the Forties Alpha was caused by corrosion. BP admitted breaching U.K. health and safety regulations and was fined £200,000.

84.     Oberon Houston was BP's deputy offshore installations manager – BP's second in command – on the Forties Alpha at the time of the gas line rupture. Houston attributed the near-miss to BP's strategy of promoting financial performance over operational performance,

including an overall lack of enthusiasm of BP's senior management for "investing in and maintaining their complex facilities." As Houston explained:

> ***A continual focus on costs and an undoubted commercial savvy was not complimented with similar expertise, or enthusiasm, for the nuts and bolts of the job. Management listened intently to the views of market analysts, who knew little about the technical detail of the oil business, but instead were driven by quarterly results; encouraging and cheering on management's relentless drive to reduce costs. This resulted in a chronic short term view at the very top of the company, obsession with performance metrics became the business for management, not the informed outcome.***

> Engineers were regularly teased for wanting to "gold-plate everything", or reminded that "we are not building a Rolls Royce here". It felt that senior management in BP commonly thought we were more concerned about the elegance of a solution rather than the costs involved, and therefore we were not really trusted. ***These concerns were voiced at all levels, but found little understanding or sympathy***.[30]

### 2.   2005 – Texas City Disaster

> ***It was unbelievable; the fire was ungodly***
> (Disaster survivor Cody Pearson)[31]

85.   One of the Amoco assets that was part of the merger with BP was a refinery in Texas City, Texas. The refinery is the third largest in the country and can produce 10 million gallons of gasoline per day. In anticipation of a sale of the refinery, Amoco had reduced its maintenance investments in the refinery and had deferred many upgrades. This practice was common in the oil industry and BP's senior management and Board members were well aware of it.

86.   Under Defendants, however, BP never provided adequate maintenance budgets for the refineries that were part of the merger with Amoco. Rather, as discussed above, the

---

[30]   Oberon Houston: *Beyond Petroleum – Events in the Gulf of Mexico affect us all*, available at http://conservativehome.blogs.com/platform/2010/06/oberon-houston-.html#more, last visited January 27, 2011.

[31]   Sarah Viren, *It was Unbelievable; the Fire was Ungodly* (Galveston County Daily News, March 24, 2005).

Board ordered BP's managers to cut all budgets – including the Texas City budget – by 25% immediately after the merger to meet Browne's promise to increase the Company's pre-tax profits by $2 billion in 2 years.

87.     Between 2002 and 2004, oil prices rose approximately 65%.  This was good news for BP's exploration division, which sells the oil to refineries and would therefore generate more revenues.  BP's refineries, however, were purchasers of oil and saw the costs of their raw materials substantially increase.  To protect profits, Defendants ordered a second round of 25% budget cuts in late 2004 to maintain the profit levels of the refineries.

88.     For the Texas City refinery, the budget cuts came at a time when the number of accidents at the plant was increasing.  In 2003, the plant experienced three near fatal injuries and in 2004 two workers died.

89.     In the fall of 2004, the Texas City refinery plant manager, Don Parus, gave a presentation to BP's worldwide refining and marketing chief, John Manzoni, entitled "Texas City is not a Safe Place to Work."  The PowerPoint slides discussed circumstances surrounding two deaths at the Texas City refinery that year, and warned that "WE STILL HAVE MUCH TO DO!"  Although Parus eventually persuaded BP to slightly increase spending at Texas City, he later explained in a deposition that it was too little, too late.[32]

90.     On March 23, 2005, workers were restarting an operating unit with volatile chemicals used to make gasoline.  Restarting such an operating unit is one of the most dangerous activities at a refining plant and is usually done after hours, when fewer workers are present. Instead, BP was restarting the unit on a busy Wednesday afternoon.

---

[32]     Daniel Schorn, *The Explosion At Texas City* (CBS News, October 29, 2006).

91.     One of the fluid-level indicators of the unit was not functioning accurately.  A tower alarm that should have warned the workers about excessive fluid build-up did not sound.  A level sight-glass was too dirty to allow workers to see the fluid build-up.  A second alarm designed to warn workers also failed to sound.  When the excessive fluid heated up, it overflowed from the unit and ignited, causing a massive explosion and fire that killed 15 people and injured more than 170 others.  Many of the casualties were in a trailer that was located too close to the operating unit, in violation of applicable safety regulations.

92.     Investigators from the U.S. Chemical Safety and Hazard Investigation Board (the "CSB") quickly determined that "[t]he startup ... was authorized on March 23 despite known problems with the tower level transmitter and the high-level alarms on both the tower and the blowdown drum." Moreover, the CSB found that this was not the first time that this unit had experienced abnormal liquid levels, "but the abnormal startups were not investigated as near-misses and the adequacy of the tower's design, instrumentation, and process controls were not re-evaluated."[33]  The CSB's interim findings were shared with the Board in October 2005.

93.     An internal investigation led by BP executive John Mogford into the causes of the Texas City disaster found that "[a] number of interviewees noted that **safety did not seem to be a priority, particularly as compared to cost management**" and that **"[p]rocess safety, operations performance and systematic risk reduction priorities had not been set and consistently reinforced by management.**"[34]  The findings of the Mogford report were shared with the Board in December 2005.

---

[33]     U.S. Chemical Safety and Hazard Investigation Board, *CSB Issues Urgent Safety Recommendations to BP Global Board, Calls for Creation of Independent Panel to Examine Corporate Safety Management, Oversight, and Safety Culture* (Aug. 17, 2005).

[34]     John Mogford, *Fatal Accident Investigation Report* (December 9, 2005), at 165; ii.

94.     In addition to being one of the deadliest industrial accidents in U.S. history, the Texas City explosion was also one of the most expensive, costing BP in excess of $1.5 billion. BP pleaded guilty to knowingly violating the Risk Management Plan regulations promulgated under the Clean Air Act (the first company ever to do so) and paid a $50 million fine.   BP also agreed to pay $21,361,500 in civil penalties for safety and health violations, including $20,720,000 for "egregious willful violations" found by OSHA.  Any Board member paying the most elementary attention to the Company would have been well aware of this incident and the resulting damages and sanctions.

### 3.     2005 – Thunder Horse Near-Miss

95.     *Thunder Horse* is the largest offshore semi-submersible oil platform in the world. BP invested $5 billion to build the platform, which is located over an oil field with the same name in the Gulf of Mexico.   Whereas the *Deepwater Horizon* was designed to drill for underwater wells, *Thunder Horse* was designed to pump the oil out of the ground once the well was accessible.  At full capacity, the *Thunder Horse* rig could pump 250,000 barrels of oil per day, doubling BP's total oil output in the Gulf.  *Thunder Horse* was seen as proof that BP was at the forefront of technological innovation and engineering ingenuity.

96.     In July 2005, the *Thunder Horse* rig in the Gulf of Mexico was evacuated in anticipation of the approach of Hurricane Dennis.  After the hurricane had passed, the BP crew discovered that the platform was listing badly, as shown below:



97.     Investigators quickly established that six inches of pipe had been improperly installed and allowed water to flow freely between ballast tanks that kept the rig level.  In addition, one way valves that were supposed to keep water out had been installed backwards and were forced open when the rig began to tip over, exacerbating rather than preventing the problem.[35]

98.     After BP repaired the *Thunder Horse*, it discovered that the pipes connecting to the rig were cracked because of welding mistakes.  If the well had been active at the time of the accident, the damaged pipes could have caused a major oil spill.  As a senior engineering consultant on the *Thunder Horse* project, explained: "***You would have lost a lot of oil a mile down before you would have even known. It could have been a helluva spill – much like the***

---

[35]     Sarah Lyall et al., *In BP's Record, a History of Boldness and Costly Blunders* (N.Y. Times July 12, 2010).

*Deepwater Horizon.*"[36]   BP was forced to retrieve and replace many pieces of pipe, costing hundreds of millions of dollars and delaying production by three years.

99.   This incident was yet another reminder that investments in maintenance and process safety are imperative for any oil company seeking to avoid disaster.  Gary Luquette, Chevron's head of North-American exploration and production explained this as follows: "You can make choices early on to cut costs, slim down your project to make it economic today and have dire consequences down the road, or you can build in that reliability and philosophy of dependability up front and save yourself a lot of headaches in the future."[37]   Defendants deliberately committed BP to the first path.

### 4.   2006 – Prudhoe Bay Spill

100.   On March 2, 2006, BP discovered an oil spill at its pipeline in Western Prudhoe Bay, Alaska.  BP initially estimated that up to 267,000 gallons of oil had spilled over 1.9 acres, making it one of the largest oil spills ever in Alaska.  The spill had gone undetected for five days as BP ignored warnings, including four separate sounds of a leak detection alarm, indicating a spill.  The incident caused the Energy and Commerce Committee of the U.S. House of Representatives to open an investigation, and received massive and detailed media scrutiny. Each BP Board member was well aware of the investigation and media scrutiny.

101.   The hole in the pipeline leaking the oil was the result of corrosion caused by neglected maintenance.  BP was later forced to admit that it had implemented various cost-cutting measures that had reduced monitoring of the pipeline for corrosion.  As Robert Malone, CEO of BP America, admitted to a congressional committee, there "was a concerted effort to

---

[36]   *Id.*

[37]   Russell Gold & Tom McGinty, *BP Relied on Cheaper Wells* (Wall St. J., June 9, 2010).

manage the costs [at the Alaska fields] in response to the continuing decline in production at Prudhoe Bay."[38]

102.    BP employees had raised concerns about management's concerted cost-cutting effort as early as 2001.  In October 2001, a BP Operations Review Team issued a report finding that "*[w]orkers consider that certain critical safety systems are in need of urgent maintenance or significant upgrades*" and that "*[t]he workers are not convinced that management is adequately addressing their operational integrity concerns*."[39]  In addition, the 2001 Operations Review Team found that:

> *Many employees believe that budgets have been cut too deeply and that [Greater Prudhoe Bay] management's top priority is controlling costs in order to achieve short-term budget targets and not safety, regulatory compliance or delivering long-term operational integrity.*[40]

103.    The 2001 Operations Review Team also found that workers did not have adequate access to "as built" drawings of equipment and the progressing work.  These drawings are essential for preventing and mitigating industrial accidents because they allow engineers and first responders to quickly understand the details of the equipment and the ongoing construction, and therefore to adequately respond.  Maintaining "as built" drawings is, however, expensive and the 2001 Operations Review Team found that BP did not keep them accessible to its workers, stating: "Revised 'as built' drawings are not always readily available to staff while work is progressing in Anchorage on reissued drawings."[41]  BP's practice was not consistent with good process safety.

---

[38]    Andrew Buncombe, *BP's Oil Spill in Alaska Blamed on Cost-cutting* (The Independent, May 17, 2007).

[39]    BP Operational Review Team, *Review of Operational Integrity Concerns at Greater Prudhoe Bay* (Oct. 2001), at 5.

[40]    *Id.* at 13.

[41]    *Id.* at 28.

104.     The 2001 findings of the BP Operations Review Team report were shared with the Board in or about September 2001.

105.     Defendants retained the law firm Vinson & Elkins ("V&E") to investigate the safety complaints of BP workers in Alaska.  V&E reported that BP employees faced retaliation for reporting problems and had seen BP allow "pencil whipping," meaning the falsifying of inspection data.  V&E also reported that employees felt pressure to skip key diagnostics, including pressure testing, cleaning pipelines, and checking for corrosion, all in the name of cost cutting.  For example, V&E reported that management had suggested "not to rebuild the pulling equipment as often . . . and possibly not to pressure test the equipment."  As BP employee Marc Kovac wrote in a safety complaint filed with the Company, "*[t]his obviously would increase the potential for equipment failure resulting in equipment damage, environmental spills and injury to workers*."[42]  BP's Board received V&E's report in October 2004.

106.     BP reduced the corrosion monitoring crew from 8 to 6.  The president of BP's Alaska operations admitted during hearings of the investigations subcommittee of the House Energy and Commerce Committee that BP had also allowed the pipeline corrosion manager to create an atmosphere of intimidation.[43]

107.     During this time, BP cut costs by relying on spot checks of the pipeline rather than using a "pipeline inspection gauge" or "pig" to test for corrosion.  Two weeks after BP discovered the spill, the U.S. Department of Transportation ordered BP to test the pipeline with a pig.  The eastern pipeline had not been tested with a pig since 1992 and was found to suffer extensive corrosion in several places.  Citing "unexpectedly severe corrosion," BP was forced to

---

[42]     Abrahm Lustgarten & Ryan Knutson, *Years of Internal BP Probes Warned That Neglect Could Lead to Accidents* (ProPublica June 7, 2010).

[43]     Paul Davidson, *Congressmen slam BP executives at Alaskan oil leak hearing* (USA Today, September 7, 2006).

shut down the eastern side of the Prudhoe Bay oil field, reducing the U.S. domestic oil supply by 8% in one swoop.

108.    In August 2006, pipeline technician Stuart Sneed discovered another crack in the Prudhoe Bay pipeline.  Fearing that a spark could ignite a fire and casualties, Sneed ordered nearby welders to immediately stop working.  Rather than commend Sneed for his process safety efforts, BP launched a retaliation campaign against Sneed.  The day after Sneed discovered the crack and prevented significant harm, a BP supervisor solicited reasons from other Prudhoe Bay employees for terminating him.  Sneed was fired two weeks later.  Sneed later explained his disappointment with BP's safety culture as follows: "***They say it's your duty to come forward, but then when you do come forward, they [expletive] you.  They'll destroy your life***."[44]  Sneed's account was confirmed by a labor dispute arbitration panel.

109.    On May 16, 2007, the head of the CSB, Carolyn W. Merritt, testified before the U.S. House of Representatives' Committee on Energy and Commerce, Subcommittee on Investigations and Oversight.  After explaining that the CSB's investigation had determined that the Texas City disaster was caused by "***organizational and safety deficiencies at all levels of the BP Corporation***," Ms. Merritt explained that there were striking similarities between the BP pipeline incident and the 2005 explosion at BP's Texas City refinery: "***Most if not all of the seven root causes that BP consultants identified for the Prudhoe Bay incidents have strong echoes in Texas City***."[45]  Ms. Merritt gave a few examples, including:

- [BP] Alaska was under severe budget pressures from BP.

---

[44]     Abrahm Lustgarten and Ryan Knutson, *Years of Internal Probes Warned That Neglect Could Lead to Accidents* (ProPublica, June 7, 2010).

[45]     Testimony of Carolyn W. Merritt, Chairman of the U.S. Chemical Safety and Hazard Investigation Board, Before the U.S. House of Representatives Committee on Energy and Commerce Subcommittee on Investigations and Oversight (May 6, 2007), at 1.

- Budgets and funding [were] largely based on affordability (vs. necessity) and were not supported by an analytical process to prioritize risk.

- Senior management incentives [were] based on cost and production.

110.    Merritt's testimony before the U.S. Congress received extensive media coverage and was shared with the BP Board at the time.

111.    On October 25, 2007, a BP subsidiary pleaded guilty to a criminal violation of the Clean Water Act and was sentenced to pay a total of $20 million, including a $12 million criminal fine and $4 million in criminal restitution, and to three years' probation.   The Department of Justice explained that the investigation leading to the guilty plea involved the March and August 2006 leaks, and that these leaks were the result of BP's "failure to heed many red flags and warnings signs of imminent internal corrosion that a reasonable operator should have recognized."[46]   Acting Assistant Attorney General, Ronald J. Tenpas, explained: "*BP cut corners with disastrous consequences and is being held to account*."[47]   Defendants were informed about this guilty plea in or before October 2007.

### 5.      2006 – Unsafe Refinery Operations in Ohio

112.   In April 2006, BP was fined $2.4 million by OSHA for unsafe operations at BP's Oregon, Ohio refinery.  Investigators had found 32 "willful" violations that were very similar to safety issues that were identified after the fatal explosion in Texas City, including vulnerable buildings close to the processing units and allowing deficiencies in gas monitors.

113.   OSHA defines a willful violation as one "committed with intentional disregard for, or a plain indifference, to employee safety and health."

114.   Reviewing BP's violations, OSHA assistant secretary Edwin Foulke, Jr. said:

---

[46]    U.S. Department of Justice News Release, *British Petroleum Exploration (Alaska) Agrees to Plead Guilty to a Criminal Violation of the Clean Water Act and Pay $20 Million in Criminal Penalties* (October 25, 2007)

[47]    *Id.*

*It is extremely disappointing that BP Products failed to learn from the lessons of Texas City to assure their workers' safety and health.*

*Our Enhanced Enforcement Program (EEP) exists for companies like this who, despite our enforcement and outreach efforts, ignore their obligations under the law and continually place their employees at risk.[48]*

115.  Defendants, including the Board, were informed in or before April 2006 that OSHA was applying its "Enhanced Enforcement Program" to BP because the Company continued to place its employees at risks.  Defendants were also informed about OSHA's finding of 32 willful violations of U.S. workplace safety regulations at BP's Oregon, Ohio refinery.

E.    **U.S. Governmental Agencies and Experts Repeatedly Warn Defendants to Change BP's Safety Culture**

1.    The Baker Report

116.    Incredibly, within months following the explosion and fire that killed 15 people and injured more than 170 others, the Texas City refinery suffered two additional accidents killing workers, and two additional incidents with the potential to become outright disasters – a hydrogen fire and a gas release.

117.    On August 17, 2005, the CSB explained that, although its investigation was ongoing, it had identified serious safety management lapses that were creating an imminent hazard and had "the potential to cause serious harm unless rectified in a short time frame."  The CSB therefore took the unprecedented step to issue the "urgent safety recommendation" that BP commission a panel of experts to "review corporate safety oversight, safe management of refineries obtained through mergers and acquisitions, corporate safety culture, and management

---

[48]    U.S. Department of Labor News Release, *OSHA Fines BP $2.4 Million for Safety and Health Violations Inspection Initiated Under Enhanced Enforcement Program* (April 25, 2006).

systems such as near-miss reporting and mechanical integrity programs."[49]  The CSB cited the Columbia Accident Investigation Board, which had investigated the 2003 Space Shuttle *Columbia* disaster, as a possible model for the panel (further underscoring the gravity of the CSB's concerns).

118.    Defendants had no choice but to comply.  In the fall of 2005, BP assembled a panel chaired by former Secretary of State James A. Baker III, later known as the "Baker Panel." In January 2007, the Baker Panel issued a 260 page report with detailed findings and recommendations (the "Baker Report").  The Baker Report was delivered to the BP Board upon publication.

119.    Dedicated to the survivors of the Texas City tragedy and the memory of those who lost their lives, the Baker Report detailed "systemic" problems at BP – "from the top of the company, starting with the Board and going down" – that had been disregarded by Defendants and remain unremedied to this day.  Explaining that "it is imperative that BP's leadership set the process safety 'tone at the top' of the organization and establish appropriate expectations regarding process safety performance," the Panel concluded that "***BP has not provided effective process safety leadership and has not adequately established process safety as a core value across all its five U.S. refineries.***"[50]

120.    As requested by the CSB, the Baker Panel also reviewed BP's corporate safety culture, and found it gravely – and in fact, fatally – deficient.  The Baker Report noted that:

- BP did not effectively incorporate process safety considerations into management decision-making that affects the U.S. refineries.

---

[49]    U.S. Chemical Safety and Hazard Investigation Board, *CSB Issues Urgent Safety Recommendation to BP Global Board, Calls for Creation of Independent Panel to Examine Corporate Safety Management, Oversight, and Safety Culture* (Aug. 17, 2005).

[50]    Baker Report at xii.

- While BP has an aspirational goal of "no accidents, no harm to people," BP has not provided effective leadership in making certain its management and U.S. refining workforce understand what is expected of them regarding process safety performance.

- BP has not always ensured that it identified and provided the resources required for strong safety performance at its U.S. refineries, including both financial and human resources.

- While all of BP's U.S. refineries have active programs to analyze process hazards, the system as a whole does not ensure adequate identification and rigorous analysis of those hazards.  The Panel's examination also indicates that the extent and recurring nature of this deficiency is not isolated, but systemic.

- [S]ignificant deficiencies existed in BP's site and corporate systems for measuring process safety performance, investigating incidents and near misses, auditing system performance, addressing previously identified process safety-related action items, and ensuring sufficient management and board oversight.

- BP has not demonstrated that it has effectively held executive management and refining line managers and supervisors, both at the corporate level and at the refinery level, accountable for process safety performance at its U.S. refineries.

- Many of the process safety deficiencies are not new but were identifiable to BP based upon lessons from previous process safety incidents, including process incidents that occurred at BP's facility in Grangemouth, Scotland in 2000.

- The Panel does not believe that BP implemented an integrated, comprehensive, and effective process safety management system for its U.S. refineries. Although BP's executive and refining line management was responsible for ensuring the implementation of such a system, BP's Board did not ensure, as a best practice, that management did so.

121.    In short, the Baker Report warned of a systemic breakdown in BP's process management, noting that "*information available to the Panel appears to indicate a more systemic breakdown occurring at multiple levels and in different line and functional positions*."[51]

122.    The Baker Panel also noted BP's culture of retaliation against workers who reported incidents and near-misses to management, finding that "many workers … believe that

---

[51]    *Id.* at 228.

some incidents, near misses, or other safety concerns do not get reported for a variety of reasons, including fear of being blamed or retaliated against – or that no corrective action would be taken so reporting would not be of any value."[52]  As a result, the Panel concluded, "***BP's process safety management system likely results in under reporting of incidents and near misses at BP's five U.S. refineries.***"[53]

123.    The Baker Panel did not mince words in assigning blame for BP's lacking process safety squarely on BP's CEO, John Browne.  As the Baker Report explained:

> Browne is generally noted for his leadership in various areas, including reducing carbon dioxide emissions and developing the use of alternative fuels.  During the last eight years, Browne has spoken frequently on these issues across the globe. In 2005, The Financial Times named him the fifth most respected business leader in the world. Browne's passion and commitment for climate change is particularly apparent. In hindsight, ***the Panel believes that if Browne had demonstrated comparable leadership on and commitment to process safety, that leadership and commitment would likely have resulted in a higher level of process safety performance in BP's U.S. refineries***.[54]

124.    Browne admitted that the report made for "painful reading" because ***"[t]he Baker Panel's conclusion was that the Texas City explosion was a process safety incident which could have been prevented.***"[55]  As Browne admitted:

> We had emphasised that individuals had to be safe as they went about their daily work – "personal safety."  That led to dramatic improvements.  ***But we had not emphasised that processes and equipment had to be safe under all circumstances and operated in a safe way at all times – "process safety."***[56]

125.    The Baker Report made 10 recommendations to improve BP's corporate safety culture, including the need for the Board to "provide effective leadership on … process safety"[57]

---

[52]     *Id.* at 79.
[53]     *Id.* at 165.
[54]     *Id.* at 67.
[55]     John Browne, *Beyond Business, An Inspirational Memoir From a Visionary Leader,* at 205 (The Orion Publishing Group, Ltd., 2010).
[56]     *Id.* at 205.
[57]     Baker Report at 244.

and "monitor the implementation of the recommendations of the Panel."[58]  The Baker Panel also recommended that BP "clearly define expectations and strengthen accountability for process safety performance at all levels in executive management" and "establish and implement an effective system to audit process safety performance at its U.S. refineries."[59]

126.    The report was made public and received extensive media coverage, including in the New York Times, the Wall Street Journal and the Financial Times.  Browne personally accepted the report on behalf of the board, and promised to implement its recommendations.  At a BP news conference following the presentation of the Baker Report, Browne said:

> If I had to say one thing which I hope you will all hear today it is this "BP gets it."
>
> And I get it too. This happened on my watch and, as Chief Executive, I have a responsibility to learn from what has occurred. I recognise the need for improvement and that my successor, Tony Hayward, and I need to take a lead in putting that right by championing process safety as a foundation of BP's operations.[60]

### 2.    The U.S. Chemical Safety and Hazard Investigation Board Report

127.    Two months later, in March 2007, the CSB issued its final report concerning the chemical safety board's investigation into the Texas City disaster that had caused nearly 200 casualties.  The findings of the CSB Report were shared with the BP Board in or about March 2007.

128.    The CSB made several factual findings that made the BP Board's systematic failure to exercise oversight over process safety painfully obvious.  The CSB determined, for

---

[58]    *Id.* at 256.

[59]    *Id.* at xvii.

[60]    Lord Browne's remarks at the press conference following the publication of the Baker Panel Report on January 16, 2007, available on BP's website at http://www.bp.com/liveassets/bp_internet/globalbp/globalbp_uk_english/SP/STAGING/local_assets/assets/pdfs/Baker_panel_transcript.pdf

example, that "**BP Group Board did not provide effective oversight of BP's safety culture and major accident prevention programs**"[61] and that, as a result:

- BP Group lacked focus on controlling major hazard risk.

- BP Group and Texas City managers provided ineffective leadership and oversight.

- BP management did not implement adequate safety oversight, provide needed human and economic resources, or consistently model adherence to safety rules and procedures.

- BP Group and Texas City did not effectively evaluate the safety implications of major organizational, personnel, and policy changes. [62]

129.    Moreover, the CSB found that the decision to cut essential budgets was made at the highest levels of BP, and with knowledge of the serious safety deficiencies at the Texas City refinery that existed even without those cuts.  As the CSB explained:

> **BP targeted budget cuts of 25 percent in 1999 and another 25 percent in 2005, even though much of the refinery's infrastructure and process equipment were in disrepair.**

> \*    \*    \*

> **Decisions to cut budgets were made at the highest levels of the BP Group despite serious safety deficiencies at Texas City.  BP executives directed Texas City to cut capital expenditures in the 2005 budget by an additional 25 percent despite three major accidents and fatalities at the refinery in 2004.**

> \*    \*    \*

> **These budget cuts "left the Texas City refinery vulnerable to a catastrophe."**[63]

130.    The CSB Report left no doubt that the pressure from senior management to cut budgets negatively impacted process safety at the Texas City refinery before the 2005 explosion. In the words of the CSB: "Cost-cutting, failure to invest and production pressures from BP

---

61    U.S. Chemical Safety and Hazard Investigation Board, *Investigation Report Refinery Explosion and Fire (15 killed, 180 injured)*, at 210 (March 2007).

62    *Id.* at 179.

63    *Id.* at 20; 189.

Group executive managers impaired process safety performance at Texas City."[64]  The CSB noted that the 2005 Texas City Health, Safety, Security and Environment ("HSSE") Business Plan had expressly warned that the refinery likely would "kill someone in the next 12-18 months."[65]  BP Board members were thus yet again put on glaring notice of the risk to human life from the Company's lacking process safety.

131.    The CSB noted the deep and pervasive problem with BP's safety culture, observing that "***BP Group executive management became aware of serious process safety problems at the Texas City refinery starting in 2002 and through 2004 when three major incidents occurred.***"[66]

132.    The process safety problems were not limited to the Texas City refinery.  The CSB noted that in 2004, BP's internal audit group had reviewed "GHSER [Getting Health, Safety and the Environment Right] audits for 2003 and found a number of serious safety deficiencies common throughout the corporation."  Moreover, the March 2004 audit report found significant common deficiencies, including that "***[l]eadership and accountability were the most common problem***" and that "***leadership was not 'reinforcing expectations through their own behaviors'***."[67]

133.    The CSB squarely blamed BP's Board and senior executives for the Company's dismal safety culture.  Based on the findings of its two year investigation, the CSB determined that the "root causes" of the Texas City disaster was the Board's utter failure to effectively oversee and address BP's safety culture and the prevention of major accidents – not failures by lower level-workers – and not human error.

---

[64]        *Id.* at 25.
[65]        *Id.* at 177.
[66]        *Id.* at 143.
[67]        *Id.* at 166.

134.     In fact, according to the CSB, the first and foremost cause for the Texas City disaster was the Board's failure to provide oversight over BP's process safety.  Specifically, the CSB found that "*BP Group Board did not provide effective oversight of the company's safety culture and major accident prevention programs.*"[68]

135.     Senior executives were also found to have utterly failed in addressing BP's process safety, in particular the critical need to prevent and control catastrophic accidents.  The CSB concluded that BP's senior executives:

- *inadequately addressed controlling major hazard risk.*  Personal safety was measured, rewarded, and the primary focus, but the same emphasis was not put on improving process safety performance;

- *did not provide effective safety culture leadership and oversight to prevent catastrophic accidents*;

- ineffectively ensured that the safety implications of major organizational, personnel, and policy changes were evaluated;

- *did not provide adequate resources to prevent major accidents;* budget cuts impaired process safety performance at the Texas City refinery.

136.     The CSB report was made public and received extensive media coverage, including in the New York Times and the Wall Street Journal.

137.     On March 23, 2010, the chair of the CSB commemorated the  fifth anniversary of the Texas City disaster, and reiterated the Investigation Board's conclusion that there was no doubt that BP's Board knew about the Company's lacking process safety but decided not to intervene – in flagrant violation of the Director Defendants' fiduciary duties to the Company and its shareholders:

> Our investigation team turned up extensive evidence showing *a catastrophe waiting to happen*, that cost-cutting had affected safety programs and critical maintenance; production pressures resulted in costly mistakes made by workers

---

[68]     *Id.* at 295.

likely fatigued by working long hours; *__internal audits and safety studies brought problems to the attention of BP's board in London, but they were not sufficiently acted upon.__*[69]

3.    The Booz Allen Report

138.    Following the oil leak in the Prudhoe Bay pipeline, Defendants caused BP America to retain the consulting firm Booz Allen Hamilton ("Booz Allen") to "identify potential organization, process, information systems, and governance issues that may have contributed to these incidents."[70]    Booz Allen's Report reached the same conclusions as the Baker and CSB Reports, warning that the BP Board was directly responsible for creating a culture focused on cost-cutting to ensure that budget targets were met, while ignoring safety issues and critical maintenance.    The Booz Allen report was delivered to BP in March 2007 and its findings were reviewed by BP's Board promptly thereafter.

139.    The Booz Allen Report indicates that senior management received updates concerning BP's operations in Alaska on weekly, monthly, quarterly, and annual intervals.    In fact, BP Exploration Alaska prepared a Quarterly Performance Review package for senior management with information on financials, human resources, operations, annual plan milestones, major and strategic project status, safety issues, renewals, integrity management and an incident summary.

140.    BP's management used the information in the updates to establish performance goals and operating budgets for BP's Alaska operations.    The Booz Allen Report found that the

---

[69]    U.S. Chemical Safety and Hazard Investigation Board, *Statement from CSB Chairman John Bresland on 5th Anniversary of Fata BP Texas City 2005 Explosion* (March 23, 2010).

[70]    Booz Allen Hamilton, *BP America Inc. Final Report, 2006 BPXA GPB OTL Incidents, Management Systems Review* (March 2007) ("Booz Allen Report") at 1.

"overall budgeting process combined a strong top-down target with a bottom-up, activity-based process."[71]

141.    The top-down targets established by BP "were considered sacrosanct and were rarely exceeded."[72]   Moreover, Booz Allen found that risk management in BP's Alaskan operations was also "largely driven by top-down targets."   Interviews with BP employees "indicated that top-down budget targets provided a 'budget box' in which activities, materials, and projects had to fit …. This top-down element was driven by a desire to run a profitable operation in a high-cost environment, holding lifting costs flat even as production declined substantially."[73]   Moreover, the report found that the increasing risks resulting from these top-down budget targets were not routinely communicated to BP's senior management.   As Booz Allen explained, "Risk-related vertical and horizontal communications do not elevate critical risk data to senior leadership."[74]   In other words, the Board was again expressly informed that it could ***not*** rely on BP's internal reporting mechanism for understanding the scope of the process safety problems.

142.    The Booz Allen Report is another example of the Board being informed that it was fostering a corporate culture that favored meeting budget targets over process safety.   In addition, at least as of March 2007, the Board knew that it was not receiving all "critical risk data" related to its strategy, leaving the Board unprepared to anticipate catastrophic incidents such as the *Texas City* disaster.

---

[71]      *Id.* at 40.
[72]      *Id.* at 41.
[73]      *Id.* at 71-72.
[74]      *Id.* at 77.

**F.     2007-2010 – Defendants Ignore Warnings and Do Not Change BP's Safety Culture**

   1.     CEO Tony Hayward Perpetuates the Strategy of Promoting Financial Performance over Process Safety

143.    A few months after the publication of the CSB, Baker and Booz Allen Reports in early 2007, Browne resigned as CEO for unrelated personal reasons.  Rather than look outside the Company to ensure a new start with an appropriate focus on changing BP's safety culture, the Board promoted one of Browne's protégés – Defendant Hayward – to become BP's new CEO.

144.    In the years leading up to his promotion, Hayward was CEO of BP's exploration and production division.  Hayward therefore was well aware of the Company's drive to reduce expenses at all costs and the consequences of that strategy.  Indeed, in 2006, shortly before becoming CEO, Hayward said: **"We have a management style that has made a virtue of doing more for less."**[75]  He explained, "The mantra of 'more for less' says that we can get 100% of the task completed with 90% of the resources – which in some cases is okay and might work, but it needs to be deployed with great judgment and wisdom. When it isn't, you run into trouble."[76] Moreover, according to Hayward "**[t]he top of the organisation doesn't listen hard enough to what the bottom of the organisation is saying.**"[77]

145.    Once Hayward was promoted to CEO, however, he – just like Browne before him – proved interested only in the cost-cutting side of the equation, ignoring the "trouble" that was likely to result from such an exclusive focus, and ignoring urgent messages from "the bottom" about the resulting risks.

---

[75]    Tom Bower, *Browne's Legacy of Cost-cutting Stored Up Barrels of Trouble* (Sunday Times, May 9, 2010).

[76]    Dominic Rushe, *Focus: Battered Petroleum* (Sunday Times, December 24, 2006).

[77]    *Id.*

48

146.     A few months after his promotion, Hayward explained that BP's profits were lagging behind those of its competitors because of "impaired U.S. refining capacity and delays to new production in the Gulf of Mexico."[78]  To improve BP's profits, Hayward announced that BP would simplify its organizational structure and – yet again – cut budgets and employees.

147.     Hayward had a personal interest in implementing these budget cuts, even if, as a result, BP's process safety would further suffer.  Under the executive compensation policies adopted by the Board, 70% of Hayward's performance bonus in 2009 would be based on the achievement of financial metrics, and only 15% on safety (including personal safety as opposed to process safety), and 15% on amorphous people skills.

148.     With the Board's approval, Hayward immediately began to implement this strategy.  Between 2008 and 2010, 22,000 people were terminated from the Company and, in 2009 alone, BP saved $4 billion.[79]  In 2009 alone, Defendants cut BP's operational costs by 15%. This reduction in budgets and manpower further undermined the Company's ability to operate safely as personnel were stretched even thinner and resources that should have been devoted to maintenance, monitoring and addressing crucial safety failures in every aspect of the Company's operations were diverted.

149.     The impact of the emphasis on cost cutting at the expense of safety was underscored by Ross Macfarlane, a former BP health and safety manager on rigs in Australia, who said that workers had "high incentive to find shortcuts and take risks" and that "*[y]ou only ever got questioned about why you couldn't spend less – never more.*"[80]

---

[78]     Terry Macalister, *Hayward Outlines restructuring to BP staff* (The Guardian, October 11, 2007).

[79]     Tim Webb, *BP records refining losses but profits rise* (The Guardian, February 2, 2010).

[80]     Guy Chazan, et al., *As CEO Hayward Remade BP, Safety, Cost Drives Clashed* (Wall St. J., June 29, 2010).

150.     Hayward's directives, under the Board's oversight, accelerated the evisceration of process safety begun by Browne.  For example, in December 2008 – almost two years after receiving the Baker, CSB, and Booz Allen Reports – a BP strategy document warned Defendants that BP still did not adequately plan for the mitigation of serious safety risks for its operations in the Gulf.  The document was discussed with members of the Board and warned that senior management's failure to address this shortcoming could result in "multiple injuries/fatalities," "major environmental damage," "catastrophic loss of the facility," and "damage to corporate reputation."[81]  Despite these dire and unmistakable warnings, however, Defendants did not do what their duties most urgently required of them.  Instead, the Company's high risk drilling operations continued.

2.     BP Continues to Pay Record Safety Fines

151.     Between June 2007 and February of 2010, BP received the overwhelming majority of all serious citations issued by OSHA.  Out of all of the citations issued by OSHA during this time period, BP received at least 760 "egregious, willful" safety citations issued.  In comparison, Sunoco and Conoco-Phillips each had eight, Citgo had two and Exxon had one comparable citation.[82]  OSHA defines a willful violation as one "committed with intentional disregard for or a plain indifference to employee safety and health" and an "egregious violation" as one so severe that it can result in a penalty each time a violation occurs.  Put another way, in stark contrast with the BP Board, the boards of directors of other U.S.-centric oil and gas companies made sure their operations were not implemented with intentional disregard for employee process safety and mandatory safety regulations, and took care to ensure that their operations did not result in catastrophe.

---

[81]     Peter Elkind, et al., *BP: "An Accident Waiting to Happen"* (Fortune, January 24, 2011).
[82]     Pierre Thomas, et al., *BP's Dismal Safety Record* (ABC News, May 27, 2010).

152.    Under Defendants' leadership, BP continued to enter into criminal guilty pleas while agreeing to pay multimillion dollar criminal and civil fines.  In 2008, BP was fined $3 million for "'willful' safety violations" at the Toledo, Ohio refinery, including the use of deficient "valves similar to those that contributed to the Texas City blast."  OSHA had first inspected the Toledo refinery in 2006.  During that inspection, OSHA uncovered problems with pressure-relief valves and ordered BP to fix the valves.  Two years later, in 2008, inspectors found that BP had carried out requested repairs, but only on the specific valves OSHA had identified.  The agency found exactly the same deficiency elsewhere throughout the refinery.

153.    On October 30, 2009, OSHA imposed a $87.4 million fine – the largest in the agency's history and more than four times the previous record fine, also levied against BP – after finding more than 700 violations at the Texas City refinery, including 439 "egregious and willful" safety violations.  Many of the violations concerned faulty valves, which are critical for safety in the refinery because of the high temperatures and pressures.  OSHA's findings and record fine came a little over a year after BP had settled criminal charges in connection with the Texas City disaster, admitting that "[o]ur operations failed to meet our own standards and the requirements of the law," and pledging to improve BP's risk management.

154.    On January 14, 2010, U.S. Representatives Bart Stupak and Henry Waxman wrote a letter to the president of BP's Alaskan operations and board member of BP America, John Mingé, warning that the Company's efforts to cut costs imperiled safety at BP facilities, noting that their "***staff have received reports that proposed budget cuts by BP may threaten the company's ability to maintain safe operations***."

155.    Five days later, the U.S. Environmental Protection Agency wrote to Mingé and BP's general counsel, Jack Lynch, mirroring the congressmen's concerns.  In addition, the EPA

raised concerns about retaliation against the inspection supervisor who had raised alarms about the faulty Prudhoe Bay pipeline, stating:

> *It appears that BP, regardless of its code of conduct and statements to the government, will do whatever is necessary to cover up the improper actions of its senior managers. This promotes intimidation, retaliation, blackballing and unethical behavior in the management ranks, and a culture of fear and lack of ethics in the employee ranks. Nothing has been done in TWO YEARS. This is a current graphic example of why EPA does not trust BP.*[83]

156. These fines, penalties, and challenges from Congress and regulators were reported to and known by the BP Board.

### G. The *Deepwater Horizon* Disaster

157. In February 2010, the *Deepwater Horizon* rig arrived at the Macondo field in the Gulf of Mexico. The drilling of the Macondo well already was facing delays and cost overruns after a previous rig, the *Marianas*, was damaged by a hurricane in the previous fall. Every day of delay cost BP approximately $1 million.

158. When it took over the job from the *Marianas*, the *Deepwater Horizon* began drilling the well with a "long string" tube. BP could have drilled the hole with a "liner" which would have reduced the blowout risk, but this was rejected because it was slower and up to $10 million more expensive.

159. Every dollar counted to BP and the *Horizon* was drilling as fast as it could. Mike Williams (the rig's chief electronic technician) explained on CBS's *60 Minutes* that he was ordered by a BP manager to "bump it up; and what he was talking about there is he's bumping up the rate of penetration – how fast the drill bit is going down."[84]   According to Williams, the

---

[83]     Abrahm Lustgarten, *Furious growth, cost cuts led to BP accidents past and present* (ProPublica, October 26, 2010).

[84]     Sally Granastein, et al., *Blowout: The Deepwater Horizon Disaster*, 60 Minutes, New York: CBS Productions.

*Horizon's* efforts to drill too fast caused the base of the well to split open, requiring BP to abandon the well. Drilling a new well took an additional two weeks and cost BP millions of dollars. After this setback, workers felt even greater pressure to deliver. Williams: "There's always pressure, but yes, the pressure was increased."

160. By April 20, 2010, the Macondo drilling project was $55 million over budget, leading to tremendous corporate top-down pressure to finish the job and minimize the cost overruns.[85]

161. BP's culture of profits over safety and the pressure to get the Macondo drilling project done caused workers on the *Horizon* to make a number of decisions that increased the risk of an accident. For example, as the *Horizon* was drilling through the earth's crust, it was losing "drilling mud" – a specialized mixture that is designed to lubricate the well and control its pressure. That either meant that the well was drilled too quickly, cracking the formation, or that the well was unstable and risked a blowout. To avoid additional delays and cost overruns, BP workers at the *Horizon* did not test the well for a build-up of pressure before starting the process of capping it with cement.

162. It was the job of the *Horizon's* cement contractor, Halliburton, to cap the hole. This is a highly specialized task and requires, among other things, that the drill string is centered, so that the cement fills all sides of the hole equally and has no weaker spots, and that the cement itself has the correct composition. Again, implementing Defendants' top-down directive to minimize delay, at all costs, BP workers on the *Horizon* and their supervisors on shore decided to use only six centralizers instead of the recommended twenty-one, and did not adequately check

---

[85]    Joe Carroll, *BP Well Was 61% Over Budget Before Drilling-Rig Blast* (Bloomberg, October 6, 2010).

to make sure that the cement could contain the pressure of the well. Tests later revealed that the composition of the cement was, in fact, unstable.

163.    None of these decisions – not testing the pressure of the well before capping it, using fewer centralizers, and not waiting to evaluate the cement composition – alone caused the *Horizon* disaster when the well blew out. None of these decisions were, however, consistent with good process safety. They each needlessly increased the risk of a catastrophic blowout while the *Horizon* was using a long string rather than a liner to drill the well. The common theme of these decisions – the elevation of cost-saving and corner-cutting over concerns for prudence and process safety – were all part and parcel of the culture fostered by the Defendants.

164.    The blowout of a well is dangerous under any circumstances. Crude oil and natural gas are released and travel up through the well without control over the pressure, pushing anything in their way up and out. In the case of an underwater blowout, the gas rises to the surface, where a spark can turn it into a horrific fire. Every drilling rig, therefore, has an alarm system to warn workers when a blowout occurs. To regain control over the gushing oil and gas after a blowout, every rig is also required by the U.S. Minerals Management Service to have a blowout preventer, or "BOP" – a large valve that is used to cut the riser connecting the rig to the well, and to seal the well to stop the flow of oil and gas. The MMS also requires rigs to maintain reliable back-up systems for actuating the BOP.[86]

---

[86]    In a March 2000 industry-wide safety alert, the MMS warned that a "backup BOP actuation system [is] an essential component of a deepwater drilling system." Industry studies in 2004 and 2007 also repeatedly warned that oil companies could not be complacent and should check the capabilities of its BOPs to make sure they were adequate. *West Engineering "Shear Ram Capabilities Study," for U.S. Minerals Management Service*, Requisition No. 3-4025-1001 (September 2004); *Development of A Blowout Intervention Method and Dynamic Kill Simulator for Blowouts Occurring In Ultra-Deepwater, U.S. Minerals Management Service* (December 2004); Michael J. Jellison, et al., *Ultradeep Drilling Pushes Drillingstring Technology Innovations* (2007).

165. When the Macondo well blew out, the *Deepwater Horizon*'s BOP failed to fully engage and did not stop the flow of oil and gas. The required back-up actuation systems for the BOP did not function either. The alarm that was supposed to warn *Horizon* workers of the blowout never sounded.

166. Congressional investigators later determined that the BOP had a dead battery, was leaking hydraulic fluid, was not adequately tested for ultra-deep drilling, and had been modified by replacing the ram that was supposed to cut the riser with a cheaper "test ram" that was incapable of doing so. The modifications to the BOP were so extensive that the available "as built" drawings of the BOP were useless at the time of the disaster. In addition, the *Horizon's* automatic alarm had been disabled and needed to be triggered manually.[87] None of these practices were consistent with good process safety. They resulted from Defendants' strategy of cutting corners and saving costs..

167. When the well blew out, gas shot up the riser connecting the *Horizon* to the well and sprayed into the rig, igniting an explosion that caused the deaths of 11 workers. Despite a three day search by the U.S. Coast Guard, the victims' remains were never found.

168. After burning for two days, the *Horizon* sank, disconnecting the riser from the well and causing the oil to spill freely into the Gulf. This turned a major industrial accident into an environmental disaster.

169. Unfortunately, BP had cut costs and did not prepare a site specific mitigation plan in the event of such an emergency. First responders, other State and Federal agencies, and BP were therefore forced to rely on a "regional" mitigation plan for the entire Gulf of Mexico – only to discover that parts of this mitigation plan had been "cut and pasted" from a mitigation plan for

---

[87] Russell Gold & Ben Casselman, *Alarm Was Disabled Before BP Blast* (Wall St. J., July 24, 2010).

drilling in the radically different environment of Alaska, listed incorrect emergency telephone numbers, listed incorrect information for a company that provides equipment to clean up an oil spill, and a long-deceased scientist who could assist with mitigating environmental harm. Defendant Hayward later admitted that BP was forced to make up its response to the disaster as it went along.[88]

170. Despite frantic efforts by the federal government and BP to stop the uncontrolled flow of oil and gas into the Gulf, the well was not permanently sealed until September 19, 2010 – almost five months after the rig exploded. As of August 2, 2010, the U.S. Geological Survey estimated that 4.9 million barrels, or 205.8 million gallons, of oil had spilled into the Gulf and that BP's containment efforts had captured only approximately 16 percent of the spill.[89] By the end of October 2010, people were cleaning hundreds of miles of soiled shoreline from Louisiana to the Florida panhandle, and it is still too soon to predict what the total environmental damage will be.

171. Hayward knew that BP's response to the *Deepwater Horizon* disaster showed an egregious failure to plan for a major accident (the exact same problem that the Baker Panel and the CSB had begged the Board to address more than three years earlier). As Hayward admitted to the *Financial Times*:

> "What is undoubtedly true is that we did not have the tools you would want in your tool kit," Mr. Hayward said. **He accepted it was "an entirely fair criticism" to say the company had not been fully prepared for a deep-water oil leak.**[90]

---

[88]    Terry Macalister, *Tony Hayward: Public Saw Us as 'Fumbling and Incompetent'* (The Guardian, Nov. 10, 2010).

[89]    Campbell Robertson & Clifford Krauss, *Gulf Spill Is Largest of Its Kind* (N.Y. Times, August 2, 2010).

[90]    Ed Crooks, *BP 'not prepared' for deep-water spill*, (Financial Times, June 2, 2010).

## V.     THE BP BOARD'S DUTIES

172.     BP's Board consists of executive and non-executive directors.  All BP directors owe fiduciary duties to the Company and its shareholders, including the duties of loyalty, good faith, candor, oversight and due care in carrying out their mandate.  BP and its shareholders depend and rely on BP's directors to carry out their fiduciary duties.  Ensuring that BP operates in a manner that minimizes the likelihood and magnitude of drilling or refining disasters is a core aspect of the BP Board's fiduciary duties.  As set forth herein, Defendants consciously disregarded numerous unambiguous warnings that BP operated in ways that increased the likelihood of catastrophe and exacerbated the consequences of disaster when it struck.

173.     Many of the Board's fiduciary duties are codified and beyond dispute.  For example, § 172 of the U.K. Companies Act of 2006 (the "Companies Act"), requires BP board members to act in "good faith" when they consider: (i) "the likely consequences of any decision in the long term;" (ii) "the interests of the company's employees;" (iii) "the impact of the company's operations on the community and the environment;" and (iv) "the desirability of the company maintaining a reputation for high standards of business conduct."

174.     Section 174 of the Companies Act requires that a director "exercise reasonable care, skill and diligence," meaning "the care, skill and diligence that would be exercised by a reasonably diligent person with (a) the general knowledge, skill and experience that may reasonably be expected of a person carrying out the functions carried out by the director in relation to the company, and (b) the general knowledge, skill and experience that the director has."

175.     The U.K. codification of basic fiduciary duties is not unique or particularly complicated. In fact, Title 12 of the Louisiana Code ("Corporations and Associations") codifies substantially similar duties, including the duty to act "in good faith, and with that diligence, care,

judgment, and skill which ordinary prudent men would exercise under similar circumstances in like positions." La. R.S. 12:91.

176. The BP Board also codified its fiduciary duties in BP's "Board Governance Principles" which, require and establish mechanisms for the Board to be informed about "material risks to BP," ensure that "systems of risk management, compliance and control are in place to mitigate such risks," and address "any material developments or issues concerning the skills and capability of the BP business."

177. The BP Board has created several committees to undertake special responsibilities to monitor specific aspects of BP's business. The duties of committee members are also codified in the Board Governance Principles. One critical Board committee is BP's Safety, Ethics and Environment Assurance Committee ("SEEAC").

178. By design, the SEEAC consists entirely of non-executive directors and was expressly charged with ensuring that significant non-financial risks were adequately addressed by BP. Director Defendants Burgmans, Carroll, Castell, and Davis were members of the SEEAC. BP's Safety, Ethics and Environment Assurance Committee's duties include:

- Monitoring and obtaining assurance that the management or mitigation of significant BP risks of a non-financial nature is appropriately addressed by the CEO;

- Receiving and reviewing regular reports from the CEO or his delegate, BP's Internal Auditor and BP's Compliance and Ethics Officer regarding the CEO's adherence to the relevant executive limitations and his management in responding to risk;

- Reviewing material to be placed before shareholders which addresses environmental, safety and ethical performance and make recommendations to the Board about their adoption and publication; and

- Reviewing reports on BP's compliance with its Code of Conduct as it relates to non-financial issues.

179. At all relevant times, an "executive liaison" would inform the SEEAC about non-financial risks at BP. Director Defendant Conn was the SEEAC executive liaison from 2006

until 2007. Director Defendant Hayward was the SEEAC executive liaison from 2007 until 2010.

180. Following the Texas City disaster, the SEEAC undertook to monitor the interaction of corporate culture and safety. According to its 2009 Annual Report, as part of this obligation, the SEEAC is "informed [every quarter] of significant safety incidents, investigations and accidents." As a result, the members of the SEEAC receive direct knowledge of the results of safety-related incidents and investigations. Members of this Committee would have been aware of the Prudhoe Bay, Texas City, and *Thunder Horse* incidents, internal reports relating to the same, as well as the Baker Report, the CSB Report, and the Booz Allen Report, among many others.

181. The Board also created a Remuneration Committee consisting of non-executive directors. Defendants Julius, Burgmans, David, Davis, and Prosser were members of the Remuneration Committee.

182. The Remuneration Committee determines the employment terms and incentive compensation of the Executive Directors. Members of this committee knew that the financial incentives for BP's executives were driven by production and cost, not process safety. Seventy percent of the executive incentive bonus is based on BP meeting certain financial targets. By contrast, safety only accounts for fifteen percent of incentive compensation (with the remaining fifteen percent accounted for by achieving amorphous people priorities). In addition, BP executives receive shares based on BP's financial performance "compared with other oil majors." As a result, BP's compensation structure incentivizes cutting budgets to meet financial targets over the use of funds to improve process safety.

## VI. DEFENDANTS CONSCIOUSLY BREACH THEIR DUTIES BY REFUSING TO CORRECT BP'S LIFE-THREATENING SAFETY CULTURE

### A. Defendants Consciously Ignore Numerous "Red Flags" Warning them of BP's Potentially Ruinous Safety Issues

183. BP's Board is responsible for BP's strategy and operations. As explained by the Board Governance Principles: "[t]he BP Board is responsible for the direction and oversight of BP plc (BP) on behalf of the shareholders and is accountable to them, as owners, for all aspects of BP's business."

184. The executive directors of BP's Board manage the Company's day-to-day operations, and include: the CEO of BP E&P, who oversees all of BP's exploration and production activities (Defendant Inglis); BP's group vice president of refining and marketing (Defendant Conn); BP's chief financial officer (Defendant Grote); and BP's chief executive officers (Defendants Hayward, and Dudley, at various relevant times). Information provided to these executive directors was by definition provided to the Board.

185. In 2007, BP created a Group Operations Risk Committee (the "GORC") consisting of BP executives and chaired by BP's CEO. Between 2007 and 2010, the Risk Committee was chaired by BP's then-CEO and Board member Hayward, and it included Director Defendants Inglis and Conn. The GORC was expressly charged with analyzing safety incidents in BP's operations. The executive liaison regularly provides the GORC's analyses and data, including compliance violations, fines and penalties, and government reportable incidents, to the SEEAC.

186. Between 1988 and 2010 the Board was repeatedly informed about incidents and warnings that BP's process safety was deficient on a Company-wide basis, failed to satisfy legal and regulatory standards, and did not adequately prepare BP for a major disaster.

187.    These "red flag" warnings were so persistent, so strong and so clear – with a particular concentration in BP's U.S. operations – that all Director Defendants were aware of them and could and should have fully anticipated that if and when a disaster occurred in the U.S., a U.S. court would hold them accountable.

188.    Among such "red flags," detailed throughout this Complaint, the Director Defendants were informed of a long train of safety failures at the highest levels:

- **March 1988**:  BP pays record £750,000 fine after 3 workers are killed in two explosions at the Grangemouth, Scotland refinery.   Investigators find flawed reporting and maintenance procedures, failures in the alarm and inadequate safety equipment.

- **March 1989**:  The Exxon Valdez runs aground at the Valdez terminal and begins to spill oil.   A BP-controlled consortium is responsible for containing the oil spill, but lacks proper equipment and is unable to adequately respond, causing Exxon to take over the clean-up operations.   Defendant Browne (later to become BP's CEO) was head of BP E&P and partially responsible for the lack of equipment.

- **July 1991**:  BP pays record $135,000 fine for safety violations at its Neptune Beach, Washington refinery after 1 worker is killed and 6 are seriously injured in an explosion.

- **April 1994**:  BP pays a £200,000 penalty for safety violations in connection with a fire at the Grangemouth refinery that killed 1 worker and injured 3 others.

- **March 1999**:  BP enters into a consent decree with the EPA, agreeing to pay $1.75 million for illegal air pollutant discharges and intentionally failing to notify emergency response authorities about the discharges at the Company's Toledo, Ohio refinery.

- **February 2000**:  BP pays $15.5 million in criminal and civil fines for failing to notify authorities about the release of hazardous substances into the environment at the North Slope Alaska oil field.

- **May 29 - June 10, 2000**:  The Grangemouth refinery suffers a power distribution failure, a steam pipe rupture, and a massive fire.   Each of these incidents could have resulted in casualties and grave consequences for the environment.   Investigators later find that BP's safety processes failed the minimum legal requirements and that BP was not focused on preventing major hazards by *failing to include major hazard safety performance as a key performance indicator in BP's safety processes*.   BP is convicted of violating the Health at Work act and fined £1 million.

- **January 2001**:  BP agrees to spend $600 million at eight refineries across the U.S., including its Texas City, Texas refinery, and to pay $9.5 million fine to resolve Clean Air Act violations.

- **September 2001**:  BP agrees to pay $141,000 fine to OSHA in connection with an explosion and fire at the Clanton Road, North Carolina facility, which killed 3 workers.

- **October 2001**:  BP Review of Operational Integrity Concerns at Prudhoe Bay report recommends "a significant increase in the scope of external corrosion and repair program by 2002" and the development of a "preventative maintenance routine."

- **July 2002**:  BP pays $46 million to resolve allegations that BP failed to improve leaking underground fuel storage tanks at 59 gas stations in the State of California, and ignored Federal requirements to improve the storage tanks for nearly a decade.

- **May 2003**:  A major oil spill in the Gulf of Mexico is narrowly avoided after the riser of the *Discoverer Enterprise* rig splits in two.  BP engineers conclude that BP was not prepared to adequately respond to the potential problem. BP reports that "***no one was hurt and the well was secure, but the initial scene was daunting***."[91]

- **November 2003**:  A gas line ruptures on the Forties Alpha platform in the North Sea, resulting in thousands of pounds of pressurized gas escaping at a high velocity.  An investigation later reveals that the gas leak occurred because of pipeline corrosion in what investigators called "***an accident waiting to happen***."[92]  BP admits breaching health and safety regulations and pays a £200,000 fine.

- **March 2005**:  A massive explosion and fire kills 15 workers and injures more than 170 others at the Texas City refinery.  Investigators later determine that BP's budget cuts and production pressures on managers impaired process safety performance.  BP later pleads guilty to knowingly violating the Risk Management Plan regulations promulgated under the Clean Air Act (the first company ever to do so) and pays a $50 million criminal fine (twice the fine paid by Exxon in connection with the Exxon Valdez disaster).  BP also pays $21 million to settle workplace safety violations with OSHA and more than $1.5 billion in damages and repairs.

- **March 2005**:  BP agrees to pay a $25 million penalty and $6 million in past emissions fees to the air pollution agency for Orange County and the urban portions of Los Angeles (the South Coast Air Quality Management District) to resolve claims of inadequate inspection and maintenance of large above-ground storage tanks and improper emissions.

- **July 2005**:  The *Thunder Horse* rig in the Gulf of Mexico lists and nearly sinks.  BP Executive Director Defendant Inglis coordinates BP's response to the *Thunder Horse* incident from Houston.  Investigators later determine that this incident was caused by a valve that was installed backwards.  According to analysts, competitors, and former

---

[91]   BP Oil Spill Commission Report at 49.
[92]   Maggie Barry, *Gas Leak: BP fined*, (Daily Mirror, Nov. 17, 2004).

employees, "***the problems at Thunder Horse were not an anomaly, but a warning that BP was taking too many risks and cutting corners in pursuit of growth and profits.***"[93]

- **August 17, 2005**:  The CSB warns that "serious safety management lapses" are creating an imminent hazard and "the potential to cause serious harm unless rectified in a short time frame," and urges BP's Board to immediately commission a panel of experts to "review corporate safety oversight, safe management of refineries obtained through mergers and acquisitions, corporate safety culture, and management systems such as near-miss reporting and mechanical integrity programs."  Under outside pressure, the Board convenes the Baker Panel.

- **March 2006**:  A hole in BP's pipeline spills approximately 267,000 gallons of oil at BP's Prudhoe Bay, Alaska facility.  Investigators determine that the hole was caused by neglected corrosion and that BP ignored four separate alarms indicating the pipeline was leaking oil.

- **April 2006**:  OSHA imposes a $2.4 million fine for unsafe operations at the Oregon, Ohio refinery.  Investigators find 32 "willful" violations that were similar to the findings after the fatal explosion in Texas City.  OSHA assistant secretary Edwin Foulke, Jr. later notes that "***It is extremely disappointing that BP Products failed to learn from the lessons of Texas City to assure their workers' safety and health.***"

- **August 2006**:  Pipeline technician Stuart Sneed finds a crack in a transit line in the pipeline at Prudhoe Bay, Alaska and orders nearby welders to stop working, fearing that a spark could ignite a fire and cause a catastrophe.  BP immediately begins retaliating against Sneed and fires him two weeks later.  Sneed later says: "They say it's your duty to come forward, but then when you do come forward, they [expletive] you.  They'll destroy your life."  Arbitrators conduct an investigation and confirm Sneed's account.

- **August 2006**:  BP spills oil at its Prudhoe Bay facility in Alaska.

- **August 2006**:  BP agrees to pay a $2.4 million fine to OSHA for unsafe operations at the refinery in Oregon, Ohio.  OSHA investigators find multiple safety violations that were similar to violations that were discovered during the investigation of the fatal explosion at BP's Texas City refinery.

- **September 2006**:  BP pays a $900,000 air pollution settlement to the EPA resolving claims that it emitted volatile organic compounds from its gasoline stations.

- **January 2007**:  The Baker Panel issues its report finding that "***[f]rom the top of the company, starting with the Board and going down … BP has not provided effective process safety leadership and has not adequately established process safety as a core value across all its five U.S. refineries***" and urges the Board to improve BP's lacking safety culture.  Defendant Browne personally accepts the Baker Report on behalf of BP.

---

[93]     Sarah Lyall et al., *In BP's Record, a History of Boldness and Costly Blunders* (N.Y. Times July 12, 2010).

- **March 2007**:  The CSB issues it final report into the investigation of the Texas City disaster, finding that the root causes of this disaster included that "*[t]he BP Board of Directors did not provide effective oversight of BP's safety culture and major accident prevention programs*."

- **March 2007**:  Booz Allen reports that BP's strategy of elevating financial performance over operational safety has resulted in a culture where targets are considered "sacrosanct," and where top-down budget targets provide a "budget box" in which activities, materials, and projects have to fit.  In addition, Booz Allen warns that senior management may not be receiving all material risk information.

- **October 2007**:  BP pleads guilty and agrees to pay $20 million (including a $12 million criminal fine) and accepts 3 years' probation in connection with the Alaska oil spills.

- **October 2007**:  BP announces two plea agreements and a deferred prosecution agreement with the U.S. Department of Justice in connection with the Texas City disaster, the Alaska oil spills and an investigation concerning improper propane trading.  In its press release, BP America President and Chairman, Bob Malone, admits that the Texas City disaster was caused by BP's lacking process safety: "*If our approach to process safety and risk management had been more disciplined and comprehensive, this tragedy could have been prevented.*"

- **May 2008**:  The *Deepwater Horizon* offshore rig partially floods with sea water because a "T" piece of piping was removed, causing approximately $1 million in damages.  Investigators later determine that the pipe was removed without permit, planning, risk assessment, or authority from rig management.

- **June 2008**:  A piece of steel tubing attached to a pipeline pump ruptures on the *Atlantis* in the Gulf of Mexico, causing the rig to spill 193 barrels of oil.  Investigators later find that BP managers postponed repairing the pump in "the context of a tight cost budget," and that leadership did not question the safety impact of this delay because the budget for the *Atlantis* was underestimated, leading to "conflicting directions/demands."

- **August 2008**:  The *Deepwater Horizon* loses all electrical power for two minutes and, according to a contractor on the rig is "about to drift off" into the sea.

- **August 2008**:  BP production manager, Kenneth Abbott, emails colleagues warning that "hundreds if not thousands" of "as built" documents for the *Atlantis* rig were never finalized, and that having the wrong documents on board could lead to catastrophic operator errors.  A colleague acknowledges that "*this could lead to catastrophic Operator errors due to their assuming the drawing is correct*."  After raising these concerns, Abbott is terminated.  Abbotts estimates that BP saved $2 to $3 million by not completing these critical drawings.  Abbott's allegations about unsafe work conditions aboard the *Atlantis* are later found substantiated by BP's outside ombudsman, Gavel Consulting.

- **September 2008**: An eight-inch high pressure gas line in Alaska separates. No one is hurt, but Alaska investigators find the incident could have been catastrophic. According to the Alaska's Petroleum Systems Integrity Office, *the rupture resulted from "procedures that either were not in place or had not been fully implemented at BP in their management system*."

- **September 2008**: BP is forced to evacuate 212 workers from a rig when a blowout of a gas-injection well causes large parts of the Azeri-Chirag-Guneshli (ACG) field to be shut down for weeks. BP later concludes that the blowout was caused, at least in part, by a "bad cement job."

- **November 2008**: OSHA imposes a $3 million fine for "willful" safety violations at the Toledo, Ohio refinery. Jordan Barab, Deputy Assistant Secretary of OSHA states, "*There was clear knowledge of these problems . . . and yet they hadn't been addressed*" *in other parts of the refinery*.

- **February 2009**: BP agrees to pay $180 million fines to the EPA for Clean Air Act violations at the Texas City refinery.

- **March 2009**: U.S. District Court in Houston approves BP guilty plea and $50 million criminal fine for Clean Air Act violations in connection with Texas City disaster.

- **September 2009**: OSHA imposes $87.4 million fine (the highest fine in OSHA's history) after finding more than 700 workplace safety violations at the Texas City refinery, including 439 egregious and willful safety violations.

- **October 2009**: The U.K. Health and Safety Executive ("HSE") warns BP executives that its training of new personnel to basic safety standards on the *Clair*, a deepwater drilling rig off the coast of Scotland, is ineffective and there is "evidence of a culture among your contractors, Seawell (up to senior levels of management), of working outside of procedures, permit or permit conditions." The HSE began its investigation after receiving complaints by a worker on the *Clair*, criticizing BP for not taking the worker's concerns seriously. According to HSE, BP "*did not appear to identify the significance of issues raised by the complainant once they were put to you by HSE*."[94]

- **October 2009**: A BP central compressor plant in Alaska improperly vents explosive gas into the air. The pilot on the backup flare was not lit and cameras, while on, were not pointed at the flare location, preventing BP staff from discovering the problem. If the gas had ignited, the blast zone could have reached 300 feet. Investigators compared the potential damage to the gas valve error that led to the massive explosion on the Piper Alpha, which killed 167 workers.

- **November 2009**: An eighteen-inch pipe near the Lisburne Production Center in Alaska ruptures, spraying 46,000 gallons of crude oil over an 8,400 square foot area. EPA

---

[94]     Rowena Mason, *BP Lacked "Basic Safety" in North Sea before Gulf of Mexico Oil Spill, HSE investigation finds* (The Telegraph, Sep. 14, 2010).

debarment attorney Jean Pascal demands that BP show maintenance receipts because she is "no longer willing to accept their word."[95]

- **January 2010**: U.S. House of Representatives members Bart Stupak and Henry Waxman write BP's president of Alaskan operations, warning that the Company's efforts to cut costs could imperil safety at BP facilities: "*Committee staff have received reports that proposed budget cuts by BP may threaten the company's ability to maintain safe operations.*" Attached to the Congressmen's letter is a request for documents. The letter and the document request are discussed with members of the Board.

- **January 2010**: U.K. Health and Safety inspectors visiting the *Magnus* rig off the coast of Scotland find that there is confusion about who would order a well shut-off in event of a blowout.[96]

- **January 2010**: EPA attorneys send an email to BP General Counsel, Jack Lynch, stating that: "[i]t appears that BP, regardless of its code of conduct and statements to the government, will do whatever is necessary to cover up the improper actions of its senior managers. This promotes intimidation, retaliation, blackballing and unethical behavior in the management ranks, and a culture of fear and lack of ethics in the employee ranks. *Nothing has been done in TWO YEARS. This is a current graphic example of why EPA does not trust BP*."[97]

- **March 2010**: OSHA finds 62 workplace safety violations at the Toledo, Ohio refinery and levies more than $3 million fine. In announcing the violations and fine, U.S. Secretary of Labor, Hilda Solis, notes that "*OSHA has found that BP often ignored or severely delayed fixing known hazards in its refinery … There is no excuse for taking chances with people's lives. BP must fix the hazards now.*"[98]

- **April 2010**: The *Horizon* disaster takes place:

---

[95] Abrahm Lustgarten, *Furious growth, cost cuts led to BP accidents past and present* (ProPublica, October 26, 2010).

[96] Tom Bergin & Daniel Fineren, *BP North Sea rig lacked procedures on blow-outs* (Reuters Sep. 15, 2010).

[97] Abrahm Lustgarten, *Furious growth, cost cuts led to BP accidents past and present* (ProPublica, October 26, 2010).

[98] U.S. Dept. of Labor News Release, *U.S. Labor Department's OSHA proposes more than $3 million in fines to BP-Husky refinery near Toledo, Ohio*, Release Number 10-234-CHI (March 8, 2010).



189.  **April through July 2010**:  An estimated 4.9 million barrels (205.8 million gallons) of oil floods into the Gulf of Mexico.  Nearly half of the oil would have been contained or avoided if the BP Board had ensured that BP operated the *Deepwater Horizon* with basic safety plans and protections in the event of a problem.

190.  A majority of the Director Defendants (Burgmans, Castell, Conn, Davis, Flint, Grote, Hayward, Inglis, Julius, and Prosser) served on the Board from the time that the Board received the Baker, CSB and Booz Allen reports in March 2007 until the *Horizon* disaster in April 2010.  During virtually all of this time, Defendant Sutherland was Chairman of the BP Board, resigning a few months before the accident.  Further, as noted above, executive Board members Hayward, Conn and Inglis, were at the center of receiving, analyzing and communicating each of these red flags in their capacity as members of the Group Operations Risk Committee.

191.    Defendant Conn was the executive liaison with the SEEAC from 2006 until 2007. Hayward was the executive liaison from 2007 until 2010.  During this time, Conn and Hayward informed the non-executive Board members of the red flags discussed above.

192.    The Board did not want to see these red flags or understand their implications for BP's operations because adequately addressing BP's safety compliance deficiencies would require the Board and senior management to take actions inconsistent with the cost-cutting measures that lie at the heart of BP's strategy to meet Wall Street analysts' quarterly earnings estimates.

193.    Despite repeated guilty pleas, warnings, employee deaths and injuries, and criminal and civil penalties imposed on the Company by numerous federal and state regulators, the Defendants continued to systematically cut budgets, regardless of whether those budgets were associated with essential maintenance or safety procedures, and regardless whether their conduct increased the risk of a calamity.  As David Uhlmann – chief of the U.S. Department of Justice's environmental crimes section from 2000 until 2007 – explained:

> Whenever you have a repeat offender, there's a reason. Within corporations, if there are repeat offenders or repeated criminal violations committed by a corporation, it usually means that there isn't a sufficient compliance culture within that company.  It means that the company, for whatever reason, is not making the necessary commitment that it needs to make to make sure that it's following the rules that everybody else has to play by.
>
> **So within BP, that is certainly a concern. This is a company that had problems in the 1990s. This is a company that my former office prosecuted twice beginning in my tenure. And now this is a company that has brought us the worst environmental disaster in U.S. history. That's not an accident.**[99]

194.    The Executive Defendants also had a financial interest in continuing BP's reckless budget-cutting strategy.  They received substantial bonuses if the Company met its

---

[99]    Frontline Interview, David Uhlmann (PBS, Aug. 3, 2010).

financial goals, even if that meant cutting safety corners. The Non-Executive Director Defendants consciously failed to change these perverse incentives.

195.     Defendants' bad faith conduct constituted a breach of their fiduciary duties to the Company and subjected the Company to the consequences of major industrial accidents with deadly consequences for human lives, property, and the environment. The *Deepwater Horizon* disaster was the foreseeable and, indeed, inevitable result of their disregard.

> **B.     Investigatory Reports Confirm that Defendants' Decisions and Deliberate Inaction are the Root Cause of the *Deepwater Horizon* Disaster**

196.     The National Academy of Engineering ("NAE") and the National Research Council ("NRC") jointly investigated the causes of the *Horizon* disaster. On November 16, 2010, they issued a joint interim report with initial findings, concluding that an "insufficient consideration of risk" and "a lack of operating discipline" by BP materially contributed to the *Horizon* disaster and the resulting oil spill. The NAE and NRC determined that many of BP's decisions "were likely to result in less cost and less time relative to other options," and criticized the Company for failing to ensure that safety did not take a back seat to cost.

197.     The Presidential BP Horizon Oil Spill and Offshore Drilling Commission ("BP Oil Spill Commission") also released a preliminary report of its investigation into the *Horizon* disaster in November 2010, and similarly concluded that BP's "culture of complacency," caused serious errors before the *Horizon* exploded. As Commission co-chair Bob Graham explained: ***"[t]he problem here is that there was a culture that did not promote safety … leaders did not take risks seriously enough, didn't identify risks that proved to be fatal."*** Commission co-chair

William Reilly agreed and said that there was "emphatically not a culture of safety on" the *Deepwater Horizon* rig.[100]

198.    On January 11, 2011, the BP Oil Spill Commission issued its final report, concluding that BP suffered from systemic problems in its safety and control process—the very same lack of process safety that the Baker Panel, CSB, and Booz Allen Hamilton reports had identified four long years earlier.  Just like those prior investigative commissions, the BP Oil Spill Commission concluded that the root causes for the *Horizon* disaster were systemic – not human error.  As the BP Oil Spill Commission explained: "[t]he blowout was not the product of a series of aberrational decisions made by rogue industry or government officials that could not have been anticipated or expected to occur again. Rather, the root causes are systemic."[101]

199.    The BP Oil Spill Report also echoed the Baker Panel and CSB conclusions that the disaster could have been prevented had Defendants implemented a safety culture at BP that emphasized process safety:

> BP's management process did not adequately identify or address risks created by late changes to well design and procedures. BP did not have adequate controls in place to ensure that key decisions in the months leading up to the blowout were safe or sound from an engineering perspective.[102]

200.    Similarly, the BP Oil Spill Report left no doubt that it was BP's "process safety" that was sorely lacking:

> ***BP has caused a number of disastrous or potentially disastrous workplace incidents that suggest its approach to managing safety has been on individual worker occupational safety but not on process safety. These incidents and subsequent analyses indicate that the company does not have consistent and***

---

[100]    BP Oil Spill Commission Public Hearing on Preliminary Findings Regarding BP's Macondo Well Blowout, *Opening Remarks by co-chairs Senator Bob Graham and former EPA Administrator William Reilly* (November 9, 2010).

[101]    BP Oil Spill Commission Report at 122.

[102]    *Id.*

70

***reliable risk-management processes—and thus has been unable to meet its professed commitment to safety.***[103]

201.    History repeats itself if its lessons are ignored.  The above conclusion was, of course, also one of Browne's observations from the Baker report investigation the *Texas City* disaster four years earlier (see ¶ 124 above).

202.    Finally, like the Baker Panel and the CSB report before it, the BP Oil Spill Report left no doubt that BP's lack of process safety were caused by BP's senior management.  As the BP Oil Spill report explained: "***Most of the mistakes and oversights at Macondo can be traced back to a single overarching failure—a failure of management.***"[104]

### C.    Another Disaster Could Spell the End for BP

203.    The *Deepwater Horizon* disaster was BP's last and final wakeup call.  BP was forced to reserve $40 billion and plans to sell off up to $30 billion of its assets – including the Texas City, Texas refinery – over the next year and a half just to finance the estimated damages caused by the disaster.  The direct damage to BP is already in the tens of billions.  Its goodwill will be impaired by billions more in the future.

204.    Indeed, BP's total liability is still not known.  Nearly 500,000 claims have been filed for payments from a $20 billion fund that BP set up to pay for economic damages suffered by individuals and business in the Gulf Coast.  BP is a defendant in thousands of lawsuits, including a lawsuit by the U.S. Department of Justice alleging violations of the Clean Water Act and the Oil Pollution Act, exposing BP to fines in an estimated range of $5 billion to $21 billion.  According to Mitratech, a consulting firm which handles legal and trial logistics for Fortune 500 companies, BP's legal costs defending against the lawsuits alone could reach as much as $2 billion.

---

[103]    *Id.* at 218.
[104]    *Id.* at 90.

205.    The long-term damage to BP's reputation may be even more serious and, according to industry analysts, is likely to exceed BP's immediate monetary damage payments.[105] For example, EPA officials are currently considering whether BP will be barred from receiving any government contracts, including concessions to drill in federally controlled land and selling fuel to the military.  In its statement announcing possible debarment, the EPA explained that it will make this decision after weighing "the frequency and pattern of the incidents, corporate attitude both before and after the incidents, changes in policies, procedures, and practices."[106]

206.    In August 2010, *Reuters* published a 46 page research report similarly concluding that the *Horizon* disaster is far from over.  It stated:

> But the most expensive damage is likely to be reputational. For example, the uncertainty over the explosion may make it harder for BP to secure exploration licenses in the United States. True, Exxon's share price had largely recovered just three months after its disastrous spill. But Exxon, unlike BP, had not just spent the better part of four years restoring its reputation for safety.[107]

207.    In its report *Reuters* also drew attention to the unknown government and regulatory response as an important risk that BP may still suffer substantial damages in the future, explaining:

> The biggest unknown is the government and regulatory response.  BP's business in the United States accounts for 46 percent of the company's value, according to Citigroup. Hereon, BP will have to have the highest safety standards in the industry. It may struggle for years to win new exploration licenses. And likely restrictions on deep-water exploration will hurt all drillers. Assume BP's U.S. business has lost 25 percent of its pre-spill value. Adjusted for the wider stock-market drop, that would be another $17 billion destroyed.[108]

---

[105]    Clifford Krauss, *Oil Spill's Blow to BP's Image May Eclipse Costs* (N.Y. Times, April 29, 2010).

[106]    Abrahm Lustgarten, *EPA Considering Banning BP from Government Contracts* (CBS News, May 25, 2010).

[107]    Fiona Maharg-Bravo, *In too deep: How BP Blew it in the Gulf of Mexico*, at 10 (Reuters, August 2010).

[108]    *Id.* at 19.

208.    To effectively deal with these risks, *Reuters* called for significant changes of BP's leadership, stating that "the board still needs a more radical reshaping – starting with the appointment of a new chairman."[109]

209.    Another catastrophe may indeed be the end for BP and wipe out all shareholder equity.  Unfortunately, there is reason to believe that Defendants are still not changing BP's process safety.  Although Hayward resigned as CEO, he did not leave the Company and is now running BP's operations in Russia.  In a game of musical chairs, the Board chose the previous head of BP's Russian operations – Robert W. Dudley – as Hayward's successor.  Moreover, Dudley is a company insider who joined Amoco in 1979 has spent his entire career at BP or its predecessors.

210.    BP's stream of accidents and fines has also continued after the *Deepwater Horizon* disaster:

- Between April 6 and June 4, 2010, the Texas City refinery released 538,000 pounds of toxic chemicals, including 17,000 pounds of benzene (a known carcinogen).  Investigators found that BP failed to discover the extent of the emission because fence line monitors did not detect the chemicals.  Thousands of Texas City, Texas residents are reportedly bringing a class action seeking $10 billion in connection with the emission.[110]

- On August 12, 2010, BP agreed to pay $50.6 million in fines for failing to address the safety problems at the Texas City refinery, in direct breach of its promises in the 2007 settlement.  The fine, which resolved only 270 of the outstanding OSHA violations, was accompanied by a commitment by the Company to spend $500 million improve safety at the refinery.  The U.S. Labor Secretary, Hilda Solis, explained that "***The size of the fine rightly reflects BP's lack of regard for worker safety***."

---

[109]    Chris Hughes, *In too deep: How BP Blew it in the Gulf of Mexico*, at 3 (Reuters, August 2010).

[110]    Jonathan Berr, *BP Could Face 12,000 Plaintiffs Unrelated to the Gulf Oil Spill* (Daily Finance, August 6, 2010).

## VII.    THE ACTION IS PROPERLY BEFORE THIS COURT

211.    This action charges certain of BP's current and former directors and senior managers with deliberately breaching their fiduciary duties by disregarding their obligation to require adequate maintenance budgets and adequate safety processes, thereby causing BP to endanger the lives of its workers and the environment in violation of numerous U.S. laws.  This Court is the most appropriate forum to hear these claims.

212.    In light of the Company's deep ties to the U.S. and BP's extensive history of killing U.S. workers and endangering U.S. property, any BP director or officer would reasonably expect to be called to account in a U.S. Court for his or her role in the events leading to the *Deepwater Horizon* disaster.

213.    *First*, although technically registered under the laws of England and Wales, BP stopped being British a long time ago.  As Browne explained in his memoir, ***"[b]y the end of the 20th century, we were no longer 'British', more a multinational."***[111]  To be sure, the company known as BP is the result of a $110 billion "merger of equals" between BP and Amoco – one of the standalone companies following the breakup of Standard Oil.  BP's next evolutionary step was its $27 billion acquisition of Arco, another Standard Oil spin-off.

214.    As a result, BP's business, operations, shareholders base and, unfortunately, victims, are concentrated in the U.S. as much or more than any other country.  As BP's former CEO, Hayward, told the Houston Forum on November 8, 2007: "***America – and Americans – [are] the greatest single part of BP***."[112]  For example:

- BP is the largest oil producer in the U.S.;

---

[111]    John Browne, *Beyond Business, An Inspirational Memoir From a Visionary Leader* at 193 (The Orion Publishing Group, Ltd., 2010).

[112]    Tony Hayward, *BP CEO Tony Hayward details commitment to U.S. energy security in the new era* (The Houston Forum, November 8, 2007), available at http://www.bp.com/genericarticle.do?categoryId=98&contentId=7038285

- 45% of BP's proved oil reserves are in the U.S. (versus 9% in the U.K.);

- BP is the largest gas producer in the U.S., supplying around 4% of the total U.S. natural gas consumption;

- BP is the second largest holder of natural gas reserves in the U.S.;

- 27.3% of BP's total natural gas production in 2009 was produced in the U.S. (versus 7.3% in the U.K.);

- BP is the nation's second largest gasoline retailer through 11,500 service stations throughout the U.S.;

- BP's two most senior executive directors – Defendants Robert Dudley (CEO) and Byron Grote (CFO) – are both American;

- BP's previous two CEOs, Browne and Hayward, came up through the ranks of BP's U.S. operations;

- BP's stock is listed on the New York and London Stock Exchanges and, as of December 2009, BP estimated that approximately 39% was held by investors in the U.S. (versus approximately 40% for U.K. investors, 17% in the rest of the world and 4% that could not be identified);

- BP determines shareholder dividends in U.S. dollars because "it is the economic currency of BP;"[113]

- BP's single largest division – BP America – is incorporated in Delaware and has its headquarters in Houston;

- BP has 22,800 employees in the U.S. (versus 10,000 in the U.K.);

- 54% of BP's total refining is conducted in the U.S.;

- 40% of BP's fixed assets are located in the U.S. (versus 20% in Europe);

- 40% of BP's average daily hydrocarbon production in 2009 took place in the U.S. (versus 10% in the U.K.);

- 31% of BP's petrochemical production capacity is located in the U.S.;

- BP is the largest seller of gasoline to the U.S. military, providing nearly 12 percent of the U.S. military's fuel supply in 2009; and

---

[113]  BP, *2009 Annual Report*, at 157.

- In 2009, BP paid the federal government more than $674 million in royalties for its government leases.

215.  BP's operations touch virtually every state in the nation, as shown by the following map from a BP "fact sheet" that can be accessed on BP's website:



216.  BP's operations in Texas and the Gulf of Mexico are *the most significant part of BP's operations and assets in the world*:

- The Houston area represents "the largest concentration of BP people and assets in the world."[114]

- In 2009, 58% of BP's liquids production in the U.S. came from deepwater drilling in the Gulf (up from 45.3% in 2008 and 38.2% in 2007);

- In 2009, the Gulf of Mexico was BP's largest area of growth in the U.S., prompting Hayward to announce in a press release that the "world's largest increase in oil production [in 2009] by far came from the U.S., mainly from the Gulf of Mexico;"[115]

- BP is the largest oil producer in the Gulf; and

- BP is the largest leaseholder in the Gulf.

---

[114]  BP Government and Public Affairs, *BP in the U.S.* (2008), at 43.
[115]  Tony Hayward, *Welcome to the 2010 edition of the BP Statistical Review of World Energy* (June 2010).

217.    *Second*, the Defendants' decisions and deliberate inaction caused one of the largest environmental disasters in history in the U.S. – claiming eleven American lives, causing physical injury to dozens of additional Americans, causing economic damage to hundreds of thousands of Americans, and soiling the territorial waters and coast lines of Texas, Louisiana, Mississippi, Alabama and Florida.  The evidence regarding the *Deepwater Horizon* disaster is overwhelmingly concentrated in the Texas and Louisiana areas.

218.    *Third*, eight of the seventeen defendants, including BP's current CEO (Dudley) and CFO (Grote), are U.S. citizens.  By contrast, only seven of the seventeen defendants are British (including Defendant Julius who is a dual U.S./U.K. citizen).  Of the remaining three defendants, one is a citizen of Sweden (Svanberg, BP's current chairman of the Board), one is a citizen of Ireland (Sutherland, BP's former chairman of the Board), and one is a citizen of the Netherlands (Burgmans).

219.    *Fourth,* because of the parallel civil and criminal proceedings in this forum presenting overlapping factual issues and discovery cooperation agreements between Plaintiffs and Defendants, proceeding before this Court serves judicial economy.

220.    In short, any director of BP during the last few years would inevitably learn not only about the depth and magnitude of BP's operations in the U.S., but also about the persistent warning signs that BP's U.S. operations were conducted in a manner that made a colossal disaster of some sort a predictable event.  Accordingly, any BP director during the past few years would reasonably anticipate that if, and when, a massive disaster struck in BP's U.S. operations, a U.S. court would reasonably exercise jurisdiction over the BP Board.

## VIII.   DERIVATIVE ALLEGATIONS

### A.   Plaintiffs Bring This Action in Good Faith on Behalf of BP

221.   Plaintiffs bring this action derivatively in the right and for the benefit of BP to redress injuries suffered, and to be suffered, by BP as a direct result of the Defendants' breaches of fiduciary duties by virtue of the wrongs alleged herein.  Anyone acting in accordance with their fiduciary duties to the Company would consider the prosecution of this action to be in the best interest of BP, its shareholders and its employees.  Any BP director deciding not to prosecute this action would be acting in bad faith in light of the allegations in this Complaint and the damage caused to BP by Defendants' breaches of duty.

222.   Plaintiffs will adequately and fairly represent the interests of BP in enforcing and prosecuting its rights.  Plaintiffs have retained counsel experienced in prosecuting this type of action.  Plaintiffs have been owners of BP common stock and/or ADRs at all relevant times and continue to own such securities at this time.

223.   This action is not being used by Plaintiffs to gain any improper personal advantage, nor do Plaintiffs maintain any personal agenda other than seeking to rectify the harm caused to the Company.  Plaintiffs have not received, been promised, or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting or serving as representative parties in this action except such fees or other payments, including attorneys' fees, as the Court expressly approves to be paid to Plaintiffs or on Plaintiffs' behalf.

224.   The claims herein concern acts and omissions that were not within the Board's permissible scope of decision-making and management of BP but, rather, occurred as a consequence of the unauthorized and unratifiable failure of the Defendants to comply with their fiduciary duties to the Company, and to ensure that the Company would comply with U.S. law.

## B. Plaintiffs Were Not Required To Make a Pre-Suit Demand

225. At the time this action was initiated, the Board was comprised of fourteen directors, including five executive directors and nine non-executive directors. The five executive directors were Anthony B. Hayward (former CEO), Robert W. Dudley (current CEO), Ian C. Conn (head of refining and marketing), Byron E. Grote (chief financial officer), and Andrew G. Inglis (former head of exploration and production). The nine non-executive directors were Paul M. Anderson, Antony Burgmans, Cynthia B. Carroll, Sir William M. Castell, George David, Ian Davis, Douglas J. Flint, DeAnne S. Julius, and Carl-Henric Svanberg.[116]

226. Plaintiffs did not issue a demand upon the Board prior to initiating this action. To the extent U.K. law is applicable to this derivative complaint, such law does not require that shareholder plaintiffs first demonstrate that making a demand would have been futile.

227. Even if the making of a demand is deemed to be required, demand was excused because a majority of the Director Defendants: (a) breached their duty of good faith and engaged in conduct that was *ultra vires*; and (b) would have been "interested" in, and therefore unable to fairly consider, a demand because they face a substantial likelihood of massive liability for their role in the BP Board's improper and unlawful conduct.

228. In short, a Board of a company engaging in some of the most inherently dangerous business activities on earth, which chooses to allow its executives and senior management to elevate draconian cost-cutting ahead of implementing legally required, essential process safety requirements to protect workers' lives, the general public and the environment, and whose members maybe held personally liable in civil and criminal actions arising from the

---

[116]   Non-Executive Directors Paul Anderson and Ian Davis joined the Board shortly before the *Deepwater Horizon* disaster, respectively in February and March 2010, and are not named in this action.

resulting disaster, *a fortiori* cannot be trusted to decide whether to investigate, bring, and zealously pursue the claims set forth in this action.

### C. Demand is Excused Because the Director Defendants' Conduct Was Not a Valid Exercise of Business Judgment

229.    The Director Defendants' misconduct at the heart of this action constitutes the direct facilitation of illegal activity, including knowingly and consciously presiding over the Company's systematic violations of federal and state laws and regulations. Plaintiffs allege that the Director Defendants affirmatively adopted, implemented, and condoned conduct that promoted short term financial goals at the expense of operational and process safety goals, regardless of BP's obligations under federal and state laws to maintain and improve the process safety of its operations, and to minimize the risks of a catastrophic accident.

230.    The Board's decisions adopting and implementing this strategy were in flagrant breach of their fiduciary duties (including their duties of good faith and loyalty) and *ultra vires*. Put simply, breaking the law, approving the conduct by others that breaks the law, or looking the other way knowing that others under the Board's control are breaking the law, are all forms of misconduct that is not legitimate business conduct under any set of circumstances, and under any applicable law. Moreover, Board members who engage in such *ultra vires* conduct should face the prospect of personal liability for the consequences.

231.    BP's history of non-compliance with federal and state laws render the basis of this derivative action distinct from the case of virtually every other oil company with large operations in the U.S. For example, between 2001 and 2010, OSHA imposed $108 million in fines on BP for workplace safety violations at its refineries. During the same period, OSHA imposed

$170,000 in fines on Chevron, $200,000 in fines on ConocoPhillips and $360,000 on Exxon.[117] Not surprisingly, BP also received the overwhelming majority of all serious safety citations that OSHA issued between June 2007 and February 2010 – BP received 760 *egregious, willful* citations while Sunoco and Conoco-Phillips each had eight, Citgo had two and Exxon (the largest oil company in the world) had one comparable citation.[118]  The number, extent and seriousness of BP's safety violations dwarf the misconduct of other large oil companies in the U.S. and show that the Board was not seriously trying to change BP's culture.  As explained by former EPA debarment attorney, Jeanne Pascal, "*[t]here comes a point where the events conspire to basically show federal regulators that a particular company, for whatever reason, has no intent of complying with U.S. law and regulations.*"[119]

232.    Moreover, this action does not arise from anomalous incidents of misconduct or from the acts of a rogue employee or division within the Company.  Rather, as alleged herein, serious violations of federal and state laws occurred systematically and at every level of the Company as a direct result of the Board's decision to treat process safety as a costly stepchild. There is no legitimate business judgment involved in devising or carrying out such an unlawful and improper policy.  Accordingly, demand on the Board is futile and excused.

### D.    Demand Is Excused Because a Majority of the Board Is Conflicted and Could Not Fairly Consider a Demand

233.    Even if knowingly fostering and permitting illegal conduct could fall within the ambit of a legally cognizable business judgment (and it cannot), demand on the Board is also

---

[117]    Abrahm Lustgarten, *Furious Growth, cost cuts led to BP accidents past and present* (ProPublica, October 26, 2010).

[118]    Jim Morris, et al., *Renegade Refiner: OSHA Says BP Has "Systemic Safety Problem,"* (Center for Public Integrity, May 16, 2010).

[119]    Abrahm Lustgarten, *Furious growth, cost cuts led to BP accidents past and present* (ProPublica, October 26, 2010).

futile and excused because a majority of the Board is not disinterested or independent and could not, therefore, properly consider demand.

1.    <u>The Executive Directors Implemented the Board's Strategy to Cut Costs at the Expense of Process Safety, Reaping Substantial Financial Benefits</u>

234.    The five Executive Director Defendants (Hayward, Dudley, Conn, Grote, and Inglis) are conflicted because of their status and executive roles at BP. Each of them joined BP or Amoco before 1988. As the most senior managers of BP, these Defendants knew about the criticisms and recommendations of the Baker Report, the CSB Report, and the Booz Allen Report, and were well aware of BP's lacking process safety and "red flags" set forth in this Complaint. Each of these Defendants nevertheless perpetuated BP's culture of squeezing every penny of cost-cutting without regard for the resulting illegal and unsafe operational practices.

235.    Indeed, three of the five Executive Director Defendants (Hayward, Conn, and Grote) were members of the Board since before the Texas City, Texas disaster in 2005 that claimed the lives of 15 people and injured more than 170 others, and three of the five executive defendants (Defendants Hayward, Conn and Inglis) were members of the Group Operations Risk Committee after that committee was established in 2007. The Executive Director Defendants were under a duty to act upon this information to protect the Company, its shareholders and its employees from continued legal violations. The Executive Director Defendants chose not to do so.

236.    The Executive Director Defendants derived substantial financial benefits from the implementation of a strategy that improperly elevated financial goals over process safety, including bonuses and stock options, as shown by the following table, reflecting their compensation in 2009:

| Defendant | Salary | Bonus | Other | Stock Awards | Total Compensation (2009) |
|---|---|---|---|---|---|
| Hayward | $1,689,000 | $3,378,000 | $37,000 | $1,377,000 | $6,481,000 |
| Grote | $1,380,000 | $2,070,000 | $8,000 | $933,000 | $4,391,000 |
| Inglis | $1,115,000 | $2,119,000 | $349,000 | $780,000 | $4,363,000 |
| Conn | $1,115,000 | $1,784,000 | $74.000 | $890,000 | $3,863,000 |
| Dudley | $1,000,000 | $1,125,000 | $304,000 | n/a | $2,179,000 |

237.    Defendants Hayward, Dudley, Conn, Grote, and Inglis face a substantial likelihood of liability.  Because at least three of the Non-Executive Directors also face a substantial likelihood of liability, a majority of the Board is conflicted and demand is excused.

> 2.    The Non-Executive Directors Consciously Ignore Multiple Accidents and Urgent Warnings to Change BP's Process Safety

238.    Demand is excused if at least half of the Board conflicted.  The Board consisted of fourteen directors when Plaintiffs commenced this action, and because all five Executive Directors face a substantial likelihood of liability, the Board was conflicted if at least two Non-Executive Directors were also conflicted.  This threshold is easily met in this Action.

239.    *First,* three Non-Executive Director Defendants – Flint, Julius, and Burgmans – have been Board members since at least January 2005.  These Defendants were BP Directors long before the Baker Panel, the CSB and Booz Allen issued their reports in the spring of 2007.  Flint, Julius, and Burgmans were, for example, members of BP's Board at the time of:

(i)    The Texas City disaster that killed 15 people and injured more than 170 others;

(ii)    The near-sinking of the *Thunder Horse* rig;

(iii)   The CSB's interim findings of "serious safety management lapses" and its urgent appeal to immediately ask a panel of experts to review BP's corporate safety oversight;

(iv)   The multiple oil spills in Alaska; and

(v)    The criminal conviction, multimillion dollar criminal fine and criminal probation resulting from the Alaska oil spills.

240.     Non-Executive Director Defendants Flint, Julius, and Burgmans were thus repeatedly informed that BP's process safety was in shambles, and they knew even before 2007 that regulators were looking to the Board to correct BP's dismal safety culture.  Defendants Flint, Julius, and Burgmans decided to look the other way instead and, as a result, face a substantial likelihood of liability in connection with the *Deepwater Horizon* disaster.

241.     Like Defendants Flint, Julius, and Burgmans, Non-Executive Director Defendants Sutherland, Davis, and Prosser were also Board members as of January 2005 and are culpable for the same reasons.  Moreover, during this time Sutherland was Chairman of the Board and Davis and Prosser were, like Julius, members of the Remuneration Committee and could have changed BP's policy of providing incentive compensation for executives who cut corners and process safety in order to increase earnings.  Defendants Sutherland, Davis, and Prosser are, however, not taken into account for demand futility purposes because they left the Board before the commencement of this action.

242.     *Second*, four Non-Executive Director Defendants – Flint, Julius, Burgmans, and Castell – have all been Board members since at least January 2007.  They were BP Board members when:

(i)     The Baker Panel issued its report urging the Board to improve BP's lacking safety culture after finding that "*[f]rom the top of the company, starting with the Board and going down … BP has not provided effective process safety leadership and has not adequately established process safety as a core value across all its five U.S. refineries*;"

(ii)    The CSB issued its report blaming the Texas City disaster in part on the Board's leadership failures, finding that "*[t]he BP Board of Directors did not provide effective oversight of BP's safety culture and major accident prevention programs*;"

(iii)   Booz Allen issued its report finding that the Board's strategy of elevating financial performance over operational and safety resulted in a culture where top-down budget targets were "sacrosanct" and provided a "budget box" in which activities, materials, and projects have to fit;"

    (iv)  BP agreed to pay $180 million in fines to the EPA for Clean Air Act violations at the Texas City refinery; and

    (v)  BP caused a subsidiary to plead guilty, agreed to pay a $50 million criminal fine, and was put on criminal probation in connection with the Texas City refinery disaster.

243.    Non-Executive Director Defendant Carroll joined the BP Board in June 2007 and was informed about the findings and conclusions of the Baker Panel, the CSB and Booz Allen.

244.    Defendants Flint, Julius, Burgmans, Castell, and Carroll were each informed in 2007 that the Board's lack of oversight had created a systemic process safety problem that only the Board could fix. Yet, they deliberately continued to elevate financial goals at the expense of process safety. The BP Oil Spill Commission expressly identified the resulting "safety culture" (and lack thereof) as a root cause of the *Deep Water Horizon*, explaining that "***[t]he blowout was not the product of a series of aberrational decisions made by rogue industry or government officials that could not have been anticipated or expected to occur again. Rather, the root causes are systemic.***" Defendants Flint, Julius, Burgmans, Castell, and Carroll face a substantial likelihood that they will be held accountable for the consequences of BP's systemic process safety problem.

245.    *Third*, seven Non-Executive Director Defendants – Flint, Julius, Burgmans, Castell, Carroll, Svanberg, and David – were all members of the Board since at least September 2009. Defendant David joined the Board in February 2008. Defendant Svanberg joined the Board in September 2009 and became the Chairman of the Board as of January 2010. These Director Defendants were therefore members of the Board when:

    (i)  A BP plant in Alaska improperly vented explosive gas into the air because of process safety failures, creating the risk of a catastrophic explosion;

    (ii)  46,000 gallons of oil spilled in Alaska because of a ruptured pipe, causing an EPA attorney to ask for maintenance receipts because she is "no longer willing to accept [BP's] word."

(iii) BP received of a letter from Congressmen Bart Stupak and Henry Waxman warning that "*Committee staff have received reports that proposed budget cuts by BP may threaten the company's ability to maintain safe operations*;" and

(iv) OSHA found 62 workplace safety violations at the Toledo, Ohio refinery and levied a $3 million fine.

246. Defendants Flint, Julius, Burgmans, Castell, Carroll, Svanberg, and David were each repeatedly informed that the BP's poor safety culture was continuing to cause dangerous accidents and regulatory scrutiny that put the Company at risk. Moreover, Julius, Burgmans, and David were also members of the SEEAC and therefore specifically charged with analyzing and mitigating non-financial risks. Defendants Flint, Julius, Burgmans, Castell, Carroll, Svanberg, and David nevertheless kept BP steadfast on its course of ignoring U.S. safety laws and regulations in order to derive a higher profit. Each of these Non-Executive Director Defendants now faces a substantial likelihood of being held accountable for the consequences of that strategy.

## IX. CLAIMS FOR RELIEF

### COUNT I

### Derivative Claim for Breach of Fiduciary Duty for Acting *Ultra Vires* and Deliberately Causing the Company to Engage in Unlawful Conduct

### (Against all Director Defendants)

247. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

248. Each of the Director Defendants owed fiduciary duties to BP. Defendants specifically owed and owe BP the highest obligation of good faith and loyalty in the administration of the affairs of BP, including the oversight of BP's compliance with laws and regulations governing the safety of BP's activities.

86

249. The Director Defendants' fiduciary duties were informed by §§170 *et seq.* of the U.K. Companies Act 2006, the English common law, U.S. federal and state safety laws, rules and regulations, the Principles of Corporate Governance and Safe Operations adopted by the Board, and, for members of Board committees, the respective committee charters. To discharge these duties, the Director Defendants were required, among other things, to:

    a. in good faith, manage, conduct, supervise and direct the business and affairs of BP and its subsidiaries in accordance with applicable safety and environmental laws, and the charter and by-laws of BP;

    b. not consciously permit any director, officer or employee of BP and its subsidiaries to violate applicable federal and state safety and environmental laws, rules and regulations, or any rule or regulation of BP;

    c. ensure, in good faith, that BP and its subsidiaries were operated in compliance with all applicable federal and state safety laws, rules and regulations; and

    d. provide good faith oversight of the Company's safety culture and major accident prevention programs.

250. The Director Defendants breached their duties, among other reasons, by:

    a. consciously failing to ensure compliance with mandatory U.S. federal and state laws, rules and regulations regulating BP's operations;

    b. consciously failing to provide adequate funds, and affirmatively approving budget cuts, knowing that this caused BP to underfund process safety in violation of U.S. federal and state laws, rules and regulations, as well as commitments made in response to prior disasters and near misses;

    c. approving financial incentives that encouraged employees to cut corners, thereby compromising the safety of BP's operations;

    d. deciding not to change or ignoring BP's inadequate safety culture and process safety, knowing that this would increase the risk of a catastrophic disaster, including loss of life and legal liability for the Company; and/or

    e. permitting, or consciously refusing to alter, BP's deepwater drilling operations in the Gulf, despite learning in or about December 2008 that: (i) BP did not adequately plan for the mitigation of serious safety risks; and (ii) a failure to adequately plan could result in "multiple injuries/fatalities," "major environmental damage," "catastrophic loss of the facility," and "damage to corporate reputation."

251.    Defendants' conduct was *ultra vires*, constituted a breach of their fiduciary duties, and was incapable of ratification.

252.    As a direct and proximate result of the Director Defendants' decision to act *ultra vires* and not perform their fiduciary obligations, BP has sustained significant financial and reputational damage.  This damage included, among other things, the substantial civil liability and related expenses described herein in connection with the *Deepwater Horizon* disaster.

253.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## COUNT II

### Derivative Claim for Breach of Fiduciary Duty for Failing to Exercise Independent Judgment and Due Care In Causing the Company to Engage in Dangerous Activities without Adequate Process Safety

### (Against the Director Defendants)

254.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

255.    The Director Defendants' fiduciary duties were informed by §§170 *et seq.* of the U.K. Companies Act 2006, the English common law, U.S. federal and state safety laws, rules and regulations, the Principles of Corporate Governance and Safe Operations adopted by the Board, and, for members of Board committees, the respective committee charters.   For example, Section 174 of the Companies Act required the Director Defendants to "exercise reasonable care, skill and diligence," in performing their jobs, meaning "the care, skill and diligence that would be exercised by a reasonably diligent person with (a) the general knowledge, skill and experience that may reasonably be expected of a person carrying out the functions carried out by the director in relation to the company, and (b) the general knowledge, skill and experience that the director has."

256. To discharge their duties of due care and independent judgment, the Director Defendants were required to exercise reasonable care in:

    a. ensuring the process safety of BP's dangerous deepwater exploration and drilling activities;

    b. ensuring BP would implement a system of internal procedures, processes and controls that was adequate to ensure the Company's compliance with all applicable laws;

    c. encouraging employees, at all levels, to report safety issues to their superiors, and to protect them from retaliation; and/or

    d. protecting the Company against massive fines, penalties, and compensatory damages awards for violations of U.S. and state environmental, securities and ERISA laws.

257. In light of the general knowledge, skill and experience that may be reasonably expected of a Board member of a multinational oil company with its largest concentration of operations and interests the U.S., and the specific knowledge of each Board member with respect to the inherent dangers of BP's activities and inadequate process safety, the Director Defendants culpably failed to exercise the independent judgment and due care required to discharge these duties, among other reasons, by:

    a. failing to ensure compliance with mandatory U.S. federal and state laws, rules and regulations regulating BP's operations;

    b. failing to provide adequate funds causing BP to underfund process safety in violation of  U.S. federal and state laws, rules and regulations, as well as commitments made in response to prior disasters and near misses;

    c. failing to adequately inform themselves of the impact of budget cuts that they approved and implemented on BP's process safety;

    d. failing to exercise independent judgment in approving and implementing budget cuts that undermined BP's process safety;

    e. failing to adequately inform themselves about BP's plans for catastrophic incidents like the *Deepwater Horizon* disaster;

f. failing to exercise independent judgment in approving and implementing financial incentives that encouraged employees to cut corners, thereby compromising the safety of BP's operations;

g. failing to adequately inform themselves about the impact of BP's performance contracts and incentive compensation on employee incentives and process safety; and/or

h. failing to adequately inform themselves about BP's retaliation practices against employees and contractors who sounded the alarm about BP's dismal process safety, and who were subsequently demoted or terminated.

258. The Director Defendants were aware, or should have been aware, that their failure to comply with their duties posed a risk of serious injury to the Company.

259. As a direct and proximate result of the Director Defendants' failure to exercise due care and independent judgment, BP has sustained significant financial and reputational damage. This damage included, among other things, the substantial civil liability and related expenses described herein in connection with the *Deepwater Horizon* disaster.

260. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

### COUNT III

### Derivative Claim for Breach of Fiduciary Duty for Acting *Ultra Vires* and Causing the Company to Engage in Unlawful Conduct

### (Against Defendants McKay and Malone)

261. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

262. Defendants McKay and Malone owed the highest obligation of good faith in, among other things, ensuring that BP America was operated in compliance with laws and regulations governing the safety of BP's activities. When McKay and Malone learned that BP America's business practices and operations broke federal and state safety regulations, including

minimum process safety requirements, McKay and Malone were required to in good faith to take appropriate action to stop the misconduct and prevent its recurrence.

263. Instead, McKay and Malone engaged in conduct that constituted *ultra vires* acts, bad faith and reckless disregard of their fiduciary duties by, among other things:

    a. failing to ensure compliance with mandatory U.S. federal and state laws, rules and regulations regulating the operations of BP and its subsidiaries;

    b. implementing budget cuts, knowing that this caused BP and its subsidiaries to underfund process safety in violation of  U.S. federal and state laws, rules regulations, as well as commitments made in response to prior disasters and near misses;

    c. implementing financial incentives that encouraged employees to cut corners, thereby compromising the safety of BP's operations;

    d. deciding not to change or ignoring BP's inadequate safety culture and process safety, knowing that this would increase the risk of a catastrophic disaster, including loss of life and legal liability for the Company; and/or

    e. permitting, or consciously refusing to alter, BP's deepwater drilling operations in the Gulf, despite learning in or about December 2008 that: (i) BP did not adequately plan for the mitigation of serious safety risks; and (ii) a failure to adequately plan could result in "multiple injuries/fatalities," "major environmental damage," "catastrophic loss of the facility," and "damage to corporate reputation."

264. The conduct of McKay and Malone was *ultra vires*, constituted a breach of their fiduciary duties, and incapable of ratification.

265. As a direct and proximate result of the decision by McKay and Malone to act *ultra vires* and not perform their fiduciary obligations, BP has sustained significant financial and reputational damages.  Such damage included, among other things, the substantial civil liability and expenses described herein in connection with the *Deepwater Horizon* disaster.

266. As a result of the misconduct alleged herein, the McKay and Malone are liable to the Company.

## COUNT IV

**Derivative Claim for Breach of Fiduciary Duty for Failing to Exercise Due Care in Causing the Company to Engage in Dangerous Activities without Adequate Process Safety**

**(Against Defendants McKay and Malone)**

267.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

268.    Defendants McKay and Malone owed a duty to prudently supervise, manage and control the operations of BP America.  To discharge their duties of due care, the Director Defendants were, for example, required to exercise reasonable care in:

   a.  ensuring the process safety of BP's dangerous deepwater exploration and drilling activities;

   b.  ensuring BP would implement a system of internal procedures, processes and controls that was adequate to ensure the Company's compliance with all applicable laws;

   c.  encouraging employees, at all levels, to report safety issues to their superiors, and to protect them from retaliation; and/or

   d.  protecting the Company against massive fines, penalties, and compensatory damages awards for violations of U.S. and state environmental, securities and ERISA laws.

269.    In light of the general knowledge, skill and experience that may be reasonably expected of a board member and senior officer overseeing significant oil exploration and refining operations in the U.S., and the specific knowledge that McKay and Malone each have with respect to the inherent dangers of BP's activities and inadequate process safety, McKay and Malone culpably failed to exercise due care, among other reasons, by:

   a.  failing to ensure compliance with mandatory U.S. federal and state laws, rules and regulations regulating the operations of BP and its subsidiaries;

   b.  failing to provide adequate funds causing BP and its subsidiaries to underfund process safety in violation of U.S. federal and state laws, rules and regulations, as well as commitments made in response to prior disasters and near misses;

92

    c.   failing to inform themselves of the impact of budget cuts that they implemented on BP's process safety;

    d.   failing to adequately inform themselves about BP's plans for catastrophic incidents like the *Deepwater Horizon* disaster;

    e.   failing to adequately inform themselves about the impact of BP's performance contracts and incentive compensation on employee incentives and process safety; and/or

    f.   failing to adequately inform themselves about BP's retaliation practices against employees who sounded the alarm about BP's dismal process safety, and who were subsequently demoted or fired.

270.    McKay and Malone were aware, or should have been aware, that their failure to comply with their duties posed a risk of serious injury to the Company.

271.    As a direct and proximate result of McKay's and Malone's failure to exercise due care, BP has sustained significant financial and reputational damage. This damage included, among other things, the substantial civil liability and related expenses described herein in connection with the *Deepwater Horizon* disaster.

272.    As a result of the misconduct alleged herein, McKay and Malone are liable to the Company.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

(a)    Determine that this action is a proper derivative action maintainable under law;

(b)    Declaring that the defendants named herein have breached their fiduciary duties as alleged herein;

(c)    Requiring the defendants to pay to the Company the amounts by which it has been damaged or will be damaged by reason of the conduct complained of herein;

(d)    Directing Defendants to account for all damages caused by them and all profits and special benefits they have obtained as a result of their misconduct, including all salaries,

bonuses, fees, stock awards, options, and common stock sale proceeds, and imposing a constructive trust thereon;

(e)     Directing BP to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with the Company's governance obligations and all applicable laws, and to protect the Company from a recurrence of the damaging events described herein;

(f)     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants', consultants' and experts' fees, and expenses; and

(g)     Granting such other and further relief as the Court deems just and proper.

Dated:  February 4, 2011                              AJAMIE LLP

                                                      By: */s/ Thomas R. Ajamie*
                                                      Thomas R. Ajamie (Texas Bar No. 00952400)
                                                      Dona Szak (Texas Bar No. 19597500)

                                                      Pennzoil Plaza – South Tower
                                                      711 Louisiana, Suite 2150
                                                      Houston, TX 77002
                                                      Tel.: (713) 860-1600
                                                      Fax: (713) 860-1699

                                                      *Liaison Counsel for the Derivative Plaintiffs*

KAHN SWICK & FOTI, LLC                                BERNSTEIN LITOWITZ BERGER &
Lewis S. Kahn                                         GROSSMANN LLP
Albert M. Myers                                       G. Anthony Gelderman III
Michael A. Swick                                      John Alden Meade
Paul Balanon                                          2727 Prytania Street, Suite 14
Melinda A. Nicholson                                  New Orleans, Louisiana 70130
                                                      Tel.: (504) 899-2339
206 Covington Street
Madisonville, Louisiana 70447                         -and-
Tel.: (504) 455-1400
                                                      Mark Lebovitch
                                                      Jeroen van Kwawegen
                                                      1285 Avenue of the Americas
                                                      New York, New York 10019
                                                      Tel.: (212) 554-1400

                                                      *Co-Lead Counsel for the Derivative Plaintiffs*

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
Gregory M. Nespole
Robert B. Weintraub

270 Madison Avenue
New York, NY 10016
Tel.: (212) 545-4600

- and –

CHIMICLES & TIKELLIS LLP
Pamela S. Tikellis

222 Delaware Avenue, Suite 1100
P.O. Box 1035
Wilmington, Delaware 19899
Tel.: (302) 656-2500

BARRACK, RODOS & BACINE
Mark R. Rosen

Two Commerce Square
2001 Market Street
Suite 3300
Philadelphia, PA 19103
Tel: (215) 963–0600

- and –

Stephen R. Basser
One America Plaza
600 West Broadway, Suite 900
San Diego, California 92101
Tel.: (619) 230-0800

A. Arnold Gershon
425 Park Avenue, Suite 3100
New York, NY 10022
Tel. (212) 688-0782

*Co-Chairs of the Executive Committee*

CAFFERTY FAUCHER LLP
Bryan L. Clobes
Ellen Meriwether

1717 Arch Street, Suite 3610
Philadelphia, PA 19103

RYAN & MANISKAS, LLP
Katharine Ryan

995 Old Eagle School Road STE 311
Wayne, PA 1908717

*Members of the Executive Committee*

SCOTT & SCOTT LLP
Walter W. Noss
Mary Blasy

707 Broadway, Suite 1000
San Diego, CA 92101
Tel.: (619) 233-4565

LAW OFFICES OF PATRICK YANCEY
Patrick H. Yancey

761 West Tunnel Blvd., Suite C
Houma, LA 70360
Tel.: (800) 449-2319

95

GOLDFARB | BRANHAM LLP
Jeffrey Goldfarb
Charles "Trey" Branham, III
Hamilton Lindley

Saint Ann Court
2501 N. Harwood St., Suite 1801
Dallas, TX 75201
Tel.: (214) 583-2233


KOHN  SWIFT & GRAFT, P.C.
Denis F. Sheils

One South Broad Street
Suite 2100
Philadelphia, PA 19107
Tel.: (215) 238-1700

DOYLE LOWTHER LLP
William J. Doyle
John A. Lowther

9466 Black Mountain Road, STE 210
San Diego, California 92126
Tel.: (619) 573-1700



FEDERMAN & SHERWOOD
William B. Federman

10205 North Pennsylvania Avenue
Oklahoma City, Oklahoma 73120
Tel.: 405.235.1560


*Additional Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN RE BP SHAREHOLDER
DERIVATIVE LITIGATION

Case No. 4:10-cv-03447

## VERIFICATION

I, R. Randall Roche, verify that:

1. I am the General Counsel of Louisiana Municipal Police Employees' Retirement System ("LAMPERS"), a plaintiff in this action.

2. LAMPERS is a shareholder of BP, plc ("BP"), was a shareholder at the time of the wrongdoing complained of, and intends to continue to hold BP shares until at least the resolution of this action.

3. I have reviewed the allegations made in the Complaint. As to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and believe them to be true.

4. Having reviewed a copy of the Complaint, I hereby authorize its filing on behalf of LAMPERS. LAMPERS has retained competent counsel and is ready, willing and able to pursue this action vigorously on behalf of BP.

I declare that the foregoing is true and correct to the best of my knowledge.

Executed this 4th day of February, 2011 in Baton Rouge, Louisiana.

R. Randall Roche
General Counsel
*Louisiana Municipal Police Employees'
Retirement System*

## IN RE BP SHAREHOLDER DERIVATIVE COMPLAINT

I, Nicholas Staffieri, General Counsel for the Southeastern Pennsylvania Transportation Authority ("SEPTA"), pursuant to 28 U.S.C. § 1746, hereby verify I am familiar with the allegations of the Verified Consolidated Amended Shareholder Derivative Complaint, and I have authorized the filing of that complaint. I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on February 2, 2011

Nicholas Saffieri
General Counsel,
Southeastern Pennsylvania
Transportation Authority

**VERIFICATION**

I, _CLAY DIETRICH_, have read the Verified Shareholder Derivative Complaint and know the contents thereof. The complaint is true and correct to the best of my knowledge and belief. I declare under penalty of perjury the foregoing is true and correct.

_____
Signature

Print Name: _CLAY DIETRICH_

## VERIFICATION

I, Victor Skimedal, under penalty of perjury, declare as follows:

I am the Plaintiff in the above-captioned action. I have read the foregoing Complaint and authorized its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

DATED: 2-1-11

Victor Skomedal

## VERIFICATION

I, Rene Rogers, declare I have reviewed the Verified Consolidated Amended Shareholder Derivative Complaint ("Complaint") prepared on behalf of BP, and I authorize the Complaint's filing. I have reviewed the Complaint's allegations, and to those allegations of which I have personal knowledge, I believe the allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare I am a current holder, and have been a holder, of BP common stock.

2/2/11

Date

RENE ROGERS

## VERIFICATION

I, Cody A. Nedved, under penalty of perjury, declare as follows:

I am the Plaintiff in the above-captioned action. I have read the foregoing Complaint and authorized its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

DATED: 2 - 4 - 11

_____
Cody A. Nedved

## VERIFICATION

I, Frances O. Goldman, am a Plaintiff in the foregoing action. I declare under penalty of perjury of the laws of the United States that I have reviewed the Verified Consolidated Amended Shareholder Derivative Complaint in this action, and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason I believe them to be true.

~~February~~
~~January~~ 1 , 2011.


_____

FRANCES O. GOLDMAN