## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: BP SHAREHOLDER DERIVATIVE LITIGATION | ) ) ) ) | MDL NO. 2185<br><br>Civil Action No. 4:10-cv-3447 |
| In Re: BP P.L.C. SECURITIES LITIGATION | ) ) ) ) | Civil Action No. 4:10-md-2185<br><br>Hon. Keith P. Ellison |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT AND ISSUES ............................................................. 1

II.  FACTUAL BACKGROUND ........................................................................................ 4

    A.  BP's Profit Strategy Consistently Places Cost-Cutting Ahead of Safety .............. 4

        1.  BP's Extensively Regulated Business ........................................................ 4

        2.  BP: Cutting Costs at Any Expense, Including Safety ................................. 5

        3.  BP's Compensation Structure Rewards Disregard For Safety ................... 6

    B.  The Board Receives Numerous Warnings That Its Strategy Is Putting the
        Lives of Employees, the Environment and BP's Reputation at Risk .................... 7

        1.  2002–2005: the Board Is Warned Repeatedly About Safety
            Deficiencies and Inadequate Safety Leadership ........................................ 7

        2.  2005–2006: the Texas City Explosion Kills 15 and Injures 170
            Others, and Neglected Maintenance Causes a Giant Oil Spill in
            Alaska ........................................................................................................ 8

        3.  2007: The U.S. Government and Industry Experts Urge Defendants
            to Change BP's Safety Culture .................................................................. 9

        4.  Defendants Continue Promoting Financial Performance at the
            Expense of Safety ..................................................................................... 11

        5.  2007–2010: BP Incurs Additional Criminal and Civil Fines ................... 12

    C.  The Deepwater Horizon Disaster ........................................................................ 13

    D.  Initial Investigations Echo the Baker, CSB and Booz-Allen Reports ................. 15

III.  ARGUMENT ............................................................................................................ 15

    A.  Applicable Standards Under Rule 12(b) and Rule 23.1 ...................................... 15

    B.  The Complaint Meets All Pleading Standards ..................................................... 16

        1.  U.K. Law Does Not Create Any Intra-Corporate "Demand"
            Requirement .............................................................................................. 16

        2.  Defendants' "Alternative" to a Demand Requirement Does Not
            Apply in This Court .................................................................................. 17

3.      Defendants' Resort to Louisiana and Delaware Law Is a Red
        Herring ................................................................................................ 21

C.      This Court Provides a Proper and Convenient Forum ......................................... 23

        1.      The Applicable Standards ........................................................................ 24

        2.      Defendants Fail to Meet Their *Forum Non Conveniens* Burden ............. 25

D.      Ample Basis Exists to Exercise Personal Jurisdiction ........................................ 29

        1.      The Applicable Standards ........................................................................ 29

        2.      Exercising Personal Jurisdiction Over Defendants is Both Fair and
                Just .......................................................................................................... 30

IV.   CONCLUSION .............................................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Abbott Labs. Deriv. S'holders Litig.*,
  325 F.3d 795 (7th Cir. 2001) ...................................................................23

*In re Air Crash Disaster*,
  821 F.2d 1147 (5th Cir. 1987) ...................................................24, 25, 27

*Alford Safety Serv., Inc. v. Hot-Hed, Inc.*
  No. 10-1319, 2010 WL 3418233 (E.D. La. Aug. 24, 2010)....................32

*Atkins v. Hibernia Corp.*,
  182 F.3d 320 (5th Cir. 1999) .....................................................................2

*In re Bank of La./Kenwin Shops Inc., Contract Litig.*,
  No. MDL 1193, 1999 WL 518852 (E.D. La. July 19, 1999)..................29

*Baris v. Sulpicio Lines, Inc.*,
  932 F.2d 1540 (5th Cir. 1991) .................................................................25

*Bilyeu v. Johanson Berenson LLP*,
  No. 08-02006, 2010 WL 3896415 (W.D. La. Sept. 30, 2010) ....30, 32, 33

*Blessey Marine Servs. v. Jeffboat, LLC*,
  No. 10-1863, 2011 WL 651999 (E.D. La. Feb. 10, 2011).......................33

*Blum v. General Elect. Co.*
  547 F. Supp. 2d 734 (W.D. Tex. 2008).......................................................8

*Bounty-Full Entm't, Inc. v. Forever Blue Entm't Grp., Inc.*,
  923 F. Supp. 950 (S.D. Tex. 1996) ...........................................................15

*In re BP P.L.C. S'holder Deriv. Litig.*,
  No. 3AN-06-11929CI (Sup. Ct. Alaska May 7, 2008) .............................23

*In re Corel Corp. Sec. Litig.*,
  147 F. Supp. 2d 363 (E.D. Pa. 2001) ..................................................26, 28

*Cowart v. Med. Shipping Co.*,
  No. 09-3572, 2011 WL 601651 (E.D. La. Feb. 15, 2011).......................30

*Dalton v. R & W Marine, Inc.*,
  897 F.2d 1359 (5th Cir. 1990) .................................................................30

*DeAguilar v. Boeing Co.*,
    11 F.3d 55 (5th Cir. 1993) .......................................................................................5

*DiRienzo v. Philip Servs. Corp.*,
    294 F.3d 21 (2d Cir. 2002).............................................................................24, 28

*In re Dunhill Res., Inc.*,
    No. 03–41264–H2–7, 2006 WL 2578862 (Bankr. S.D.Tex. 2006)........................21

*Empagran, S.A. v. F. Hoffman-La Roche Ltd.*,
    453 F. Supp. 2d 1 (D.D.C. 2006).........................................................................29

*Erie Railroad Co. v. Tompkins*,
    304 U.S. 64 (1938)...............................................................................................19

*In re Factor VIII or IX Concentrate Blood Prod. Litig.*,
    484 F.3d 951 (7th Cir. 2007) .................................................................................5

*Fernendez-Montes v. Allied Pilots Ass'n*,
    987 F.2d 278 (5th Cir. 1993) ...............................................................................15

*Great N. Ins. Co. v. Constab Polymer-Chemie GmbH & Co.*,
    No. 5:01-cv-0882, 2007 WL 2891981 (N.D.N.Y. Sept. 28, 2007)........................25

*GRM v. Equine Inv. & Mgmt. Group*, 596 F. Supp. 307 (S.D. Tex. 1984) ..................33

*Gulf Oil Corp. v. Gilbert*,
    330 U.S. 501 (1947).............................................................................................24

*Hartford Underwriters Ins. Co. v. Foundation Health Services, Inc.*
    524 F.3d 588 (5th Cir. 1993) ...............................................................................19

*In re Guitierrez v. Logan*,
    No. Civ.A. H-02-1812, 2005 WL 2121554 (S.D. Tex. Aug. 31, 2005) ............16, 32

*Information Resources, Inc. v. Dun & Bradstreet Corp.*,
    127 F. Supp. 2d 411 (S.D.N.Y. 2001)..................................................................29

*Infosonics Corp. Derivative Litig.*, No. 06-1336, 2007 WL 257227
    (C.D. Cal. Sept. 4, 2007) ....................................................................................32

*Int'l Shoe Co. v. Wash.*,
    326 U.S. 310 (1945)......................................................................................30, 33

*Itoba Ltd. v. LEP Group PLC*,
    930 F. Supp. 36 (D. Conn. 1996).....................................................................26, 28

*Kamen v. Kemper Fin. Servs., Inc.*,
500 U.S. 90 (1991) .................................................................................2, 15, 16

*Karim v. Finch Shipping Co.*,
94 F. Supp. 2d 727 (E.D. La. 2000) ...........................................................9

*Kempe v. Ocean Drilling & Exp. Co.*,
876 F.2d 1138 (5th Cir. 1989) .................................................................24

*Manu Int'l, S.A. v. Avon Prods. Inc.*,
641 F.2d 62 (2d Cir. 1981).......................................................................26

*In re Matter of the Libel & Pet. of Gemini Navigation, S.A.*,
No. G-92-126, 1996 WL 544236 (S.D. Tex. Mar. 1, 1996) ....................31

*Mercier v. Sheraton Int'l, Inc.*,
935 F.2d 419 (1st Cir. 1991).......................................................................5

*Messinger v. United Canso Oil & Gas Ltd.*,
486 F. Supp. 788 (D. Conn. 1980) ...........................................................20

*Midwestern Teamsters Pension Trust Fund v. Deaton*,
No. H-08-1809, 2009 WL 6799492 (S.D. Tex. May 7, 2009).................16

*Nat'l Union Fire Ins. Co. of Pittsburgh v. BP Amoco, P.L.C.*,
No. 03-cv-0200, 2003 WL 21180421 (S.D.N.Y. May 20, 2003) ...........24

*In re Pfizer Inc. S'holder Deriv. Litig.*,
722 F. Supp. 2d 453 (S.D.N.Y. 2010) ......................................................22

*Piper Aircraft Co. v. Reyno*,
454 U.S. 235 (1981)..................................................................................24

*Reid-Walen v. Hansen*,
933 F.2d 1390 (8th Cir. 1991) .............................................................24, 25

*Robinson v. Snell's Limbs & Braces of New Orleans, Inc.*,
538 So.2d 1045 (La. App. 1989)...............................................................22

*Schexnider v. McDermott Int'l, Inc.*,
817 F.2d 1159 (5th Cir.1987) .....................................................................9

*In re SEDCO, Inc.*,
543 F. Supp. 561 (S.D. Tex. 1982) .............................................................3

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
130 S. Ct. 1431 (2010)...........................................................................3, 19

*Smith v. Wembley Indus., Inc.*,
   490 So. 2d 1107 (La. App. 4th Cir. 1986) ............................................................22

*Sun Oil Co. v. Wortman*,
   486 U.S. 717 (1988).............................................................................................20

*Sydow v. Acheson & Co.*,
   81 F. Supp. 2d 758 (S.D. Tex. 2000) ..............................................................26, 9

*Syndicate 420 at Lloyd's London v. Early American Ins. Co.*
   796 F. 2d 821 (5th Cir. 1986) ...........................................................................27

*Taylor v. Tesco Corp. (US)*,
   No. 09-3404, 2010 WL 4539394 (E.D. La. 2010) ...............................................7

*Torres De Maquera v. Yacu Runa Naviera S.A.*,
   107 F. Supp. 2d 770 (S.D. Tex. 2000) .........................................................26, 28

*United States v. BP Exploration (Alaska) Inc.*,
   No. 3:09-00064-JWS (D. Alaska filed Mar. 31, 2009)........................................13

*United States v. Jackson*, 426 F.3d 301 (5th Cir. 2005) ........................................21

*Vaughn v. LJ Int'l, Inc.*,
   94 Cal. Rptr. 3d 166 (Cal. Ct. App. 2009)..........................................................20

*Walk Haydel & Assocs. v. Coastal Power Prod. Co.*,
   517 F.3d 235 (5th Cir. 2008) .......................................................................30, 33

*Warth v. Seldin*,
   422 U.S. 490 (1975)...........................................................................................15

*Windt v. Qwest Commc'ns Int'l, Inc.*,
   529 F.3d 183 (3d Cir. 2008).............................................................................27

*Wixon v. Wyndam Resort Dev. Co.*,
   No. 07-0236, 2008 WL 1777494 (N.D. Cal. Apr. 18, 2008)...............................32

*World-Wide Volkswagen Corp., v. Woodson*,
   444 U.S. 286 (1980)...........................................................................................33

## STATUTES

28 U.S.C. § 1367....................................................................................................29

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12 ...................................................................................................15, 17, 20

Fed. R. Civ. P. 23.1 ...................................................................................................... passim

8 Glenn G. Morris & Wendell H. Holmes, *La. Civ. L. Treatise* § 34.13 .................................21, 22

Section 261 of the Companies Act of 2006 .................................................................17, 18, 19, 20

**UK AUTHORITIES**

*Foss v. Harbottle,*
    [1843] 2 Hare 461 .........................................................................................................20

*Konamaneni v. Rolls Royce Industrial Power (India) Ltd.,*
    [2002] 1 WLR 1269 .......................................................................................................19

*Prudential v. Newman,*
    [1982] 1 Ch 204 ...........................................................................................................19

*Smith v. Croft,*
    [1988] Ch 114 ..............................................................................................................19

*Waddington Litd. v. Chan Chun Hoo Thomas*
    [2008] HKCU 1381 .......................................................................................................19

Plaintiffs[1] respectfully submit this Opposition to Defendants' Motion to Dismiss.[2]

## I.      PRELIMINARY STATEMENT AND ISSUES

In the wake of the 2005 Texas City refinery explosion that killed 15 U.S. workers, injured hundreds, and caused hundreds of millions of dollars in property and environmental damage, BP's Board received blistering condemnations from the Baker Panel, the U.S. Chemical Safety and Hazard Investigation Board ("CSB"), and management consultant Booz Allen. These independent sources directly informed the Board that responsibility for the Texas City disaster, and other safety incidents in the U.S., stemmed from the Board's and senior management's strategic decision to place short-term cost cutting ahead of basic respect for and oversight of process safety in BP's most hazardous U.S.-based business activities. BP's then-CEO, John Browne, attempted to quell criticism, stating: "BP gets it. And I get it too. This happened on my watch, and as Chief Executive, I have a responsibility to learn from what has occurred."[3]

The Board soon replaced Browne with CEO Tony Hayward. BP's promises to finally adhere to process safety from the top of corporate management down proved completely hollow. BP's pattern of willful violations of American safety standards and laws persisted, making another disaster a question of "when" and "how bad," rather than "if." Defendants' inexcusable disregard for safety and legal compliance culminated on April 20, 2010, with the explosion on the *Deepwater Horizon* ("*Horizon*"), killing 11 workers and releasing millions of barrels of oil into the Gulf of Mexico. On the anniversary of the disaster, BP's current CEO, Bob Dudley, is trying to quell ongoing criticism of BP, stating: "BP gets it. BP is changing. We are committed to

---

[1]    Capitalized terms in this Memorandum have the same definition assigned to them in the Verified Consolidated complaint (the "Complaint"), dated February 4, 2011.

[2]    Defendants' Memorandum of Law in Support of Motion to Dismiss is referred to as "Def Mem."

[3]    References to "¶__" refer to paragraphs in the Complaint.

working together with our industry colleagues and government regulators to ensure a safer, stronger energy future."[4] Defendants' *mea culpas* show only that this is "Déjà-vu all over again."

The facts of this case – in which Defendants' years-long strategy to slash costs and budgets at the expense of compliance with safety laws and regulations triggered the single worst environmental debacle in U.S. history – are *sui generis*. No party can find a comparable record of scores of specific and persistent "red flag" warnings that a corporate board's management of a business would inevitably cause a calamity of unthinkable proportions. If ever a shareholder derivative suit based on a board's disregard for their corporate monitoring responsibility warrants a trial, this is it.

Diverting the Court's attention from the facts giving rise to this claim, Defendants raise a plethora of at-times inconsistent legal arguments. Upon scrutiny, however, the issues for decision on this motion are straightforward. Critically, Defendants do not dispute that the Complaint alleges the relevant elements of Plaintiffs' breach of fiduciary duty claims. Instead, Defendants challenge Plaintiffs' standing to sue, and assert this Court is inconvenient and has no personal jurisdiction. Each argument fails and should be rejected.

*First*, like any other derivative action, the first question is whether the Plaintiffs made a demand that was refused, or whether Plaintiffs' decision not to make a demand was excused. *See* Fed. R. Civ. P. 23.1. Defendants concede, as they must, that *U.K. law does not require a shareholder to make a demand on the Board before bringing suit*. Def. Mem. at 24. As a result, Plaintiffs' decision not to make a demand was excused, and Rule 23.1 is satisfied. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991) (holding that the law of the jurisdiction of incorporation governs whether pre-suit demand on the Board, if any, is required).

---

[4]  Bob Dudley, *The Lessons of Deepwater Horizon*, Wall St. J., April 20, 2011, attached to the May 5, 2011 declaration of Dona Szak ("Szak Decl.") as Ex. 1.

According to the Defendants, however, BP's shareholders do not have standing to sue because, "as the Companies Act itself makes clear, a shareholder of a company organized under English law" must first obtain[] "judicial permission from the English High Court." Def. Mem. at 3. Not true. The Companies Act, by its plain terms, makes clear that this "judicial permission" requirement applies *only* to actions commenced in the courts of England, Wales, or Northern Ireland. Nothing in the statute suggests that this requirement applies to derivative actions commenced in other parts of the U.K., much less those filed in any of the non-U.K. jurisdictions where BP has material business operations. (*See* May 5, 2011 declaration of Stuart Adair ("Adair Decl.") attached to Szak Decl. as Exhibit 15, ¶¶9-12).

Moreover, the requirement to ask permission *from a court* to continue an ongoing litigation is clearly a U.K. procedural rule to dispose of unmeritorious cases – not a rule concerning the "internal affairs" of a company that constitute part of the substantive law. It therefore has no application in this Court. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431 (2010) (holding a state law prohibition of class actions inapplicable in a federal court diversity proceeding). Here, the Federal Rules of Civil Procedure govern, regardless of "whether the rule affects a litigant's substantive rights, [because] most procedural rules do." *Id.* at 1442. Furthermore, as detailed in the attached affidavit of Stuart Adair, a U.K. corporate law expert, a U.K. court would also view the judicial permission process as a rule of procedure, making clear that Defendants' "international comity" arguments are misplaced as well. (Adair Decl., ¶¶13-22).

*Second*, after years of flouting mandatory American safety regulations, years of industrial accidents killing Americans and harming the American environment, and years of unequivocal red flags that another catastrophe on American soil was just around the corner, Defendants argue

that "the English High Court is a more suitable alternative forum for this derivative litigation." Def. Mem. at 3. Defendants ignore that a plurality of BP shareholders are American, its current CEO is American, and that BP's greatest concentration of operations anywhere is in America. ¶¶74, 77. Former CEO Browne acknowledged that "[b]y the end of the 20th Century, we were no longer British." Indeed, his successor, Defendant Hayward, proudly announced in Houston in 2007 that "America – and Americans – [are] the greatest single part of BP." ¶¶213-14. This action is in no respect a local English controversy. Indeed, no British court would find this Court's exercise of jurisdiction over this unique and factually unprecedented matter an offense to international comity. (Adair Decl., ¶¶90-93).

*Finally*, BP's personal jurisdiction defense ignores the extensive ties of the Defendants to the Gulf of Mexico. Indeed, BP itself touts the hands-on visits of almost all the Defendants to the Gulf region to publicly show how closely Defendants monitor BP's extensive operations in this area. Put simply, the exercise of personal jurisdiction over the Defendants will hardly offend traditional notions of fair play and substantial justice.

## II.     FACTUAL BACKGROUND

### A.     BP's Profit Strategy Consistently Places Cost-Cutting Ahead of Safety

#### 1.     BP's Extensively Regulated Business

BP's core business faces well-known operational risks. Safety violations that might be considered minor infractions in less dangerous industries can cause devastating accidents on an oil rig or in a refinery. The decision to cut maintenance budgets can have deadly consequences if, as a result, a company fails to test key indicators and safety alarms. These risks are exacerbated when an oil well is located thousands of feet below sea level. ¶¶1, 52-54. None of this is news to the BP Board. *Id.*

Decision-makers in the petroleum industry know that human error is inevitable and must

be expressly taken into account by good "process safety." ¶9. Browne summed up process safety as follows: "processes and equipment ha[ve] to be safe under all circumstances and operated in a safe way at all times." ¶124.  Compliance with process safety is a critical element of ensuring safe and lawful operations.

The oil industry is heavily regulated. Federal and state laws have been enacted to require strict compliance with process safety requirements to protect workers and the public from explosions and fires, and from the release of oil, gas and dangerous chemicals into the environment. ¶¶55-61. For example, the "Risk Management Program" regulations under the Clean Air Act require BP to inspect and test process equipment and to "correct deficiencies in equipment that are outside acceptable limits … before further use or in a safe and timely manner when necessary means are taken to assure safe operation." ¶59 (citing 40 C.F.R. §68.73). BP's compliance with process safety is subject to oversight by numerous federal and state agencies, including the U.S. EPA, the U.S. Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE" f/k/a "MMS"), and OSHA. ¶56.

### 2.     BP: Cutting Costs at Any Expense, Including Safety

In 1989, Browne assigned BP's top ten geologists including Tony Hayward, to develop a new strategy to find oil.  The group advised Browne to focus on exploring and producing "elephants" – industry jargon for massive oil fields. BP would have to drill in places where few, if any, other oil companies had drilled before – places that were difficult to reach because of political, geological or technical difficulties. Deepwater wells in the Gulf of Mexico presented steep technological challenges, but were particularly promising places to explore and produce. ¶62. Browne implemented the strategy. ¶63.

In 1998, BP entered into a $110 billion "merger of equals" with Amoco, then the largest industrial merger in history. Browne explained that Amoco was a particularly attractive merger

partner, in part because of Amoco's sizeable assets in the Gulf of Mexico. ¶¶65, 213.  Browne announced that the BP Amoco Gulf of Mexico operations would drive pre-tax profits by at least $2 billion in 2 years, driven largely from the Gulf of Mexico operations.  ¶¶70-71.

BP embarked on an aggressive campaign of exploring and developing the Gulf assets, and of further expanding its total number of leases in the region. ¶66. By 2004, BP was the largest leaseholder in the Gulf of Mexico and, ultimately, produced more oil from the Gulf than any other company. ¶68. BP explored and developed these assets by using deepwater drilling techniques that until very recently were considered beyond human capabilities. ¶66. The Board knew that deepwater drilling was a high-risk endeavor. ¶67.

BP was unable to achieve the necessary production to meet Browne's promises. ¶71. With Board approval, Browne therefore slashed expenses Company-wide, reducing budgets by 25% and cutting 6,000 jobs, including those of many structural and safety engineers.  *Id.*  As the Sunday Times reported, "Items cut included turn-arounds, safety committee meetings ... plant maintenance and training courses. Safety and maintenance expenditures were a significant portion of the cuts." *Id.*

After BP acquired ARCO (another Standard Oil spin-off), the U.S. experienced a downturn in the economy. The demand for oil declined, causing a two-year slide in the price for oil further intensifying the Board's determination to improve operating margins by cutting costs. ¶72. In 2004, the Board implemented another round of cuts to BP's operational budgets for U.S. refineries, again with no exemption for maintenance and safety programs. ¶73.

### 3.    BP's Compensation Structure Rewards Disregard For Safety

The Board enforced accountability of BP business unit leaders through individual performance contracts setting aggressive productivity and profit targets, and by holding each business unit leader personally accountable for meeting the assigned targets. ¶76. Budget cuts

would be translated into the performance contracts as "milestones" for all of BP's business unit leaders. *Id.* "Targets became the Holy Grail." ¶71.

**B.    The Board Receives Numerous Warnings That Its Strategy Is Putting the Lives of Employees, the Environment and BP's Reputation at Risk**

**1.    2002–2005: the Board Is Warned Repeatedly About Safety Deficiencies and Inadequate Safety Leadership**

In October 2002, consulting firm A.T. Kearney reported that the budget cuts were deteriorating the reliability and integrity of the Texas City refinery, in part because "maintenance budgets has been controlled essentially by a 'top down' allocation of funds' without a "'bottom up' analysis of maintenance needs." ¶77. Nothing changed. ¶¶78-80.

In November 2003, untreated corrosion caused a gas line to rupture on the *Forties Alpha* rig, jeopardizing the lives of everyone on board. ¶81-83. This risk was not theoretical – a few years earlier, a gas line rupture had set a competitor-operated rig – the *Piper Alpha* – on fire, killing 167 people on board and causing shockwaves through the industry. ¶82. Again, nothing changed. As BP's second in command on the *Forties Alpha* later stated:

> Management listened intently to the views of market analysts, who knew little about the technical detail of the oil business, but instead were driven by quarterly results; encouraging and cheering on management's relentless drive to reduce costs. This resulted in a chronic short term view at the very top of the company, obsession with performance metrics became the business for management, not the informed outcome. … These concerns were voiced at all levels, but found little understanding or sympathy. ¶84.

In March 2004, BP's internal audit group reported "a number of serious safety deficiencies throughout the corporation," including that "[l]eadership and accountability were the most common problem" and that "leadership was not 'reinforcing expectations through their own behaviors'." ¶132. Still, nothing changed.

2.      **2005–2006: the Texas City Explosion Kills 15 and Injures 170 Others, and Neglected Maintenance Causes a Giant Oil Spill in Alaska**

On March 23, 2005, workers at the Texas City refinery were restarting an operating unit with volatile chemicals used to make gasoline – one of the most dangerous activities at a refining plant. BP was restarting the unit on a busy weekday afternoon (as opposed to after hours) and despite known problems with the alarms that were supposed to warn workers of a problem. One of the unit's fluid-level indicators was not functioning accurately. The tower alarm that should have warned workers about excessive fluid build-up did not sound. A level sight-glass was too dirty to allow workers to see the fluid build-up. The back-up alarm also failed.  The excessive fluid ignited, causing a massive explosion and fire that killed 15 people and injured more than 170 others. Many of the casualties were in a trailer located too close to the operating unit, in violation of applicable safety regulations. ¶¶90-92. It was one of the deadliest and most expensive industrial accidents in U.S. history, costing BP in excess of $1.5 billion.

An internal BP investigation into the causes of the Texas City disaster found that "[p]rocess safety, operations performance and systematic risk reduction priorities had not been set and consistently reinforced by management." ¶93. The findings were shared with the Board in December 2005. *Id.* BP later pled guilty to knowingly violating the Risk Management Plan requirements of the Clean Air Act (the first company ever to do so), paid a $50 million criminal fine (twice the fine paid by Exxon in connection with the *Valdez* disaster), and paid a $180 million regulatory fine to the EPA. BP also paid $21.4 million to OSHA to settle work safety violations. ¶¶94, 188.

In March 2006, one of the largest oil spills ever took place at a BP pipeline in Alaska – a result of neglect and pipeline corrosion. ¶100. BP later admitted to Congress that it had reduced the monitoring of the pipeline for corrosion to save costs. ¶101. Moreover, the spill had gone

undetected for five days as BP ignored warnings and multiple alarms indicating a spill. ¶100. A few months after the spill, a BP engineer discovered another crack in the oil pipeline and ordered nearby welders to stop working for fear of igniting a fire. He was summarily fired. ¶108. BP later pleaded guilty to violations of the Clean Water Act and was sentenced to pay $20 million in civil and criminal fines and 3 years of probation. ¶¶7, 111, 188.

On Tuesday, May 3, 2011, BP agreed to pay a $25 million fine because of a "willful failure to comply" with court orders requiring BP to propely maintain the pipelines to prevent corrosion.  The fine is the largest per-barrel assessment ever levied against an oil company in a spill case and is another blow to BP's reputation.[5]

### 3.    2007: The U.S. Government and Industry Experts Urge Defendants to Change BP's Safety Culture

On August 17, 2005, the U.S. Chemical Safety Board ("CSB") announced that it had identified serious safety management lapses that had "the potential to cause serious harm unless rectified in a short time frame" and urged BP to request a panel of experts to "review corporate safety oversight, […] corporate safety culture, and management systems such as near-miss reporting and mechanical integrity programs." ¶117. Defendants had no choice, so they assembled a panel chaired by former Secretary of State James A. Baker III ("Baker Panel") ¶118.

In January 2007, the Baker Panel issued a 260 page report dedicated to the victims and survivors of the Texas City tragedy. ¶¶118-119. The Baker Report detailed systemic problems at BP – "from the top of the company, starting with the Board and going down." *Id.* Explaining that "it is imperative that BP's leadership set the process safety 'tone at the top' of the organization and establish appropriate expectations regarding process safety performance," the Panel found

---

[5]    *BP is Fined $25 million for '06 Spills at Pipelines*, (NY Times, May 3, 2011), attached to Szak Decl., as Exhibit 13.

that "BP has not provided effective process safety leadership and has not adequately established process safety as a core value across all its five U.S. refineries." *Id.* The Baker Panel also noted BP's culture of retaliation against workers reporting incidents, stating that, as a result, "BP's process safety management system likely results in under reporting of incidents and near misses at BP's five U.S. refineries." ¶122.

The Baker Panel made a number of recommendations to improve BP's safety culture, including the need for the Board to "provide effective leadership on … process safety" and "monitor the implementation of the recommendations of the Panel." ¶125.  The Baker Report received extensive media coverage and Browne personally accepted it on behalf of the Board, promising to implement its recommendations, stating: "If I had to say one thing which I hope you will all hear today it is this 'BP gets it'." *Id.* ¶126.

In March 2007, the CSB released its own findings of the root causes of the Texas City disaster, which were shared with the Board shortly thereafter. ¶127. The CSB determined that the "BP Group Board did not provide effective oversight of BP's safety culture and major accident prevention programs" and that, as a result the "BP Group lacked focus on controlling major hazard risk." ¶128. In addition, the CSB found that "[d]ecisions to cut budgets were made at the highest levels of the BP Group despite serious safety deficiencies at Texas City" and "[t]hese budget cuts left the Texas City refinery vulnerable to a catastrophe." ¶129.

On the fifth anniversary of the Texas City disaster, the CSB chair reiterated the Investigation Board's conclusion that the Board knew about BP's lacking process safety but the Board decided not to intervene:

> Our investigation team turned up extensive evidence showing a catastrophe waiting to happen, that cost-cutting had affected safety programs and critical maintenance; production pressures resulted in costly mistakes made by workers likely fatigued by working long hours; *internal audits and safety studies brought*

*problems to the attention of BP's board in London, but they were not sufficiently acted upon.* ¶137.

In March 2007, the Board also received a report from the consulting firm Booz Allen Hamilton ("Booz Allen"). ¶138. Echoing the Baker and CSB reports, Booz Allen determined that the "overall budgeting process combined a strong top-down target with a bottom-up, activity-based process" and that the top-down targets "were considered sacrosanct and were rarely exceeded." ¶¶140-141. Moreover, Booz Allen informed the Board that risk management was also "largely driven by top-down targets" and that the increasing risks resulting from these topdown budget targets were not routinely communicated to BP's senior management. ¶141. Thus, the Board was informed that it *could not rely on internal reporting* for understanding the scope of the BP's safety problem. ¶¶141-42.

### 4.      Defendants Continue Promoting Financial Performance at the Expense of Safety

A few months after the publication of the CSB, Baker and Booz Allen reports, Browne resigned as CEO. The Board promoted one of Browne's protégés – Hayward – to become BP's CEO. ¶143.  He, too, kept short-term results elevated above any other concern, including safety. ¶145.

A few months after his promotion, Hayward stated that BP's profits were lagging behind those of its competitors. ¶146. To improve profits, BP would simplify its organizational structure and – yet again – cut budgets and employees. *Id.* With the Board's approval, between 2008 and 2010, BP terminated 22,000 people from the Company and, in 2009 alone, BP cut operational costs by $4 billion. ¶148. These reductions further undermined the Company's ability to operate safely as personnel were stretched even thinner and resources that should have been devoted to maintenance and addressing crucial safety failures were diverted or neglected. *Id.*

In December 2008, a BP strategy document warned Defendants that BP still did not

adequately plan for the mitigation of serious safety risks for its operations in the Gulf.   ¶150. The document was discussed with members of the Board and warned that senior management's failure to address this shortcoming could result in "multiple injuries/fatalities," "major environmental damage," "catastrophic loss of the facility," and "damage to corporate reputation." *Id.* Defendants ignored these warnings and continued the Company's high risk drilling operations without change. *Id.*

### 5.    2007–2010: BP Incurs Additional Criminal and Civil Fines

Between June 2007 and February 2010, OSHA issued *760* "egregious, willful" safety citations to BP. ¶151. A willful violation is one "committed with intentional disregard for or a plain indifference to employee safety and health"; and an "egregious violation" is one so severe that it can result in a penalty each time a violation occurs. *Id.* During the same period, Sunoco and Conoco-Phillips each had eight, Citgo had two and Exxon had one comparable citation. *Id.*

Under the Defendants' leadership, BP also continued to have process safety accidents, continued to enter into criminal guilty pleas, and continued to pay multimillion dollar criminal and civil fines.   ¶152.   Indeed, two BP refineries accounted for 97 percent of all *flagrant violations found in the entire U.S. refining industry* between 2007 and 2010. ¶12. Other examples of safety accidents, criminal pleas and fines include:

- October 2007: BP announces two plea agreements and a deferred prosecution agreement with the Department of Justice in connection with the Texas City disaster, the Alaska oil spill, and improper propane trading. Defendant Malone admits: "[i]f our approach to process safety and risk management had been more disciplined and comprehensive, this tragedy could have been prevented." ¶188.

- June 2008: A piece of steel tubing attached to a pipeline pump ruptures on the *Atlantis* in the Gulf of Mexico, causing the rig to spill 193 barrels of oil. Investigators find that BP postponed repairing the pump in "the context of a tight cost budget," and that leadership did not question safety because the budget was underestimated, leading to "conflicting directions/demands." ¶188.

12

- <u>August 2008</u>: BP production manager Kenneth Abbott emails colleagues warning that "hundreds if not thousands" of "as built" documents for the *Atlantis* were never finalized, and that having the wrong documents on board could lead to catastrophic operator errors. Abbott is terminated. ¶188.

- <u>September 2008</u>: An eight-inch gas line in Alaska separates. Investigators find the incident could have been catastrophic and that "the rupture resulted from "procedures that either were not in place or had not been fully implemented at BP in their management system." ¶188.

- <u>September 2009</u>: OSHA imposes $87.4 million fine (the highest fine in OSHA's history) after finding more than 700 workplace safety violations at the Texas City refinery, including 439 egregious and willful safety violations. ¶188.

- <u>March 2010</u>: OSHA finds 62 "willful" workplace safety violations at the Toledo, Ohio refinery and levies a $3 million fine. In announcing the violations and fine, U.S. Secretary of Labor, Hilda Solis, notes that "BP often ignored or severely delayed fixing known hazards in its refinery . . . There is no excuse for taking chances with people's lives. BP must fix the hazards now." ¶188.

- <u>May 3, 2011</u>: BP agrees to pay a civil penalty of $25 million and to undertake various safety measures to ensure compliance with federal law for violations of the Clean Water Act, Clean Air Act, and the Federal Pipeline Safety Laws for violating terms of probation BP agreed to in connection with criminal prosecution regarding oil spills in 2006. *See* Szak Decl. Ex. 14 (*United States v. BP Exploration (Alaska) Inc.*, No. 3:09-00064-JWS, Consent Decree (D. Alaska May 3, 2011)).

## C.    The Deepwater Horizon Disaster

By April 20, 2010, the Macondo drilling project was 43 days behind schedule and $55 million over budget.  ¶19.  BP's culture of profits over safety, and the pressure to get the Macondo drilling project done, was clearly evident through a number of unreasonable decisions. ¶161. For example, as the *Horizon* was drilling it was losing drilling mud, suggesting that the well was unstable and risked a blowout. To avoid additional cost overruns, BP repeatedly declined to test whether the well was at risk of blowing out. *Id.* To cut costs, BP also used fewer centralizers than recommended, and did not adequately check to make sure that the cement could contain the pressure of the well.  ¶162.  Tests later revealed that the cement composition was unstable.  *Id.*

None of these decisions alone caused the *Horizon* disaster; none of them, however, was consistent with good process safety.   ¶163   Each needlessly increased the risk of a catastrophic blowout, but was in keeping with BP's culture of elevating cost-savings over safety.   *Id.*

When the Macondo well blew out, the *Horizon*'s mandatory blowout preventer ("BOP") had a dead battery, was leaking hydraulic fluid, had not been adequately tested for ultra-deep drilling, and had been modified by replacing the ram that was supposed to cut the riser with a cheaper "test ram" that was incapable of doing so.   ¶¶165-66.   It failed to fully engage and did not stop the flow of oil and gas.   ¶165.   The legally required back-up systems did not function either. *Id.* The alarm that was supposed to warn *Horizon* workers had been disabled and never sounded. *Id.* Gas shot up the riser connecting the *Horizon* to the well and sprayed into the rig, igniting a lethal explosion that caused the deaths of 11 workers.   ¶167.

After burning for two days, the *Horizon* sank, disconnecting the riser from the well and causing oil to spill into the Gulf and turning a major industrial failure into an environmental disaster.   ¶168.   But BP had cut costs and never prepared a site specific mitigation plan, and was therefore forced to rely on a "regional" mitigation plan for the entire Gulf of Mexico – only to discover that parts of this mitigation plan had been "cut and pasted" from a mitigation plan for drilling in Alaska.   ¶169.   Three years after the Baker Panel and the CSB had begged the Board to address BP's failure to plan for a major industrial accident, BP was still forced to make up its response as it went along. As Hayward admitted:

> "What is undoubtedly true is that we did not have the tools you would want in your tool kit," Mr. Hayward said. He accepted it was "an entirely fair criticism" to say the company had not been fully prepared for a deep-water oil leak. ¶171.

The well was not permanently sealed until September 19, 2010, after at least 4.9 million barrels of oil had spilled into the Gulf. ¶170.

**D.      Initial Investigations Echo the Baker, CSB and Booz-Allen Reports**

Since the filing of the Complaint, initial investigations have found that a culture of poor process safety and a focus on saving money at all costs were primary causes of the *Horizon* disaster. For example, the report of the Chief Counsel to the Presidential Oil Spill Commission noted that "[w]hat the investigation makes clear, above all else, is that management failures, not mechanical failings, were the ultimate source of the disaster."[6] By contrast, BP's own investigators were not asked to look into any "systemic" causes of the *Horizon* disaster, continuing the Board's willful blindness and unpreparedness to deal with a major industrial accident in the future.[7]

## III.      ARGUMENT

**A.      Applicable Standards Under Rule 12(b) and Rule 23.1**

In ruling on Rule 12(b) motions, the courts must construe the allegations in the complaint in favor of the plaintiff.[8] In light of their unique nature, derivative actions are subject to the pleading requirements of Fed. R. Civ. P. 23.1. As the Supreme Court explained:

> The derivative form of action permits an individual shareholder to bring suit to enforce a *corporate* cause of action against officers, directors, and third parties. Devised as a suit in equity, the purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers. *Kamen*, 500 U.S. at 95-96 (internal citations omitted).

Recognizing that different jurisdictions make different policy judgments about when shareholders or directors should have decision-making authority over the institution of corporate causes of action, Rule 23.1 requires shareholder plaintiffs to "state with particularity: (A) any

---

[6]      Szak Decl. Ex. 2.

[7]      *See* Szak Decl. Ex. 3 (Wetherbee Tr. 21-22).

[8]      *See Warth v. Seldin*, 422 U.S. 490, 501 (1975) (Rule 12(b)(1)); *Bounty-Full Entm't, Inc. v. Forever Blue Entm't Grp., Inc.*, 923 F. Supp. 950, 954 (S.D. Tex. 1996) (Rule 12(b)(2)); *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284-85 (5th Cir. 1993) (Rule 12(b)(6)).

effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). Put another way, in an effort to ensure that federal courts not interfere with the "internal affairs" of corporations, Rule 23.1 only allows a derivative suit to proceed when whatever "internal" process dictated by state law has been adhered to or excused. *Kamen*, 500 U.S. at 95-96.

Critically, however, "although Rule 23.1 clearly *contemplates* both the demand requirement and the possibility that demand may be excused, it does not *create* a demand requirement of any particular dimension." *Kamen*, 500 U.S. at 96 (*quoted in Guitierrez v. Logan*, 2005 WL 2121554, *3 (S.D. Tex. Aug. 31, 2005). The issue of what kind of pre-suit demand on a company's board of directors is required in any given case – and whether any demand is required at all – is to be governed by the law of the jurisdiction of incorporation of the company involved in that case. *Kamen*, 500 U.S. at 108-09; *see also Midwestern Teamsters Pension Trust Fund v. Deaton*, 2009 WL 6799492, at *4 (S.D. Tex. May 7, 2009) (same).

**B.     The Complaint Meets All Pleading Standards**

**1.     U.K. Law Does Not Create Any Intra-Corporate "Demand" Requirement**

Defendants do not argue that any English authority requires shareholders, prior to instituting a derivative suit, to make demand on a corporate board of directors to bring the claims. Indeed, as explained by Mr. Adair, when a derivative suit is initiated under U.K. law, there is no requirement that shareholders ask the Board to decide whether to pursue the case at all. (Adair Decl. ¶¶14, 33).  Thus, the "internal affairs" of the company, which lies at the heart of Rule 23.1, are not implicated. Accordingly, Plaintiffs' allegation that they made no demand because none was required under U.K. law, *see* ¶ 226, fully satisfies Rule 23.1.

## 2.    Defendants' "Alternative" to a Demand Requirement Does Not Apply in This Court

Unable to argue that there is any demand requirement under U.K. law sufficient to warrant dismissal under Rule 23.1, Defendants raise what they describe as "an alternative to the demand requirement" by citing Section 261 of the Companies Act of 2006. Def. Mem. at 24. This argument does not withstand scrutiny. Section 261 states as follows:

> 261. Application for permission to continue derivative claim
>
> (1) A member of a company who brings a derivative claim *under this Chapter* must apply *to the court* for permission (in Northern Ireland, leave) to continue it.
>
> (2) If it appears *to the court* that the application and the evidence filed by the applicant in support of it do not disclose *a prima facie case* for giving permission (or leave), the court.
>
> > (a) must dismiss the application, and
> >
> > (b) may make any consequential order it considers appropriate.[9]

As explained below, Section 261 is not an "alternative" to a demand in any manner implicated by Rule 23.1.  Moreover, Section 261 is procedural, not substantive law, and therefore does not apply in this Court.

First and foremost the procedure described in Section 261 contemplates a *judicial* review of the *prima facie* basis of the action. This process is akin to a Rule 12(b)(6) analysis. As further detailed by Mr. Adair, Section 261 reflects a policy choice fundamentally inconsistent with a corporate demand requirement.  (Adair Decl. ¶¶13-23).  In crafting the Act, Parliament could have mimicked the director demand requirements of many U.S. states, which Rule 23.1 respects. Instead, the Companies Act takes the power of review of a derivative suit entirely out of management's and the board's hands and places it wholly within the hands of a judge.[10]  . (*Id.*).

---

[9]    See Ex. 3 attached to the Declaration of Stuart Adair dated May 5, 2011, attached to the Szak Decl. as Ex. 15.  Emphasis is added unless otherwise indicated.

[10]    Defendants concede this point, as well. *See* Def. Mem. at 24 ("As one recent article observed, 'under

Thus, Defendants point to no "internal affairs" of BP to which this Court should defer.

Since Section 261 reflects the U.K.'s decision not to impose a "demand" requirement as all, Rule 23.1 is not a hurdle to this action. Instead, Defendants argue that the Section 261 permission process is part of the substantive law of U.K. corporations, and that this Court must dismiss because this action can only proceed with permission of the British High Court.[11] Defendants' argument, however, ignores the fact that Section 261 only applies in ongoing proceedings in England, Wales or Northern Ireland and in any event is plainly procedural. Thus, a federal court sitting in diversity has no reason or basis for applying Section 261.

First, Defendants ignore that Section 261 is subject to a geographical limitation to its applicability. Section 260 of the 2006 Act provides: "This Chapter applies to *proceedings in England and Wales or Northern Ireland* ...." (emphasis added). Thus, by its own terms, Section 261 only applies to actions *initiated in certain parts of the U.K.* The inapplicability of Section 261 in this Action is confirmed by Mr. Adair, who explains that the contemplated process applies *only* to actions commenced in a U.K. court and is not intended or designed to manage or restrict the jurisdiction of other courts. (Adair Decl. ¶¶9-12, 90-94). Specifically, Mr. Adair explains that section 261 is part of Part 11, Chapter 1 of the 2006 Act entitled "Derivative Claims in England and Wales and Northern Ireland," that section 260(1) expressly states that "[t]his Chapter applies to proceedings in England and Wales or Northern Ireland," and that English courts interpreting these provisions do so in light of "the presumption that unless the contrary intention appears the Act is taken to extend to the whole of the United Kingdom but not beyond." (*Id*. ¶¶9-12).

---

the Companies Act, the court makes the initial determination of whether shareholder derivative litigation is in the interests of the corporation, rather than the board of directors."") (citation omitted).

[11] BP argues that because "court" is defined in this context as the London High Court, *ipso facto*, this Court must dismiss the action and Plaintiffs have to pursue their claims in London. Def. Mem. at 11.

Even if this Court sidesteps the geographic limitation of Section 260 (which Defendants have simply ignored), Section 261 must be construed as a matter of procedure, and is therefore not applicable in this diversity action.  As an initial matter, "the law of the forum jurisdiction determines whether an issue in the action is substantive or procedural in nature." *Hartford Underwriter*, 524 F.3d at 593 (citing 1A C.J.S. Actions § 41). And as the Supreme Court recently made clear: "The test [of whether a rule is procedural or substantive] is not whether the rule affects a litigant's substantive rights; most procedural rules do."  *Shady Grove*, 130 S. Ct. at 1442. Instead, the test rests on whether the rule "governs only 'the manner and the means' by which the litigants' rights are 'enforced'." *Id.*  Since Section 261 governs only the manner and the means by which litigants in England 'enforce their rights, it is properly classified as a procedural rule of a foreign jurisdiction that, under *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), will not be applied by a federal district court sitting in diversity.

Mr. Adair explains, citing extensive precedent, that even the U.K. Courts treat the Section 261 permission process as procedural, not substantive.  Indeed, sections 261 to 264 of the 2006 Act are "procedural provisions concerned with the management of legal proceedings pending in the courts of England and Wales or Northern Ireland" and "do not relate to the internal management of English companies."  (Adair Decl. ¶22).  Based on numerous authorities, Mr. Adair further explains that this conclusion is consistent with the procedural common law that preceded enactment of the 2006 Act, including *Prudential v. Newman*, [1982] 1 Ch 204, *Smith v. Croft*, [1988] Ch 114, and *Konamaneni v. Rolls Royce Industrial Power (India) Ltd.*, [2002] 1 WLR 1269.  (*Id.* ¶¶24-34). After reviewing the history of the requirement to seek permission from a court to continue a derivative action, Lord Millet also concluded – in *Waddington Litd. v. Chan Chun Hoo Thomas* [2008] HKCU 1381 – that "[t]he question whether the leave of the

court is required is a procedural question governed by the lex fori…" (*Id.* ¶31).

Defendants' sole basis for arguing to the contrary is *Vaughn v. LJ Int'l, Inc.*, 94 Cal. Rptr. 3d 166 (Cal. Ct. App. 2009). There, the court held that a provision in the British Virgin Islands Companies Act requiring permission from a court to "bring" proceedings on behalf of a company was part of the BVI substantive law because the section "by its own terms limits the entitlement to sue to those shareholders who have complied with its provisions." *Id.* at 220. Unlike the BVI law at issue in *Vaughn,* the Section 261 of the 2006 Act, does not require court permission to bring an action at all. Rather, the 2006 Act requires permission to "continue" a derivative action that is already pending in the courts of England, Wales or Northern Ireland – much like Plaintiffs need permission to continue this case under Rule 12(b)(6). (Adair Decl. ¶¶13-23).

Read more broadly, as Defendants suggest, *Vaughn* is directly refuted by a case Defendants did not cite. In *Messinger v. United Canso Oil & Gas Ltd.*, 486 F. Supp. 788 (D. Conn. 1980), the court declined to dismiss derivative claims of the shareholders of a Canadian company for failure to comply with a provision in the Canadian Business Corporations Act mandating that "no derivative action may be commenced without leave of court" *Id.* at 797. As the court explained, "*the particular device by which plaintiffs obtain leave to file suit is surely a procedural mechanism that this court is not obligated to employ.*" *Id.*[12] The same is true here.[13]

---

[12]   The *Messinger* Court also held that the complaint satisfied the conditions for the inapplicability of and/or exceptions to, the rule in *Foss v. Harbottle,* [1843] 2 Hare 461. *See* 486 F. Supp. at 791-797.

[13]   This is true, moreover, even if an English court would not allow this derivative action to proceed at all if it had been commenced in England. *See, e.g.*, *Sun Oil Co. v. Wortman*, 486 U.S. 717, 725 (1988) (because limitations period are procedural, even if a right arising in one jurisdiction cannot be enforced there due to an expired statute of limitation, it can still be enforced in another jurisdiction with a longer limitations period). Thus, even read broadly, *Vaughn* was also incorrectly decided as a matter of English law. (Adair Decl. ¶¶35-42) (noting the absence of any BVI law experts in the *Vaughn* proceedings).

3. **Defendants' Resort to Louisiana and Delaware Law Is a Red Herring**

A director who consciously or recklessly causes an English company to break the law and, by doing so, puts at risk the lives of employees, the environment, and the company's reputation breaches his fiduciary duties, including: (i) the duty to "only exercise powers for the purposes for which they are conferred" (C.A. §171(b)); (ii) the duty to, in good faith, promote the success of the company, while doing so with regard to the likely consequences of any decision in the long term, the interests of the company's employees, the impact of the company's operations on the community and the environment, and the desirability for the company to maintain a reputation for high standards of business conduct (C.A. §172); and (iii) the duty to "exercise reasonable care, skill and diligence" (C.A. §174). (Adair Decl. ¶¶56-61). Such misconduct also constitutes a breach of duty under the common law. (Adair Decl. ¶¶61-78). Indeed, Defendants do not contest that the Complaint adequately alleges breach of fiduciary claims and have therefore waived the argument. *See U.S. v. Jackson*, 426 F.3d 301, 304 n.2 (5th Cir. 2005) (argument raised for first time in reply brief is waived); *In re Dunhill Res., Inc.*, 2006 WL 2578862 (Bankr. S.D.Tex. 2006) (same).

Instead, Defendants argue that Plaintiffs fail to meet the demand requirements of Louisiana law and, because Defendants claim that Louisiana law will follow Delaware law, under Delaware law as well. (Def. Mem. 24-31) (*citing* 8 Glenn G. Morris & Wendell H. Holmes, *La. Civ. L. Treatise* § 34.13 (2010)).  This is a red herring.

*First*, as noted above, the law of the jurisdiction of incorporation determines whether a demand on the Board must be made before starting a derivative action, and because U.K. law does not require such a demand, Plaintiffs have satisfied the requirements of Rule 23.1.

*Second*, were Louisiana law to apply (and it does not), pre-suit demand "is excused when a majority of directors is involved in the self-dealing and mismanagement that are the subject of

the suit." *Smith v. Wembley Indus., Inc.*, 490 So. 2d 1107, 1109 (La. App. Cir. 1986).[14] Thus, Louisiana law does not look to Delaware for determining whether demand is excused. Indeed, the legal treatise cited by Defendants expressly notes that these Louisiana decisions are "at odds with the pro-management leanings of national trends." 8 Glenn G. Morris & Wendell H. Holmes, *La. Civ. L. Treatise* § 34.13. Here, a majority of BP's directors were involved in the alleged misconduct and thus, under Louisiana law, demand was excused.[15]  ¶¶233-46.

*Third*, even if Louisiana law were to apply and look to Delaware law for guidance with respect to demand (a truly academic proposition at odds with the actual "leanings" of Louisiana), pre-suit demand of the BP board was excused because the Complaint contains detailed allegations of the Board's conscious disregard, if not active encouragement, of pervasive wrongdoing. ¶¶229-232. *See In re Pfizer Inc. S'holder Deriv. Litig.*, 722 F. Supp. 2d 453, 460-62 (S.D.N.Y. 2010) (demand excused because complaint pled "misconduct of such pervasiveness and magnitude, undertaken in the face of the Board's own express formal undertakings to directly monitor and prevent such misconduct, that the inference of deliberate disregard by each and every member of the board is entirely reasonable"); *In re Abbott Labs. Deriv. S'holders*

---

[14]   *See also Robinson v. Snell's Limbs & Braces of New Orleans, Inc.*, 538 So. 2d 1045, 1046 (La. App. 1989) (same). Defendants are also not assisted by *Atkins v. Hibernia Corp.*, 182 F.3d 320 (5th Cir. 1999), which noted that the issue of demand excusal was not even presented in *Atkins* because "the Plaintiffs properly made demand that defendants refused." 182 F.3d at 324 n.3.

[15]   Defendants' unsupported assertion that Plaintiffs did not separately allege demand futility as to each director (Def. Mem. at 29-31) fails. The Complaint spells out, in detail, the basis for the claims against each defendant, including their tenure and role on the Board, and how their involvement on the board and its various committees served to inform them of the consequences of their conscious policy decision to promote or permit massive cost-cutting activities at the expense of process safety. ¶¶225-246. Moreover, *all* of the defendants—more than sufficient to establish demand futility under any law—served long enough before the *Horizon* incident to have been exposed to the "red flags" and acted upon them. *See* ¶31 (Conn since 2004); ¶32 (Dudley since April 2009); ¶33 (Grote since 2000); ¶34 (Hayward since 2003); ¶35 (Inglis since 2007); ¶37 (Burgmans since 2004); ¶38 (Carroll since June 2007); ¶39 (Castell since July 2006); ¶40 (David since February 2008); ¶41 (Davis since 1998); ¶42 (Flint since January 2005); ¶43 (Julius since 2001); ¶44 (Prosser since 1999); ¶45 (Sutherland since 1993); ¶46 (Svanberg since September 2009). *See also* ¶¶190-193, 239-246.

*Litig.*, 325 F.3d 795, 806 (7th Cir. 2001) (reversing dismissal because "there is a corporate governance structure in place, we must then assume the corporate governance procedures were followed and that the board knew of the problems and decided no action was required").[16]

## C.   This Court Provides a Proper and Convenient Forum

Defendants next seek dismissal based on *forum non conveniens*, asserting that because BP is incorporated in England, Defendants may be sued *only* there. This argument is unfounded.

BP grew to its current size through mergers with old-line American oil companies like Amoco and ARCO, which were spun off of Standard Oil generations ago. ¶213. BP's operations and assets in the Gulf of Mexico are the most significant part of BP's operations and assets in the world. ¶216. BP America is BP's single largest division. ¶214. Defendant Hayward has publicly stated that "America – and Americans – [are] the greatest single part of BP." ¶214. BP has Americans – Dudley and Grote – as its two highest executive positions, and six other Defendants are also American citizens. ¶218. BP shares are held by roughly equal numbers of U.S. and U.K. investors. BP has twice as many employees in the U.S. as in the U.K. ¶214. Forty-five percent of BP's oil reserves are in the U.S. (compared to only 9% in the U.K.), which accounts for 54% of total refining, 40% of fixed assets, and 31% of petrochemical production. ¶214. In response to disasters in Texas City and Alaska, Defendants promised reforms regarding process safety and internal controls to be implemented throughout America. ¶188.

The *Horizon* disaster has no effects in the U.K. but ravages U.S. lives and livelihoods, environment and commerce.  Indeed two large Louisiana state retirement funds are Plaintiffs

---

[16]   Defendants mistakenly cite to *In re BP P.L.C. S'holder Deriv. Litig.*, Third Judicial District Superior Court, Alaska, No. 3AN-06-11929CI (Sup. Ct. Alaska, May 7, 2008), to argue that this action is barred by the Stipulation of Settlement in that case ("Alaska Settlement," attached as Exhibit 1 to the Declaration of Thomas W. Traylor). Def. Mem. at 5-6, 10 n. 8. The current action seeks to recover for damages suffered by BP as a result of the Gulf of Mexico oil spill. The incidents cited in the Complaint pertaining to prior safety problems (including the Alaska Settlement itself) serve as strong "red flags" to the Board that they ignored, leading to the *Horizon* catastrophe.

here. Further, there is related MDL tort, statutory, securities, and ERISA litigation pending in this Court and the Eastern District of Louisiana, and BP itself elected to initiate proceedings against its *Horizon* business partners, including foreign corporations such as Transocean, in federal court in Louisiana.

### 1.      The Applicable Standards

The doctrine of *forum non conveniens* allows a court to dismiss a case properly within its jurisdiction in favor of another forum "when trial in the plaintiff's chosen forum would establish … oppressiveness and vexation to a defendant out of all proportion to plaintiff's convenience, or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems'." *Kempe v. Ocean Drilling & Exp. Co.*, 876 F.2d 1138, 1141 (5th Cir. 1989). Defendants bear a heavy burden. *In re Air Crash Disaster*, 821 F.2d 1147, 1164 (5th Cir. 1987). "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). This caveat applies with greater force when the plaintiff has chosen his home forum, as is the case here. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 at 255-56 (1981).[17]

The Fifth Circuit applies a three-step analysis, requiring the defendant to prove that: (1) a foreign forum is available and adequate; (2) that the weight of the "private interest" factors

---

[17]    Defendants argue that Plaintiffs' choice of forum herein is not entitled to deference because only two of the Plaintiffs—LAMPERS and NOERS— are residents of Louisiana and because Plaintiffs are suing in a representative capacity.  Def. Mem. at 17.  In considering this forum *non conveniens* motion, "the relevant distinction is whether or not the plaintiff who has selected the forum is a *United States* citizen, not whether the plaintiff resides in the particular district where the case was brought[;] the 'home' forum for the plaintiff is any federal district in the United States, not the particular district where the plaintiffs lives."  *Reid-Walen v. Hansen*, 933 F.2d 1390, 1394 (8th Cir. 1991).  Also, "[a]ffording less deference to representative plaintiffs *does not mean* they are *deprived of all deference* in their choice of forum."  *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 28 (2d Cir. 2002) (emphasis added).  Moreover, Defendants do not—and cannot argue—that Plaintiffs' choice of forum was motivated by improper purposes.  *Nat'l Union Fire Ins. Co. of Pittsburgh v. BP Amoco, P.L.C.*, 2003 WL 21180421, at *3 (S.D.N.Y. May 20, 2003).  Accordingly, Plaintiffs' choice of forum must be given deference.

24

favors dismissal; and (3) if the private interest factors do not weigh in favor of dismissal, that the weight "public interest" factors do. *In re Air Crash*, 821 F.2d at 1162-1165; *DeAguilar v. Boeing Co.*, 11 F.3d 55, 58 (5th Cir. 1993); *Baris v. Sulpicio Lines, Inc.*, 932 F.2d 1540, 1549 (5th Cir. 1991).[18] An analysis of these factors makes clear that Defendants' *forum non conveniens* arguments fail.

### 2.   Defendants Fail to Meet Their *Forum Non Conveniens* Burden

A defendant is required to "put forth unequivocal, substantiated evidence presented by affidavit testimony" in order to show that a foreign forum is available and adequate. *Baris*, 932 F.2d at 1550 n.14. Defendants offer merely an unsupported assertion that "the individual defendants are amenable to process" in English courts. Def. Mem. at 15.  The first prong inquiry can end there.

Second, the "private interest" prong factors include:

(1) the relative ease of access to sources of proof;
(2) the availability of compulsory process for attendance of unwilling, and the costs of obtaining attendance of willing, witnesses;
(3) probability of an opportunity to view the premises, if view would be appropriate to the action; and
(4) all other practical problems that make trial of a case easy, expeditious and inexpensive, including the enforceability of a judgment once one is obtained.

*In re Air Crash*, 821 F.2d at 1162. No one factor should be given conclusive weight, and dismissal is warranted only if the balancing – including the deference to be given to the plaintiff's choice of forum – weighs *heavily* toward the foreign forum. *Id.* at 1163-65.

---

[18]   Contrary to the Defendants' assertion that "the focus of the forum non conveniens analysis is properly [limited to] the Eastern District of Louisiana," Def. Mem. at 15 n.11, numerous courts, including the court in the case cited by Defendants for this proposition, *In re Factor VIII or IX Concentrate Blood Prod. Litig.*, 484 F.3d 951 (7th Cir. 2007), analyze and weigh the interest factors as between the foreign country and the United States as a whole.  *See id.* at 956 ("evaluation of the relative convenience of the United States and the United Kingdom as potential fora for this litigation")*; Mercier v. Sheraton Int'l, Inc.*, 935 F.2d 419, 429-30 (1st Cir. 1991) (same); *Reid-Walen*, 933 F.2d at 1394 (same); *Great N. Ins. Co. v. Constab Polymer-Chemie GmbH & Co.*, 2007 WL 2891981, at *13 (N.D.N.Y. Sept. 28, 2007) (same).

Defendants incorrectly assert that "all of the relevant corporate documents … are maintained at the company's headquarters in London." Def. Mem. at 18.  Yet Defendants' failure to ensure process safety in BP's Gulf of Mexico operations, including the Macondo well, unquestionably generated an extensive record located, in critical part, in the Gulf Coast states and BP's American headquarters in Houston, Texas. Regardless, rapid international travel, e-mail, and electronic storage, transferability, and access to documents have reduced, if not eliminated, the importance of the location of documents.[19] Indeed, Defendants have already produced over *1.46 million* pages of documents, *all electronically*, to Plaintiffs (in this action and in the related securities, ERISA and tort/economic damages MDL).

Nor does the attendance of witnesses favor BP here. A large number of witnesses, including many of the Defendants (eight of whom are U.S. citizens), will be found in the United States. Furthermore, "the Court [can be] confident that Defendants will be able to ensure their [employees'] attendance at trial or otherwise present their testimony." *Torres De Maquera v. Yacu Runa Naviera S.A.*, 107 F. Supp. 2d 770, 780-81 (S.D. Tex. 2000). That some witnesses are English does not alter the outcome. BP already proven its ability to make its employees available for deposition in the related MDL 2179 proceeding, and the possibility of videotaped testimony for trial, as well as letters rogatory to obtain depositions abroad, weigh against dismissal.  *Sydow v. Acheson & Co.*, 81 F. Supp. 2d 758, 769 (S.D. Tex. 2000). At most, witness locale does not tip the scales either way, and Plaintiffs' choice of forum should not be disturbed.  *Itoba Ltd.*, 930 F.

---

[19] "To the extent documents exist in England, advances in transportation and communication accord this issue less weight." *Itoba Ltd. v. LEP Group PLC*, 930 F. Supp. 36, 44 (D. Conn. 1996)). "While the initial repository of most relevant documents may be in [a foreign country], this fact is of lesser significance in the modern electronic age. Documents can easily be photocopied or otherwise transferred to this jurisdiction." *In re Corel Corp. Sec. Litig.*, 147 F. Supp. 2d 363, 366 (E.D. Pa. 2001).  *See also Manu Int'l, S.A. v. Avon Prods. Inc.*, 641 F.2d 62, 65 (2d Cir. 1981) (ease of international correspondence in this technological age demonstrates that problems of document production between foreign countries cannot be great).

Supp. at 45; *see also Taylor v. Tesco Corp. (US)*, 2010 WL 4539394, at *5 (E.D. La. 2010) (witnesses in both forums, "factors are a wash and do not favor dismissal").[20]

Finally, given the large number of American defendants and the extensive presence of BP in the United States, any judgment issued in this action would be easily enforceable.[21] *In re BP P.L.C. S'holder Deriv. Litig.*, Order Denying Motion to Dismiss, at 19 (Super. Ct. Alaska, May 17, 2007).[22] Moreover, the related investigations and litigation are all proceeding in the United States – in both the instant MDL 2185 (the securities and ERISA actions) and in the related tort/economic damages MDL 2179 in the Eastern District of Louisiana. If this action were dismissed in favor of a foreign forum, both Plaintiffs and Defendants would lose the ability to coordinate efforts with these related actions, resulting in drastically more expensive and inefficient litigation.[23] The private interest factors weigh do not weigh in favor of dismissal.

Next, the Court considers the "public interest" factors:

   (1) the administrative difficulties flowing from court congestion;
   (2) the local interest in having localized controversies resolved at home;
   (3) the interest in having the trial of a diversity case that is at home with the law that must govern the action;
   (4) the avoidance of unnecessary problems in conflicts-of-law, or in application of foreign law; and
   (5) the unfairness of burdening citizens in an unrelated forum with jury duty.

---

[20]   The only "premise" relevant to this case is, obviously, BP's Gulf Coast operations in Texas and Louisiana, and what remains of the *Horizon* rig.

[21]   Eight of the seventeen Defendants, including BP's current CEO (Defendant Dudley) and CFO (Grote) are Americans.  Defendants McKay and Malone are also American and both Defendants in their capacity as *de facto* directors.  (Adair Decl. ¶59).

[22]   Hereinafter "Alaska Order," Szak Decl. Ex. 4.

[23]   The cases cited by Defendants actually support the preservation of Plaintiffs' choice of forum here. In *Windt v. Qwest Commc'ns Int'l, Inc.*, 529 F.3d 183 (3d Cir. 2008), the court observed that "Defendants would be forced to stretch their resources over both sides of the ocean" unless the case were dismissed, yet Defendants' present motion seeks to create the exact problem that warranted a dismissal in *Windt*. Similarly, in *Syndicate 420 at Lloyd's London*, 796 F.2d 821, 823 (5th Cir. 1986), the court dismissed on *forum non conveniens* grounds in order to send the case when there was an "ongoing British lawsuit concerning the same transactions" that Plaintiffs could intervene in.

*In re Air Crash*, 821 F.2d at 1162-63. As with the private factors, no one public factor should be given conclusive weight, and the plaintiff's choice of forum is given priority. *See id.* at 1163.

Defendants never assert that "dismissing … would actually reduce the burden on the Court, which is, ultimately, the purpose underlying [the first] factor." *Blum v. Gen. Elec. Co.*, 547 F. Supp. 2d 734 (W.D. Tex. 2008).  Indeed, as in *Blum* and noted *supra*, the Court will need to adjudicate claims arising from the same incident regardless, so this factor weighs against dismissal. *Id.* at 733-34.

Considering BP's admitted status as a multi-national corporation whose greatest single part is America and Americans (¶214), Defendants' assertion that this is a "localized controversy" to England is disingenuous and divorced from reality. It cannot be "unfair" to ask a local jury to decide whether Defendants are liable for a conscious breach of duties regarding process safety requirements, which ruined a multi-national corporation that is as much American as English and killed eleven Americans and caused the largest environmental disaster in U.S. history.[24]  *See* also Adair, Decl. ¶95 (U.K. courts will recognize a judgment rendered in this action)  Moreover, § 172(1) of the 2006 Act specifically obligates directors to consider "the interests of the company's employees," … "the impact of the company's operations on the community and the environment" and "the desirability of the company maintaining a reputation for high standards of business conduct." An American judge and jury are perfectly situated to

---

[24]    *See Itoba Ltd.*, 930 F. Supp. at 45 (the "court clearly has an interest in deciding this controversy" when approximately half of a foreign corporation's stock is held by United States citizens); *see also DiRienzo*, 294 F.3d at 28, 32 ("[C]onsidering that defendants sought out business opportunities in this country by registering stock on American exchanges, filing statements with the SEC and conducting the bulk of its business in the United States … a legitimate interest exists in trying this securities fraud litigation here."); *In re Corel*, 147 F. Supp. 2d at 367 n.2 (holding that the "local interest" factor does not favor dismissal of securities claims when American investors suffered alleged harm from purchases they made in the United States); *De Maquera*, 107 F. Supp. 2d at 781 ("[T]his case is brought against Defendants that conduct regular business in Texas. The State of Texas therefore has a keen interest in the disposition of cases involving corporate entities doing business within its borders ….").

assess whether the directors' oversight of BP's drilling operations in the Gulf of Mexico complied with those duties.

Finally, "the need to apply foreign law is not alone sufficient to dismiss under the doctrine of forum non conveniens." *Karim v. Finch Shipping Co.*, 94 F. Supp. 2d 727, 737 (E.D. La. 2000); *see also Schexnider v. McDermott Int'l, Inc.*, 817 F.2d 1159, 1164 (5th Cir.1987) (courts "must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform") (citation omitted); *Sydow*, 81 F. Supp. 2d at 770 (The "Court is confident of its ability to properly apply whatever law is determined to be governing.").[25] Defendants have failed to show that trial in this forum would result in "oppressiveness and vexation" to the Defendants. The Court should deny the Defendants' Motion on *forum non conveniens* grounds.

## D.    Ample Basis Exists to Exercise Personal Jurisdiction

Having purposefully availed themselves of the privileges and benefits of the laws of the United States and Louisiana, Defendants' attempt to evade personal jurisdiction in this Court is no more convincing than their attempt to establish the "inconvenience" of litigating here.

### 1.    The Applicable Standards

A federal district court sitting in diversity may exercise personal jurisdiction if permitted by applicable state law. *In re Bank of La./Kenwin Shops Inc., Contract Litig.*, No. MDL 1193, 1999 WL 518852, at *6 (E.D. La. July 19, 1999). Louisiana exercises personal jurisdiction to the

---

[25]    In fact, even an English court would not dismiss a derivative action involving a foreign corporation for these reasons, but would find it within its power to apply foreign law an adjudicate such claims. (Adair Decl. ¶90). For these same reasons, the Court should deny Defendants' Motion on the grounds of international comity. None of the sources cited by Defendants in their Motion belie this conclusion—neither *Empagran, S.A. v. F. Hoffman-La Roche Ltd.*, 453 F. Supp. 2d 1 (D.D.C. 2006), nor *Info. Res., Inc. v. Dun & Bradstreet Corp.*, 127 F. Supp. 2d 411 (S.D.N.Y. 2001), involve dismissal of an entire lawsuit on international comity grounds, as Defendants urge the Court to do here. Rather, both actions involve declining to exercise supplemental jurisdiction over foreign-law claims pursuant to their ability to do so under 28 U.S.C. § 1367. These cases, thus, have no bearing on the instant matter.

maximum limits permitted by Constitutional due process. L.R.S. § 13:3201(B). Thus, the only relevant inquiry here is (i) whether Defendants have "minimum contacts" with Louisiana, and (ii) whether exercising jurisdiction over Defendants would be consistent with "traditional notions of fair play and substantial justice." *Cowart v. Med. Shipping Co.*, No. 09-3572, 2011 WL 601651 at *1 (E.D. La. Feb. 15, 2011) (citing *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)). In making this determination, the Court "should not act as a fact finder and must construe all disputed facts in the plaintiff's favor and consider them along with the undisputed facts." *Walk Haydel & Assocs. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008). When a cause of action arises out of a defendant's purposeful contacts with the forum, minimum contacts are found to exist and the court may exercise its jurisdiction over the defendants. *Dalton v. R & W Marine, Inc.*, 897 F.2d 1359, 1361-62 (5th Cir. 1990). The question is whether a defendant "purposefully availed itself of the privileges or benefits of the laws of the forum state." *Bilyeu v. Johanson Berenson LLP*, 2010 WL 3896415, at *2 (W.D. La. Sept. 30, 2010).

## 2. Exercising Personal Jurisdiction Over Defendants is Both Fair and Just

Defendants have a long history of continuous and systematic contacts with the United States in general and the Gulf region in particular (*see* ¶¶17, 211-220), to wit:

- During 2010, "[w]ith the exception of the two non-executive directors who joined the board in November, each non-executive director has visited the Gulf of Mexico at least once."[26]

- During 2010, the chairman (Defendant Svanberg) and the chairman of the Safety, Ethics, Environment Assurance Committee ("SEEAC") (Defendant Castell) making "more frequent visits."[27]

- Each Defendant members (Castell, Burgmans, Carroll and Davis Jr.) of the SEEAC "visited operations in the Gulf of Mexico at least once during the [2010] year, with the

---

[26] *See* Szak Decl. Ex. 5 (BP Governance Board Performance Report (2011)).

[27] *See id.*, Ex. 7 (Notice of BP Annual General Meeting 2011).

SEEAC Chairman [Castell] making a number of visits to the region and its command centers."[28]

- Since April 2010, Defendant Castell "has made seven visits to the Gulf of Mexico."[29]

- Each Defendant member (Flint, David, Davis, Jr. and Prosser) of the Audit Committee "visited the Gulf of Mexico" in connection with the Macondo oil spill.[30]

- The Defendant members of the Gulf of Mexico committee (Castell and David) have met (along with Defendant McKay) at least three times in the United States since July 2010.[31]

- Defendant Dudley, McKay and Inglis have all given recent speeches in Louisiana touting BP's and his their own connections to Louisiana and the Gulf region.[32]

- Defendant Hayward has given corporate speeches in Houston, Texas on behalf of BP, touting (among other things) BP's $30 billion investment in a five year period in the United States and in particular in the Gulf of Mexico.[33]

- Defendant McKay recently gave a speech stating, "[i]t is a pleasure to be back in New Orleans, the city where I began my career in the energy business…"[34]

- Defendant Inglis began a speech only weeks prior to the blowout by stating, "I'm delighted to be in New Orleans, which is a special city for BP." [35]

- Defendant Conn's contacts with the U.S. and in the Gulf region (with BP Amoco) are so regular and systematic that he maintains a U.S. social security number. ¶31.

- Defendant Grote is an American citizen, and has had extensive contacts in the Gulf over the past decade, including his tenure as executive vice-president of BP E&P. ¶33.

Defendants' frequent visits to the Gulf of Mexico are no coincidence. BP is the largest leaseholder in the Gulf, the largest oil producer in the Gulf, and the Gulf was BP's largest area of growth in 2009. ¶216.  In addition:

- Defendants personally approved the Macondo exploration project as a whole, which led to placing seven of BP's eight Gulf of Mexico deepwater projects in waters adjacent to

---

[28] *See id.,* Ex. 6 (SEEAC Processes).

[29] *See id.,*Ex. 7 (Notice of BP Annual General Meeting 2011).

[30] *See* Szak Decl. Ex. 8 (Audit committee processes).

[31] *See id.,*Ex. 9 (GoM committee process).

[32]  *See id.,*Ex. 11 ("Strengthening Safety, Restoring Trust, Building Value") and Ex. 12 ("IOC's: a strategy for growth").

[33] *See id.,*Ex. 10 (28th CERA Executive Conference – Opening Speech to the Cambridge Energy Research Association).

[34] *See id.,*Ex. 11

[35] *See id.,*Ex. 12

Louisiana,[36] (¶17);

- Defendants caused BP to develop and submit to federal regulators a spill response plan that explicitly acknowledged the chances of an oil spill impacting the entire Gulf region, including Louisiana. (¶169);

- Defendants' misconduct resulted in the deaths and injuries of local workers, severe damage to the Louisiana environment and a devastating impact upon the Louisiana economy, all in derogation of their duties under § 170 *et seq.* of the Companies Act to conduct the company's affairs with due regard for the interests of employees, the impact on the community and environment, and the desirability of maintaining a reputation for high standards of business conduct (¶¶ 247-272);

Defendants' decisions made it entirely foreseeable – especially in light of BP's woefully deficient safety culture – that when the inevitable disaster struck, the impact of Defendants' misconduct would be felt here, and that Defendants would be answerable for the consequences to a Louisiana Court here.[37] In *Alford Safety Serv., Inc. v. Hot-Hed, Inc.*, the Court held that acts or omissions outside the state that cause injury within the state can constitute the minimum contacts necessary to subject even a nonresident defendant to specific personal jurisdiction. 2010 WL 3418233, at *4-*6 (E.D. La. Aug. 24, 2010) (citing *Guidry v. U.S. Tobacco Co.,* 188 F.3d 619, 628 (5th Cir. 1999)).

The Alaska BP derivative litigation is directly on point.[38] There, the court held that the defendant directors and officers of BP were subject to personal jurisdiction in Alaska because (i) they had "availed themselves of the benefits of sitting on the Board or being officers of BP and

---

[36]  Courts have considered "'[offshore] artificial island' platforms [to be] within the boundaries of the adjacent state for long-arm jurisdiction purposes." *In re Matter of the Libel & Pet. of Gemini Navigation, S.A.*, 1996 WL 544236 at *2 (S.D. Tex. Mar. 1, 1996).

[37]  Courts do not hesitate to find jurisdiction over non-resident directors when they were directly involved in actions giving rise to a shareholder derivative action. *Wixon v. Wyndam Resort Dev. Co.*, No. 07-0236, 2008 WL 1777494, at *5-6 (N.D. Cal. Apr. 18, 2008) (citing *Infosonics Corp. Derivative Litig.*, No. 06-1336, 2007 WL 257227 at *4-5 (C.D. Cal. Sept. 4, 2007)). Both directors and officers will be deemed to have purposely availed themselves of a forum if it was foreseeable that their alleged breaches of fiduciary duty would be felt in that forum. *See* 2008 WL 1777494, at *5; *Bilyeu,* 2010 WL 3896415, at *4.

[38]  *See* Alaska Order, Szak Decl. Ex. 5.

its subsidiaries" and "should all reasonably expect to be responsible for their decisions including the impact where those decisions are carried out," (ii) the "alleged breach of their duties had an impact on BP's operations in Alaska," and (iii) the "injuries complained of took place in Alaska."[39] Here, Defendants' misconduct was similarly directed at Louisiana and the Gulf region.[40] *See* ¶¶ 4, 69, 71, 74, 76, 144-46, 148, 177-180.[41] This can come as no surprise to Defendants Conn, Grote, Hayward, Inglis, Burgmans, Carroll, Castell, Davis, Jr., Flint, Julius, Prosser, and Sutherland, who were also BP directors at the time of the Alaska litigation. ¶¶31-46.

With minimum contacts shown, "the burden shifts to the defendant to defeat jurisdiction by showing that its exercise of jurisdiction would be unfair or unreasonable." *Bilyeu*, 2010 WL 3896415, at *2. Here, the exercise of jurisdiction is fair because Defendants' breaches of fiduciary duty affected BP's operations in Louisiana; the rig disaster occurred in adjacent waters and directly impacted Louisiana; Louisiana citizens and businesses were injured; and the majority of any witnesses, documents, and parties are here. There would be no offense whatsoever to "traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at

---

[39] *See id.* at 15.

[40] A case arising from another oil spill in the Gulf of Mexico amply demonstrates why personal jurisdiction exists here. In *In re SEDCO, Inc.*, 543 F. Supp. 561, 564-69 (S.D. Tex. 1982), the court sustained personal jurisdiction over a drilling company whose activities in the Gulf caused an oil spill that reached the waters of Texas. The Court noted that the drilling company had prepared contingency plans for a possible blowout of the well; knew that the Gulf current would carry any spilled oil to Texas, making damages reasonably foreseeable; and engaged in the hazardous activity of drilling. The Court also pointed to the substantial impact the disaster had on Texas, including the clean-up efforts required to clean the beaches and the direct losses by businesses and individuals. Therefore, the court concluded that defendants had acted with "a higher degree of purposefulness" in availing themselves of the benefits and protections of the state's laws, even though its activities took place outside the borders of the state.

[41] In addition, the scope of foreseeability broadens because the oil industry is highly regulated by Federal and State agencies (¶¶55-61), and because the Macondo project and *Horizon* drilling had to be approved by the MMS. *See World-Wide Volkswagen Corp., v. Woodson*, 444 U.S. 286, 295 (1980) (stating that scope of "foreseeability" for a minimum contacts inquiry broadens when the enterprise giving rise to the action is subject to federal regulation). *See also GRM v. Equine Inv. & Mgmt. Group*, 596 F. Supp. 307 (S.D. Tex. 1984).

316.[42]

Finally, Defendants caused BP to file multiple suits in the Eastern District of Louisiana against Transocean, Halliburton, and Cameron for their role in the disaster. When it suits their purposes, Defendants eagerly invoke Louisiana's justice system to litigate issues arising from the *Horizon* disaster. When it does not, they complain about the unfairness of litigating the same underlying events in that forum. Defendants' selectivity should be rejected.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Dated: May 5, 2011

AJAMIE LLP

By: */s/ Thomas R. Ajamie*
Thomas R. Ajamie (Texas Bar No. 00952400)
Dona Szak (Texas Bar No. 19597500)
Pennzoil Plaza – South Tower,
711 Louisiana, Suite 2150
Houston, TX 77002
Tel.: (713) 860-1600
*Liaison Counsel for the Derivative Plaintiffs*

KAHN SWICK & FOTI, LLC
Lewis S. Kahn
Albert M. Myers
Melinda A. Nicholson
206 Covington Street
Madisonville, Louisiana 70447
Tel.: (504) 455-1400

BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
G. Anthony Gelderman III
John Alden Meade (*pro hac vice*)
2727 Prytania Street, Suite 14
New Orleans, Louisiana 70130
Tel.: (504) 899-2339

-and-

Mark Lebovitch (*pro hac vice*)
Jeroen van Kwawegen (*pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Tel.: (212) 554-1400

*Co-Lead Counsel for the Derivative Plaintiffs*

---

[42]  Although Plaintiffs believe the Complaint alleges sufficient minimum contacts for the Court to exercise jurisdiction over Defendants, if the Court is inclined to grant the Motion as to this issue, Plaintiffs request a reasonable opportunity to conduct jurisdiction-related discovery. *See, e.g.*, *Walk Haydel & Assocs.*, 517 F.3d at 241; *Blessey Marine Servs. v. Jeffboat, LLC*, 2011 WL 651999, at *5 (E.D. La. Feb. 10, 2011).

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
Gregory M. Nespole
Robert B. Weintraub
270 Madison Avenue
New York, NY 10016
Tel.: (212) 545-4600

- and –

CHIMICLES & TIKELLIS LLP
Pamela S. Tikellis
Scott M. Tucker
Tiffany J. Cramer
222 Delaware Avenue, Suite 1100
P.O. Box 1035
Wilmington, Delaware 19899
Tel.: (302) 656-2500

BARRACK, RODOS & BACINE
Mark R. Rosen
Two Commerce Square
2001 Market Street
Suite 3300
Philadelphia, PA 19103
Tel: (215) 963–0600

- and –

Stephen R. Basser
One America Plaza
600 West Broadway, Suite 900
San Diego, California 92101
Tel.: (619) 230-0800
A. Arnold Gershon
425 Park Avenue, Suite 3100
New York, NY 10022
Tel. (212) 688-0782

*Co-Chairs of the Executive Committee*