**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In Re: BP P.L.C. SECURITIES LITIGATION | ) ) ) ) ) | **MDL NO. 2185** **Civil Action No. 4:10-md-2185** **Hon. Keith P. Ellison** |
| In re: BP SHAREHOLDER DERIVATIVE LITIGATION | ) ) ) ) | **Civil Action No. 4:10-cv-3447** **Hon. Keith P. Ellison** |

**DERIVATIVE PLAINTIFFS' SUPPLEMENTAL BRIEF**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    SUMMARY OF INITIAL ARGUMENTS PRESENTED TO THE COURT ................... 3

III.   PLAINTIFFS SATISFY THE REQUIREMENTS OF SECTIONS 260 - 263, WHICH THIS COURT CAN BUT NEED NOT APPLY ........................................................ 6

   A.   Defendants Concede That Sections 260 – 263 Contain Procedural Rules ...................... 6

   B.   Plaintiffs Have Standing Under Section 260 ................................................. 7

   C.   Plaintiffs Satisfy the Requirements of Section 261 and 263 ............................ 7

IV.    PLAINTIFFS ALSO SATISFY THE STANDING REQUIREMENTS TO BRING THIS ACTION UNDER THE COMMON LAW ............................................................ 15

V.     PLAINTIFFS REQUEST JURISDICTIONAL DISCOVERY ....................................... 22

VI.    CONCLUSION ............................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*City of Harper Woods Employees' Retirement System v. Olver,*
  589 F.3d 1292 (D.C. Cir. 2009) ...................................................................19, 20, 21

*Guidry v. U.S. Tobacco Co.,*
  188 F.3d 619 (5th Cir. 1999) ...............................................................................22

*Hausman v. Buckley,*
  299 F. 2d 696 (2d Cir. 1962)..................................................................................4

*In re BP P.L.C. Deriv. Litig.,*
  No. 3AN-06-11929CI, 2007 WL 4913136 (Sup. Ct. Alaska May 7, 2008) ...........23

*In re Infosonics Corp. Deriv. Litig.,*
  No. 06-1336, 2007 WL 2572276 (S.D. Cal. Sept. 4, 2007)...................................21

*Koster v. American Lumbermans' Casualty Co.,*
  330 U.S. 518 (1947)................................................................................................2

*Mehlenbacher ex rel. Asconi Corp. v. Jitaru,*
  No. 6:04-1118, 2005 WL 4585859 (M.D. Fla. 2005)............................................22

*Messinger v. United Canso Oil & Gas Ltd.,*
  486 F. Supp. 788 (D. Conn. 1980)..........................................................................4

*Piper Aircraft Co. v. Reyno,*
  454 U.S. 235 (1981)................................................................................................3

*Vaughn v. LJ Int'l. Inc.,*
  94 Cal. Rptr. 3d 166 (Cal. Ct. App. 2009) ..............................................................4

OTHER AUTHORITIES

Fed. R. of Civ. P. 23.1............................................................................................3, 4

Fed. R. Civ. P. 44.1 ...................................................................................................21

U.K. Companies Act of 2006 § 260 ................................................................. passim

U.K. Companies Act of 2006 § 261 ................................................................. passim

U.K. Companies Act of 2006 § 263................................................................. passim

**UK AUTHORITIES**

*Anderson v. Midland Railway Co.*,
  [1902] 1 Ch. 368 ........................................................................................................18

*Arab Monetary Fund v. Hashim*,
  [1996] 1 Ll.R 589..............................................................................16, 17, 20, 21

*Australian Agricultural Co. v. Oatmont Pty*,
  [1992] 8 ACSR 255 ...............................................................................15, 16, 21

*Cockburn v. Newbridge Sanitary Steam Laundry Co.*,
  [1915] 1 IR 237 ....................................................................................15, 16, 21

*Foss v. Harbottle*,
  [1843] 2 Hare 461 ........................................................................... passim

*Kiani v. Cooper*,
  [2010] BCC 463..........................................................................................11, 12

*Powell v. Kempton Park Racecourse Co.*,
  [1897] 2 QB 242 ......................................................................................15, 21

*Prudential Assurance Co. v. Newman Industries Ltd. (No. 2)*,
  [1982] 1 Ch. 204 ........................................................................................19

*Rolled Steel Products (Holdings) Ltd. V. British Steel Corp.*,
  [1985] 3 All ER 52.............................................................................16, 18, 20

*Smith v. Croft (No. 2)*,
  [1988] 1 Ch. 114 ........................................................................................18

*Stainer v. Lee*,
  [2010] EWHC 1539 ..................................................................................12, 14

## I.   INTRODUCTION

Following oral argument, Plaintiffs sought the opportunity to (1) explain the significance of new positions advanced by Defendants and their expert, Mr. Martin Moore, on reply and at the argument, (2) to brief why, even if the territorial limitation of Chapter 1 is not applied literally, the Motion to Dismiss should in all events be denied, and (3) to request jurisdictional discovery. On August 11, 2011 this Court entered an Order Granting Leave for Additional Briefing and Discovery (No. 4:10-cv-3447, Doc. 125) regarding, *inter alia*, the following questions:

(1)     Can this Court apply Sections 260-263 of the Companies Act to determine whether Plaintiffs have standing to bring this Action?

(2)     Can this Court apply Sections 260-263 of the Companies Act to determine whether Plaintiffs should be given permission to proceed with this Action and, if so, should permission be given?

(3)     If the Court cannot apply the elements of Sections 260-263, does the common law allow Plaintiffs to continue this Action?

In section II, below, Plaintiffs briefly summarize the specific bases for dismissal that Defendants initially asserted, as well as Plaintiffs' responses to those challenges.

Sections III-IV answers the three questions set forth above. As to the first question, the parties now appear to agree that this Court has the **power**, under choice of law rules, to apply any part of the Companies Act. Thus, dismissal in favor of a U.K. court is in no event mandatory, as Defendants initially asserted. As explained by Defendants' expert, Section 260 addresses the substantive standing requirements for a derivative action, while Section 261 and 263 contain the procedural rules for the judicial determination of whether a case should proceed. ***See Section III.a., below***. Even assuming the Court disregards the territorial limitation applicable to Chapter 1 and finds that Section 260 provides a substantive rule of standing, Plaintiffs satisfy the

requirements of this statute. ***See Section III.b., below***. Under Section 261 of the Companies Act, the Court determines whether the complaint states a *prima facie* case under the standards set forth in Section 263, just like the Rule 12(b)(6) procedure in federal court. Following discovery, the standards of Section 263 are again applied, just like the Rule 56 procedure applicable in federal court. Thus, Section 261-263 are rules of procedure, not controlling in federal court. Even accepting the Defendants' position and holding that the Court has the power and obligation to apply the Companies Act in full, however, Plaintiffs satisfy the requirements of Section 261 and 263. ***See Section III.c., below***.

As to the third question, if this Court determines that Sections 260-263 are not to be applied in this Action (either because those sections are purely procedural or because of the territorial limitation present in the Chapter's language), this Court can and should still determine that this unique Action meets the standards that have been applicable to all U.K. derivative suits filed in the U.S. since long before passage of the 2006 Act. Specifically, because BP's underlying actions violated federal laws, the non-ratifiable exception to the rule of *Foss v. Harbottle* applies, and the case can and should proceed. ***See Section IV, below***. Finally, Plaintiffs respectfully reiterate their request for jurisdictional discovery. ***See Section V, below***.

At bottom, this case is truly *sui generis* in ways that make it hard to analogize to prior cases or to accept Defendants' lament about how allowing this case to proceed could open the proverbial floodgates. Plaintiffs recognize that federal judges will in the majority of instances decline to assert jurisdiction over a derivative suit involving a foreign company, either under the foreign company's law of incorporation or, more often, in applying the *forum non conveniens* doctrine. But as Justice Cardozo held in *Koster v. American Lumbermans' Casualty Co.*, 330 U.S. 518 (1947), "To trace in advance the precise line of demarcation between the controversies

2

affecting a foreign corporation in which jurisdiction will be assumed and those in which jurisdiction will be declined would be a difficult and hazardous venture." *Id.* at 530. Necessarily, then, the Supreme Court assumes that there can be a case in which exercising jurisdiction over a foreign corporation's derivative suit would be proper. Indeed, in *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981), Justice Marshall made clear that if district courts automatically refrained from exercising jurisdiction over foreign companies because judges treated one factor in the analysis as superceding all others, "the *forum non conveniens* doctrine would lose much of the very flexibility that makes it so valuable." *Id.* at 249-50.

If ever there was or will be a single case in which a federal court could and should adjudicate a derivative suit involving a foreign company, this is it.  BP's board was told for years by U.S. investigators, regulators and legislators, that BP operated in the U.S. in violation of applicable safety and environmental laws, and did so in a manner and to a magnitude that made inevitable a calamity harming U.S. citizens and environment.  If this Action does not justify a federal judge hearing a derivative suit, then Justice Marshall's concern has come to pass.

## II.  SUMMARY OF INITIAL ARGUMENTS PRESENTED TO THE COURT

In their opening brief, Defendants argued that Plaintiffs lack standing because "a shareholder of a company organized under English law cannot pursue a derivative claim on behalf of that company without first obtaining judicial permission from the English High Court." Defendants' Memorandum in Support of Their Motion to Dismiss the Verified Consolidated Amended Shareholder Derivative Complaint (No. 4:10-cv-3447, Doc. 91; "Def. Br.") at 3, 11. Defendants relied on Sections 260-63 of the U.K. Companies Act of 2006 ("Companies Act") and a declaration by their U.K. law expert, Martin Moore, Q.C. (No. 4:10-md-3447, Doc. 91-2; "Moore Decl.").

Plaintiffs opposed Defendants' motion on numerous grounds. First, Plaintiffs argued that

demand was excused, and Federal Rule of Civil Procedure 23.1 satisfied, because Defendants conceded that U.K. law does not require a shareholder to make a pre-suit demand on the Board. Plaintiffs Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Shareholder Derivative Complaint (No. 4:10-cv-3447, Doc. 108; "Pl. Br.") at 2 (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991)).[1] Second, Plaintiffs argued that the "judicial permission" requirement of Sections 260-63 applied only in the courts of England, Wales or Northern Ireland and, moreover, were procedural rules that neither governed the "internal affairs" of a company nor otherwise constituted substantive U.K. law. Pl. Br. at 3 (*citing Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431 (2010)).[2]

In reply, Defendants still insisted that, "[b]ecause plaintiffs admit that they have not sought, let alone obtained, permission from the High Court to proceed with these derivative claims on behalf of BP, plaintiffs lack standing to sue derivatively under English law." Defendants' Reply Memorandum in Further Support of their Motion to Dismiss (No. 4:10-cv-3447, Doc. 114, "Def. Reply") at 4. Defendants' own U.K. law expert, however, disagreed. Mr.

---

[1]     Plaintiffs maintain that demand was excused and Rule 23.1 satisfied because (i) UK law does not require a shareholder to make a demand on the Board before bringing suit; and (ii) the UK judicial permission requirement is part of procedural rules that are applied in UK proceedings. Pl. Br. at 16-21. *See also* Second Declaration of Martin Moore  (No. 4:10-cv-3447, Doc. 114; "Moore Reply") ¶10 (explaining that "the provisions of the 2006 Act set out the test to be applied *in the context of UK proceedings*") (emphasis added). *Vaughn v. LJ Int'l. Inc.*, 94 Cal. Rptr. 3d 166 (Cal. Ct. App. 2009) is contrary to a decision rendered by another court in this Circuit, *Messinger v. United Canso Oil & Gas Ltd.*, 486 F. Supp. 788 (D. Conn. 1980), and, in any event, was wrongly decided. Pl. Br. at 20. Moreover, *Hausman v. Buckley*, 299 F. 2d 696 (2d Cir. 1962), simply does not apply because, unlike here, the foreign law required authorization of **the general meeting of shareholders** to bring a derivative action and clearly implicated the company's internal affairs. *Id.* at 699-700.

[2]     Plaintiffs submitted a declaration of U.K. law expert, Stuart Adair, explaining that U.K. courts view Sections 260-63 as rules of procedure, that the U.K. judicial permission process does not deprive this Court of jurisdiction, and that U.K. courts would not be offended if this Court exercised jurisdiction over this Action. *Id.*; Declaration of Stuart Adair (No. 4:10-cv-3447, Doc. 109-16; "Adair Decl.") ¶¶13-34. Mr. Adair further made it clear that U.K. law does not tolerate willful disregard for criminal law, and has for over a century recognized a shareholder's standing to derivatively sue officers and directors who direct illegal conduct. Adair Decl. ¶¶45-48, 61-87.

Moore expressly rejected any suggestion that he was opining that "English law requires that the plaintiffs in a foreign derivative action would have to seek permission to continue from the English Court." Moore Reply ¶5(a) (emphasis added). Mr. Moore further agreed with Mr. Adair, stating that it was *not* his opinion that "Parliament was legislating to deprive foreign courts of jurisdiction to hear derivative proceedings on behalf of English companies." Moore Reply ¶6. Moreover, Mr. Moore also stated that the "vast majority," necessarily meaning that *not all* "derivative actions on behalf of English companies will be brought in England," and that "England would *ordinarily* be considered the most appropriate forum." Moore Reply ¶34 (emphasis added). Thus, Mr. Moore would not opine that dismissal was mandatory under U.K. law, arguing only for discretionary dismissal.

At oral argument, Defendants tried to reconcile their arguments with Mr. Moore's reply declaration, arguing for the first time that *this Court* could apply the elements of Sections 260-63 to determine whether this Action should proceed as follow:

> [Section 261] says nothing about the propriety of applying these provisions abroad pursuant to a foreign court's choice of law rules. I mean, just like if there is a Delaware statute that says that this is the law of the State of Delaware and your Honor, applying Texas choice of law rules, determines that it's governed by Delaware law, you would then apply Delaware law without regard to the fact that the Delaware statute says it applies in Delaware.

Hearing Tr. at 30-31.[3] By asserting that Sections 260-63 can apply in proceedings outside the U.K., Defendants have abandoned their argument that *only* the English High Court can give judicial permission. Otherwise, a U.K. court would be required to assert its authority over proceedings outside the U.K., thereby violating foreign sovereignty and international comity. The impossibility of this outcome highlights Plaintiffs' primary position that this section is

---

[3]      The slides prepared by Defendants for oral argument also stated that "Section 260(1) does not prohibit the extraterritorial application of the judicial permission requirement under foreign choice-of-law rules." Defendants' slides at 6.

5

procedural and hence inapplicable. Given that Plaintiffs are herein assuming *arguendo* that Section 261 does apply in this Action, the only rational construction of the Companies Act is that the "court" in Section 261 refers to the court of the foreign jurisdiction where the case is filed, and that in the U.K. itself, the designated court for derivative suits is the High Court.

### III. PLAINTIFFS SATISFY THE REQUIREMENTS OF SECTIONS 260 - 263, WHICH THIS COURT CAN BUT NEED NOT APPLY

#### A.    Defendants Concede That Sections 260 – 263 Contain Procedural Rules

Of the four sections in the pertinent Companies Act chapter, only Section 260 arguably addresses the substantive standing requirements for pursuing a derivative action. Sections 261 through 263 address the judicial process for evaluating whether a pending derivative action should continue. *See* Adair Decl ¶¶15-22. Defendants' expert, Mr. Moore, has acknowledged that "the Act is a replacement <u>both</u> for the substantive rule in <u>*Foss v. Harbottle*</u> **and the majority of the basic rules of procedure**." Moore Reply ¶30 (underline in original; bold italics added). More specifically, Mr. Moore distinguishes between the substantive and procedural components within Part 11, Chapter 1 as follows:

(a) <u>The availability of a derivative action</u>, i.e. whether and when the ordinary management powers of the board are displaced so that a shareholder may sue on behalf of an English company. This goes to the authority of the shareholder to represent the English company in legal proceedings. As a matter of English law that is a question of substance, and as I have explained above, the English conflict of laws principles recognise it as such.

(b) <u>The particular process by which the Court evaluates that authority</u>, whether by the ex *parte* paper process in s.261(2), the *inter partes* application under s.263, the prior "leave to continue" test under the CPR, or some other means (including an application by the defendants to strike out or dismiss the claim).

13. It is not in doubt that the matters I describe in (b) are matters of process, and as such it is not surprising (indeed it is wholly obvious) that they might be described as "procedural" - although as with all such things the Court's approach

6

in terms of what evidence it hears and the point in the case at which the matter arises may affect the substantive outcome.

Moore Reply ¶¶12(b), 13.

Accepting Mr. Moore's position, point (a) above argues that Section 260 is substantive, as it relates to the availability of a derivative action, while Section 261 and 263 (the subject of point (b) above) are procedural. In fact, this reading brings consistency to Mr. Moore's express rejection of any suggestion that "proceedings in a foreign jurisdiction could not be continued without the permission of the English High Court" Moore Reply ¶6.

### B.   Plaintiffs Have Standing Under Section 260

The test for standing under the Companies Act is simple. Section 260 requires (1) that the plaintiff be a "member" (*i.e.* shareholder) of the company, (2) that the cause of action be one "vested in the company," (3) that the claim seek "relief on behalf of the company," and (4) that the cause of action arise out of "an actual or proposed act or omission involving negligence, default, breach of duty or breach of trust by a director of the company." These elements are all met in this case. Plaintiffs are shareholders of BP who are asserting breach of duty claims against BP's senior management and Board on behalf of the company.[4]

### C.   Plaintiffs Satisfy the Requirements of Sections 261 and 263

Section 261(1) of the Companies Act requires a member of a company who brings a derivative claim under Part 11, Chapter 1 of the Act to apply for judicial permission to continue the Action. Under Section 261(2), the court may only dismiss the action if it appears that the

---

[4]   During oral argument, BP's counsel suggested that it would be absurd to allow a plaintiff to acquire shares after the alleged wrongdoing and then initiate a suit. Hearing Tr. at 38-39. First, respect for foreign legal regimes also means not imposing domestic policy decisions about a plaintiff's standing into the foreign regime. Second, to the extent a continuous ownership requirement is somehow imposed in this Action as a matter of federal standing rules, there is no suggestion that Plaintiffs have not met it.

application and the evidence filed by the applicant in support of it do not disclose a *prima facie* case. Section 261 references the criteria under section 263 and involves a vetting process akin to that undertaken in connection with a Rule 12(b)(6) motion to dismiss. As Plaintiffs have repeatedly pointed out, Defendants have not challenged the sufficiency of Plaintiffs' allegations regarding the Defendants' breaches of their duties under Section 170-181 of the Companies Act. *See* Pl. Br. at 21; *see also* Adair Decl. ¶44. Thus there can be no doubt that, under Section 261, Plaintiffs have set forth a *prima facie* case such that permission should be granted for this Action to continue.

Having met the requirements under both Sections 260 and 261, the analysis should conclude and the claim should move forward. Pursuant to the plain language of the Companies Act, any further analysis of the propriety of a derivative claim in this instance should be deferred until *after* discovery has been taken and each of the parties' English law experts have been deposed. Indeed, Section 263 of the Act is akin to our summary judgment procedure pursuant to Fed.R.Civ.P 56. However, even if this Court chooses to consider the criteria set forth in Section 263 of the Act regarding whether permission is to be given in the context of this motion, Plaintiffs have made a *prima facie* showing that permission to continue the claim should indeed be granted even in the absence of discovery by any of the parties to this Action. Moreover, nothing prevents this Court from conducting a review under Section 263 at the summary judgment stage of this proceeding.

Under Section 263(2),[5] a court must terminate a claim if it concludes that a person acting in accordance with the duty to promote the success of the company would not bring the claim, or if the act or omission complained of has been authorized or ratified by the company. No such

---

[5]       Section 263(1) is descriptive and not a criterion.

finding can be made here.

A person acting to promote the success of BP would undoubtedly try to hold accountable those individuals whose breaches of fiduciary duty led to widespread legal violations, the largest oil spill in history and tens of billions of dollars in damages to the Company. Moreover, the acts or omissions that led to the Deepwater Horizon disaster were certainly not authorized or ratified by the Company.[6] As previously briefed and argued, the BP Board, which included senior management of the Company, oversaw illegal conduct that was not and could not be authorized or ratified by BP. These defendants were repeatedly warned that the Board's and senior managements' cost-cutting procedures and failure to properly oversee process safety could and was likely to lead to disaster.

Under Section 263(3), a court should also take into account the following items:

(a)   whether the member is acting in good faith in seeking to continue the claim;

(b)   the importance that a person acting in accordance with section 172 (duty to promote the success of the company) would attach to continuing it;

(c)   where the cause of action results from an act or omission that is yet to occur, whether the act or omission could be, and in the circumstances would be likely to be –
(i)  authorized by the company before it occurs, or
(ii) ratified by the company after it occurs;

(d)   where the cause of action results from an act or omission that has already occurred, whether the act or omission could be, and in the circumstances would be likely to be, ratified by the company;

(e)   whether the company has decided not to pursue the claim;

---

[6]   Because the Deepwater Horizon catastrophe has already occurred, Section 263(2)(b) is inapplicable to this Action.

(f)     whether the act or omission in respect of which the claim is brought gives rise to a cause of action that the member could pursue in his own right rather than on behalf of the company.

Each of these elements weighs in favor of granting permission to continue. First, Plaintiffs' good faith in bringing this claim is not contested. Plaintiffs have brought this action in good faith via the most appropriate mechanism - a derivative proceeding - in order to recoup for the Company some of the damages caused by what can only be viewed as flagrant and illegal misconduct by the defendants in violation of their duties as directors of BP. Plaintiffs also seek corporate governance changes including meaningful changes to the BP Board's accountability and oversight of legal and corporate compliance within the Company. Thus Section 263(3)(a) is satisfied.

Second, Section 263(3)(b) looks to the guidelines set forth in Section 172 of the Act for purposes of fulfilling a director's duty to promote the success of a company. Section 172 states that directors should have regard to, among other things, the likely consequences of any decision in the long term, the impact of the company's operations on the community and the environment, the company's maintenance of a reputation for high standards of business conduct, the interests of the company's employees, the need to foster the company's business relationships, and the need to act fairly as between members of the company. A hypothetical independent director reviewing the detailed allegations of the complaint and understanding the Company's reckless approach to compliance and safety (which has already raised the specter of federal debarment for the Company) would continue this Action.

The directors' and senior managers' breaches of their fiduciary duties have caused BP to violate a wide range of applicable laws and to suffer the extraordinary damages associated with

10

the Deepwater Horizon incident. The disaster was the culmination of a long-standing pattern of reckless behavior and deadly workplace catastrophes, including the 2005 Texas City refinery explosion that killed 15 U.S. workers, injured hundreds, and caused hundreds of millions of dollars in property and environmental damage. The U.S. Chemical Safety and Hazard Investigation Board that investigated BP identified serious safety management lapses and urged BP to commission a panel of experts to ensure BP corrects its safety lapses in the future. Complaint ¶117. The resulting Baker Report detailed systemic, top-down" problems at BP, including, among other things, a lack of "effective process safety leadership" and a culture of retaliation against workers reporting incidents. Complaint ¶¶118-119. Management consultant Booz Allen determined in March 2007 that due to the lack of effective internal controls, the Board could not satisfactorily rely on internal reporting for understanding the scope of BP's widespread safety problems. Complaint ¶¶141-142.

These investigations faulted the Board's and senior management's failure to adhere to process safety and flouting of safety regulations for the Texas City and other disasters. Nevertheless, BP board members and senior managers continued to focus on short-term cost-cutting measures over process safety, thereby continuing to compromise process safety in one of the most hazardous industries. For instance, even after the Texas City disaster and the dissemination of the above-described reports, the new CEO Hayward began again making deep cuts in maintenance budgets and cut jobs, including those of many structural and safety engineers. Under Defendants' leadership, BP continued to have process safety accidents, enter into criminal guilty pleas, and pay multimillion dollar criminal and civil fines, while utterly failing to adequately plan for the mitigation of serious safety risks for BP's operations in the Gulf. Complaint ¶¶143-150. Clearly, allowing the Action to continue, thereby holding the

11

defendants accountable for their misconduct, would promote the Company's success and long-term viability, benefiting BP and its shareholders as a whole.

Quite significantly, the authorities cited in the Moore Declaration actually support the proposition that this Action meets the test of Section 263. For instance, the plaintiff in *Kiani v. Cooper*, [2010] EWHC 577 sought permission from the court to continue an action for breach of fiduciary duty stemming from the director defendant's assertion that he was a creditor of the company and his transfer of corporate funds to a company whose shares were registered in the name of defendant's secretary. *Kiani*, ¶¶17, 23, 32. Justice Proudman, in granting permission for the case to proceed to the disclosure phase, found that Section "263(a)(2) will apply where the court is satisfied that *no* director acting in accordance with Section 172 would seek to continue the claim. If some directors would, and others would not, seek to continue the claim, the case is one for application of Section 263(3)(b)." *Id.* ¶13. Taking into account the size of the claim, the court held that a director acting in accordance with his Section 172 duties would proceed with the action and therefore dismissal under Section 263(3) was inappropriate *Id.* ¶¶44-46. Applying the factors to be considered under Section 263(3), the court held that the plaintiff was acting in good faith, the alleged harm to the company supported the filing of a derivative action and the notional director acting in accordance with his Section 172 duties would seek to continue the claim. *Id.* ¶¶41-46.

Likewise, the court in *Stainer v. Lee*, [2010] EWHC 1539, granted permission for a derivative action challenging the defendants' decision to allow the company to lend millions of dollars to a special purpose vehicle owned by the company's controlling shareholder without shareholder approval. *Stainer*, ¶15, 30. As in *Kiani*, the *Stainer* court held that Section 263(2)(a) only applies where *no* director acting in accordance with Section 172 would seek to continue the

claim. *Id.* ¶28. The court added:

> [U]nder section 263(3)(b), as regards the hypothetical director acting in accordance with the section 172 duty, if the case seems very strong, it may be appropriate to continue it even if the likely level of recovery is not so large, since such a claim stands a good chance of provoking an early settlement or may indeed qualify for summary judgment. On the other hand, it may be in the interests of the Company to continue even a less strong case if the amount of potential recovery is very large.

*Id.* ¶29. Justice Roth combined his application of the requirements of Sections 263(2) and 263(3)(b). The Court found the directors' failure to obtain interest over a 9 year period constituted very strong grounds for a breach of fiduciary duty claim that many directors would consider important to continue. *Id.* ¶¶34, 37. Turning to Section 263(3), Justice Roth pointed out that the factors set out in Section 263(3) are considered at the court's discretion and are not an absolute bar to granting permission. *Id.* ¶50. The Court granted permission for plaintiffs to proceed to the disclosure phase of the case because the (1) plaintiff was acting in good faith, as he was bringing the proceedings for the benefit of a large number of minority shareholders, (2) the theoretical availability of proceeding by way of another action was no reason to refuse permission, and (3) it was "hardly likely" that the two directors constituting the whole board, would "commence a financial claim against themselves." *Id.* ¶¶53, 55. Thus, even the recent precedent on which Mr. Moore relies illustrates why this Action should proceed.

Under Section 263(3)(d),[7] the Court should consider whether the act or omission giving rise to the action could be, and in the circumstances would likely be, ratified by the company. As discussed below, the allegations in the Complaint describe conduct that can not be ratified. By allowing BP to be run in a way that violated laws and endangered the life of the company and of others, *after* being repeatedly told not to, the individual defendants breached their duties to the

---

[7]      Section 263(3)(c) is inapplicable to this case.

Company. Such conduct could not be ratified.[8] Moreover, as set forth in the Adair Declaration, BP has not asked its shareholders to ratify the actions relating to the Deepwater Horizon. Adair Decl. ¶78. Accordingly, this factor also weighs strongly in favor of continuing this claim.

Under Section 263(3)(e), the court should consider whether the company has decided not to pursue the claim. BP has not and will not pursue these claims other than through this Action. In this case the individual defendants have moved to dismiss the claim, and have caused the company to join the motion in its status as a nominal defendant. That the company has nominally moved to dismiss reflects the individual defendants' control of the Board. As described in detail in the Complaint, the individual defendants' tenure on the Board spans the allegations contained in the Complaint, extending from the disaster at Texas City through the Deepwater Horizon catastrophe and to today. *See* Complaint ¶¶31-35, 37-46, 48-49, 91-94, 96-98, 100-101, 111-112, 116-125, 127-142, 150-151, 188-189; Pl. Br. at 13. Here again, the cases cited by Mr. Moore support the proposition that this Action should be allowed to proceed. As noted above, in deciding that the derivative claim should proceed, Justice Roth in *Stainer v. Lee*, [2010] EWHC 1539, noted that it was "hardly likely" that the two directors constituting the whole board would "commence a financial claim against themselves."

Under Section 263(3)(f), the final element relevant to this analysis is whether members could pursue the act or omission on which the claim is brought directly rather than on behalf of the company. This is no such case. The direct injury alleged is to the Company, not any particular member or members. Moreover, the relief sought would flow to the Company itself, not any particular member or members. *See also* Moore Decl. ¶¶9-10 (stating that the cause of action is vested only in the company).

---

[8]      *See infra* at Section IV.

14

### IV. PLAINTIFFS ALSO SATISFY THE STANDING REQUIREMENTS TO BRING THIS ACTION UNDER THE COMMON LAW

As summarized above and detailed in the Complaint, the conduct of the BP Board fits squarely with the types of illegal and/or *ultra vires* conduct that are incapable of ratification and therefore actionable under the common law. *See* Complaint ¶¶7, 11-12, 52-54, 77, 93-94, 101, 111, 117-119, 121-122, 125-129, 132, 137-138, 140-142, 150-152, 171, 188, 225-246; *see also* Pl. Br. at 22 n.15.

As Mr. Adair explained, acts which are either illegal or *ultra vires* cannot be ratified by shareholders—and thus fall well within the "unratifiability" exception of *Foss v. Harbottle*, [1843] 2 Hare 461.[9] Adair Decl. ¶62. Derivative actions alleging that illegal conduct has occurred or will occur have uniformly been allowed to proceed in the form of derivative actions brought by minority shareholders. *Id.* ¶¶65-66 (citing *Powell v. Kempton Park Racecourse Co.*, [1897] 2 QB 242, *Cockburn v. Newbridge Sanitary Steam Laundry Co.*, [1915] 1 IR 237, 254), and *Australian Agricultural Co. v. Oatmont Pty*, [1992] 8 ACSR 255).

In *Powell*, for example, a shareholder sued to enjoin the directors of a racetrack from making space available to bookies, in violation of the criminal law. The court ruled that it had jurisdiction to adjudicate the shareholders' derivative claims based on harm to the company. *Powell*, 2 QB 242, 268. Similarly, in *Cockburn*, the chief executive officer of a military contractor allegedly skimmed profits and paid kickbacks to obtain contracts for the company. When shareholders brought a derivative action seeking disgorgement back to the company, the court allowed the action to proceed, holding that the board could not have validly entered into

---

[9]      Under the general rule of *Foss*, derivative actions may not be maintained unless the circumstances fall into one of several exceptions. One of these exceptions involved acts which could not be ratified by shareholders (under the assumption that acts which *could* be ratified *might* later be, mooting the derivative action and proving it to have been a waste of resources).

illegal contracts tainted by bribery *ex ante*, so the theoretical possibility of *ex post* ratification made no sense. *See Cockburn*, 1 IR 237, 254 ("To do a thing which would have for its main object either the commission of a crime, or the aiding and abetting of a crime, or the hushing up of a crime, could not be in any way within the powers of a company, and a matter of 'internal management' in which the Court should not interfere.").

The *Oatmont* case discussed by Mr. Adair in paragraph 67 of his Declaration makes clear that conduct which is illegal, whether or not not *ultra vires* in a technical sense, was unratifiable and thus fell within the *Foss* exception. In *Oatmont*, the company violated a law prohibiting certain land purchases. The court made clear that if the conduct was plainly illegal, or known by the directors to be illegal, the *Foss* exception would apply. *See Oatmont*, [1992] 8 ACSR 255, ¶¶36-37 ("where the directors are acting in abuse of their powers by knowingly or recklessly acting contrary to the general law, as a result of which the company sustains loss, this breach of the directors' fiduciary duty could well give rise to a derivative action").

Furthermore, the leading legal treatises on British law recognize that illegal acts, "or at least certain classes of such acts," cannot be ratified and thus fit within the unratifiability exception of *Foss. See* Adair Decl. ¶¶68-70. Thus, *Palmer's Company Law* states that corporate shareholders "cannot either unanimously or by the required statutory majority, overcome prohibitions imposed on the company by the general law, the Companies Act or the company's articles . . . ." And *Gore-Brown on Companies* observes that among the categories of unratifiable acts is "[a]ny breach of duty which results in the company performing an act which it cannot lawfully do, either by virtue of the doctrine of *ultra vires* or on account of some prohibition imposed upon it by statute or general law." *Id.*

In response to the above law, and its application to the present facts, Defendants have misstated the facts. Of Cockburn, for example, Mr. Moore opines simply that it is "an Irish case . . . not binding on English courts." Moore Reply ¶67(c). *Cockburn* was decided in 1915, when Ireland was part of the United Kingdom, so it is just as binding as an English decision. Adair Decl. ¶66.[10] And decisions from post-independence Ireland, as from Australia (*Oatmont*) and other Commonwealth courts, although not binding on English courts, "are accorded great respect and not lightly ignored." Adair Decl. ¶66. Regarding *Palmer's* and *Gore-Brown*, Mr. Moore argues that treatises are not binding, sometimes wrong, and not as authoritative as case law. Moore Reply ¶¶61-54. But English decisions routinely rely on these treatises, including cases relied upon by Mr. Moore, and Mr. Moore never explains how, if at all, the treatises are wrong.

Notably, none of the cases Mr. Moore cites holds that a shareholder does not have standing to bring a derivative action against a Board that, as here, oversees illegal conduct. The cases Mr. Moore cites address only whether illegal acts are ***necessarily*** *ultra vires* vis-à-vis third parties, such that the company can avoid third party obligations by asserting the individual who bound the company to a contract, for example, was acting ultra vires.  In that context or similar contexts, the cases Mr. Moore identifies finds that illegality does not absolve the company of liability to third parties.  These cases shed no light on shareholder rights through derivative actions. To rely on them is simply to disregard the relevant point, which is that it is not only *ultra vires* acts that are unratifiable under *Foss*, but illegal acts as well. Defendants' objective is apparently to conflate and then disregard the *ultra vires* and illegality exceptions to the *Foss* rule.

---

[10]     Mr. Moore also castigates *Cockburn* as being in conflict with *Rolled Steel Products (Holdings) Ltd. v. British Steel Corp.*, [1986] Ch. 246, and *Arab Monetary Fund v. Hashim*, [1993] 1 Lloyd's Rep. 543 (appellate decision at [1996] Lloyd's Rep. 589). Moore Reply ¶67(b). But as discussed below, neither *Rolled Steel* nor *Arab Monetary Fund* supports Defendant's arguments.

For example, *Arab Monetary Fund v. Hashim*, [1996] 1 Lloyd's Rep. 589 (appellate decision), did *not*, as Mr. Moore states, address whether an illegal act is capable of ratification and falls within a *Foss* exception. Moore Reply ¶¶59, 68. The case was not a derivative action at all, but rather an action by an investment fund against one of its own officers. At issue was whether payments to the officer by the builder of the company' corporate headquarters in Dubai were bribes and were made with notice by the builder that they were *ultra vires* because not within the officer's capacity to accept, and hence were recoverable by the company from the builder in a direct action. The court held that the builder could not have been on notice that the payments to the officer were outside the powers of the company. The court did not address, and did not have to address, *Foss* or any of its exceptions. In addition, while the court held that unlawful acts could be within the corporate capacity (otherwise a company could never be found liable for them), the fact that a company can be held liable for an unlawful act is not the same thing as saying that it can ratify and adopt the unlawful acts of its directors.

Similarly, *Rolled Steel Products (Holdings) Ltd. v. British Steel Corp.*, [1986] Ch. 246, was not a derivative action and contained no discussion of *Foss* or its exceptions. The case was a direct action where a bankrupt entity sued to invalidate prior guarantee payments; at issue was simply whether the payments were *ultra vires*. Again, the case has nothing to say about whether or not an illegal act can be ratified.

Mr. Moore's other authorities also do not hold what he says they do. For example, Mr. Moore states that *Smith v. Croft (No. 2)*, [1988] 1 Ch. 114, holds that "general illegality does not constitute an exception" under *Foss*. Moore Reply ¶68. There was no such holding in *Smith*. There, the issue was whether certain payments to directors were or were not made in good faith, such as to come within the "fraud on the minority" exception of *Foss*. *Smith*, [1988] 1 Ch. at

18

157C, 166F. The opinion does not address whether the payments were illegal, much less whether they fell within an illegality or unratifiability exceptions. Moreover, the issue of whether the director payments were "criminally illegal (being theft, and possibly criminal fraud)," Moore Reply ¶68, was not addressed at all; these are just Mr. Moore's editorial insertions. Mr. Moore's insinuation that the court somehow addressed and rejected the illegality exception *sub silentio* is negated by the defendants' own argument in the case, which *conceded* that illegal acts were not ratifiable and hence fit within the *Foss* illegality exception. *See Smith*, [1988] 1 Ch. 114, 122G.

Similarly, while *Anderson v. Midland Railway Co.*, [1902] 1 Ch. 369, 377 (*see* Moore Reply ¶70), was brought as a derivative action, the only harm alleged to have been done was charging certain customers preferential rates, in violation or certain tariffs. Although the rates violated the tariff, the company itself arguably had suffered no harm from the rates. More significantly, the cited case contains no discussion of *Foss* or the illegality exception. Nor does the rampant illegality at issue here remotely compare to the comparatively trivial tariff violations in *Midland Railway*. Of no more benefit is Mr. Moore's citation of the Law Commission Consultation Paper Shareholder Remedies, which he cites as a purportedly exhaustive list of *Foss* exceptions and which does not include "illegality" as such. Moore Reply ¶45. But the "Consultation Paper" does not constitute a restatement of the law and, as Mr. Adair notes, was simply "a paper designed to provoke discussion and responses" for the purpose of the Law Commission's later, *finalized* "Report." Adair Decl. ¶87.[11]

This brings us to the American decision primarily relied upon by Defendants, *City of*

---

[11]     Similarly unavailing is *Prudential Assurance Co. v. Newman Industries Ltd. (No. 2)*, [1982] Ch. 204. *See* Moore Decl. ¶9; Moore Reply ¶¶17-18. In *Prudential*, the Court of Appeal pointedly *refrained* from issuing a holding to bind future courts on the subject of *any* exceptions to *Foss v. Harbottle. See Prudential*, [1982] Ch. 204, 220-21. Further, *Prudential* does not touch upon the illegality exception to *Foss*.

*Harper Woods Employees' Retirement System v. Olver*, 589 F.3d 1292 (D.C. Cir. 2009). *Harper Woods*, in which the D.C. Circuit, relying on identical arguments from Mr. Moore, held that *Foss* did not apply to give derivative standing to shareholders who made conclusory allegations regarding the payment of illegal bribes. *Harper Woods* should not, and need not, be followed by this Court.

First, the illegal conduct alleged in *Harper Woods* is entirely distinguishable from the conduct alleged in this Action. The plaintiffs in *Harper Woods* alleged bribes by BAE Systems, an English company, to Saudi prince Bandar (which happened to be wired through a U.S. bank) to obtain a valuable contract for the company. The conduct alleged there had an absurdly tenuous link to the United States. Moreover, the plaintiffs and their British law expert effectively conceded both that no harm had been done to BAE Systems and that the "essence" of the wrongs consisted only of mismanagement which were not actionable as a derivative claim under the common law. 589 F.3d at 1296-97, 1300. *Cf.* Complaint ¶224. It was largely on the strength of such concessions that the D.C. Circuit found the claims nonactionable. *See Harper Woods*, 589 F.3d at 1300-01.

By contrast, Defendants' breaches of duty in this Action are legion and have caused enormous and ongoing damage ***to the company*** (currently estimated at over $40 billion), as well as to the forum jurisdictions of Louisiana and the United States. Plaintiffs have consistently maintained that the Defendants' conduct far exceeds mismanagement. There simply can be no reasonable comparison between the conduct alleged in *Harper Woods* and the conduct alleged here. Moreover, unlike in *Harper Woods*, the illegality of the conduct at issue here is not merely

20

*alleged*,[12] it is irrebuttably *established* by the Company's multiple criminal guilty pleas and its repeated sanctions, in the hundreds of millions of dollars, by U.S. regulators. *See, e.g.*, Complaint ¶¶7, 12, 111, 151-152, 188.

Second, the D.C. Circuit also found that the plaintiff "has not convincingly demonstrated that English law finds illegal acts incapable of ratification by shareholders." *Harper Woods*, 589 F.3d at 1301. But the court depended for its analysis on declarations by Mr. Moore himself, which contained the same erroneous analysis based on inapposite authorities discussed above. For example, the D.C. Circuit accepted Mr. Moore's reliance on *Arab Monetary Fund* and *Rolled Steel Products. See id.* at 1301. But, as demonstrated above, neither *Arab Monetary Fund* nor *Rolled Steel* addressed *Foss* or was a derivative action at all, and neither had occasion to address the relevant issue of whether illegal conduct was ratifiable under *Foss*. The D.C. Circuit also accepted Mr. Moore's reliance on the Law Commission's tentative "Consultation Paper." *See id.* at 1301-02. Finally, the D.C. Circuit distinguished *Powell*, noting that *Powell* concerned only an injunction of future illegal conduct. Plaintiffs here, however, do seek to enjoin the BP Defendants from future violation of U.S. safety laws – just as in *Powell*. Complaint part X.(e). Moreover, Plaintiffs' other English and Commonwealth authorities—including *Cockburn*, *Oatmont*, *Palmer's*, and *Gore-Brown*—make clear that *past* misconduct is no more ratifiable than future misconduct. *See supra.*[13] Properly framed, the D.C. Circuit's conclusion should have

---

[12]     In *Harper Woods*, there was a single notice from regulators that the payments at issue could constitute a violation of the Foreign Corrupt Practices Act. There were no prior notices, much less prior fines, penalties, or criminal guilty pleas. Moreover, the D.C. Circuit found the complaint in *Harper Woods* to have asserted no more than "in conclusory terms, that the directors 'caused BAE to engage in a pattern and practice of making illegal and improper payments," etc. The D.C. Circuit continued, "These unsupported assertions are insufficient to charge the defendant directors with illegal acts." *Id.* at 1300-01. No similar characterization of conclusoriness is possible with respect to Plaintiffs' allegations here.

[13]     The D.C. Circuit also rejected the plaintiffs' independent argument that the illegal payments to Prince Bandar were *ultra vires* and hence fit within the *ultra vires* exception to *Foss*, but it did so solely on the strength of the fact that at BAE (as in *Arab Monetary Fund*), the company's memorandum of association had specifically

been that the plaintiffs had "not convincingly demonstrated that English law finds [*those*] illegal acts incapable of ratification by shareholders." *Harper Woods*, 589 F.3d at 1301.

Unlike the plaintiffs in *Harper Woods*, Plaintiffs here have thoroughly demonstrated, with the assistance of Mr. Adair, that where Plaintiffs seek to recover damages for the company, based on harm done to the company by the individual defendants, the illegal conduct (as alleged in the Complaint) is *not* susceptible of ratification. The plaintiffs in *Harper Woods* did not, and could not, make such a point. In any event, the D.C. Circuit's interpretation of U.K. law is not binding on this Court, especially insofar as it contains conclusions on foreign law. *See* Fed.R.Civ.P. 44.1.

## V. PLAINTIFFS REQUEST JURISDICTIONAL DISCOVERY

Directors who breach their fiduciary duties cause effects in those places where the corporation has major business operations, and are therefore subject to specific personal jurisdiction there. *See In re Infosonics Corp. Deriv. Litig.*, No. 06-1336, 2007 WL 2572276, at *4-5 (S.D. Cal. Sept. 4, 2007) (holding in a derivative suit that director defendants of a Maryland company were subject to specific personal jurisdiction in California, where their breaches of duty had caused harm in the location of the company's principal place of business); *see also, Mehlenbacher ex rel. Asconi Corp. v. Jitaru*, No. 6:04-1118, 2005 WL 4585859 (M.D. Fla. 2005) (holding that the court had specific personal jurisdiction over a defendant director of a Nevada corporation, where the complaint alleged that the director breach his fiduciary duty, thereby harming the corporation which maintained a principal place of business in Florida, even though the defendant director had never visited Florida). "Even an act done outside the state that

authorized it to provide compensation in return for services rendered in the conduct of its business. No argument is possible here, of course, that BP's memorandum of association authorized it to disregard U.S. safety and environmental laws.

22

has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendants' conduct." *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 628 (5th Cir. 1999).

Plaintiffs' Complaint describes how the Defendants' breaches of their fiduciary duties harmed not only the people and environment of the Gulf Coast, but also harmed the company's reputation and critical business operations and shareholders, ***here, in Louisiana, Texas, and the United States***. Complaint ¶¶247-272. BP is the largest leaseholder and the largest oil producer in the Gulf. Complaint ¶216. The nerve center for BP's Gulf of Mexico drilling operations is located on the Texas and Louisiana Gulf Coast. Complaint ¶¶214, 216. BP's Gulf of Mexico Training and Competence center, which focuses specifically on Health, Safety, Security and Environment and is also home to BP's disaster response center (the "Joint Information Center") is in Houma, Louisiana. BP's operational shorebase for its Gulf of Mexico operations is in Port Fourchon, Louisiana.

In connection with these operations, BP's Board received persistent warnings of deficiencies in process safety, particularly deficiencies in U.S. operations where BP conducts the vast majority of its operations. Complaint ¶¶7, 10-15, 119, 134, 186-188, 214. Notably, in contrast with defense counsel's assertion to the contrary at argument, the Complaint alleges that Defendants specifically approved the Macondo well anyway, knowing that the project pushed the technological envelope. Hearing Tr. at 102 ("it's not true and it's not alleged in the complaint that the directors approved the Macondo drilling site"); *cf.* Complaint ¶¶17-18 ("In 2009, the Board approved an exploration plan to drill for oil in the Macondo project"). And in spite of multiple regulatory filings claiming the contrary, Defendant Tony Hayward belatedly

acknowledged that BP did not have the resources to respond once the project resulted in disaster. Complaint ¶¶18, 171.

Under the facts of this case, Plaintiffs have established that Defendants are subject to specific personal jurisdiction in both Louisiana and in Texas.[14] Plaintiffs expect that jurisdictional discovery will further demonstrate how the individual Defendants made personal inspections of BP's Louisiana and Gulf Coast operations, knew of the safety and technological difficulties affecting deepwater drilling and the Macondo well in particular, knew of BP's deficient compliance with U.S. regulatory standards, and moved forward with the Macondo project despite the dangers. Accordingly, Plaintiffs expect that jurisdictional discovery will conclusively establish that Defendants' actions constituting the breaches of their fiduciary duties to BP caused effects here such that the exercise of specific jurisdiction over the defendants is warranted.

## VI. CONCLUSION

For the above reasons, Plaintiffs' Request for Jurisdictional Discovery should be granted and Defendants' Motion to Dismiss should be denied.

Dated: August 31, 2011                                    Respectfully submitted,

                                                          AJAMIE LLP

---

[14]    Plaintiffs note the directors of BP have already been held subject to specific personal jurisdiction in a derivative action in Alaska for similar reasons. *See In re BP p.l.c. Derivative Litig.*, No. 3AN-06-11929CI, 2007 WL 4913136. In that case, the Court conditionally granted such jurisdictional discovery, but later mooted the issue by rejecting BP's personal jurisdiction arguments outright.

24

By: */s/ **Thomas R. Ajamie**___
Thomas R. Ajamie
Texas Bar No. 00952400
Dona Szak
Texas Bar No. 19597500
Pennzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, TX 77002
Tel.: (713) 860-1600
Fax: (713) 860-1699

**ATTORNEY-IN-CHARGE:**

BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP
By: */s/ **Mark Lebovitch**___
Mark Lebovitch
*Attorney-in-Charge*
Jeroen van Kwawegen
John Alden Meade
1285 Avenue of the Americas
New York, NY 10019
Tel.: (212) 554-1400
Fax: (212) 554-1444
**Plaintiffs' Co-Lead Counsel**

**ATTORNEY-IN-CHARGE:**
KAHN SWICK & FOTI, LLC
By: */s/ **Lewis S. Kahn**___
Lewis S. Kahn
*Attorney-in-Charge*
Albert M. Myers
Michael A. Swick
Melinda A. Nicholson
206 Covington Street
Madisonville, Louisiana 70447
Tel.: (504) 455-1400
Fax: (504) 455-1498
**Plaintiffs' Co-Lead Counsel**

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
Gregory M. Nespole
Robert B. Weintraub
270 Madison Avenue
New York, NY 10016
Tel.: (212) 545-4600

BARRACK, RODOS & BACINE
Mark R. Rosen
Two Commerce Square
2001 Market Street
Suite 3300
Philadelphia, PA 19103
Tel: (215) 963–0600

CHIMICLES & TIKELLIS LLP
Pamela S. Tikellis
Scott M. Tucker
Tiffany J. Cramer
222 Delaware Avenue, Suite 1100
P.O. Box 1035
Wilmington, Delaware 19899
Tel.: (302) 656-2500

Stephen R. Basser
One America Plaza
600 West Broadway, Suite 900
San Diego, California 92101
Tel.: (619) 230-0800
A. Arnold Gershon
425 Park Avenue, Suite 3100
New York, NY 10022
Tel. (212) 688-0782

*Co-Chairs of the Executive Committee*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Supplemental Brief in Opposition to Defendants' Motion to Dismiss has been served through the Court's electronic filing and notification system on August 31, 2011.

*/s/ Thomas R. Ajamie*
Thomas R. Ajamie